Trenton H. Norris (California State Bar No. 164781)
Sarah Esmaili (California State Bar No. 206053)
ARNOLD & PORTER LLP
90 New Montgomery Street, Suite 600
San Francisco, CA  94105
Telephone:  (415) 356-3000
Facsimile:  (415) 356-3099
Email:  trent.norris@aporter.com
Email:  sarah.esmaili@aporter.com

Peter L. Zimroth (*pro hac vice*)
Kent A. Yalowitz (*pro hac vice*)
Nancy G. Milburn (*pro hac vice*)
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY  10022
Telephone:  (212) 715-1000
Facsimile:  (212) 715-1399
Email:  peter.zimroth@aporter.com
Email:  kent.yalowitz@aporter.com
Email:  nancy.milburn@aporter.com

Attorneys for Plaintiff
CALIFORNIA RESTAURANT ASSOCIATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION, <br><br> Plaintiff, <br><br> v. <br><br> THE COUNTY OF SANTA CLARA and THE SANTA CLARA COUNTY PUBLIC HEALTH DEPARTMENT, <br><br> Defendants. | No. CV-08-03685 CW <br> (Related to No. CV-08-03247 CW) <br><br> **PLAINTIFF'S AMENDED NOTICE OF MOTION AND MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Hearing Date:    August 28, 2008 <br> Hearing Time:    2:00 p.m. <br> Courtroom:        Courtroom 2, 4th Floor <br><br> The Honorable Claudia Wilken <br><br> Complaint filed:  July 22, 2008 <br> Notice of Removal filed:  August 1, 2008 |

1

## **AMENDED NOTICE OF MOTION AND MOTION**

2      PLEASE TAKE NOTICE <u>AS AMENDED</u> that on August 28, 2008 at 2:00 p.m., or as soon

3   thereafter as the matter may be heard, in the courtroom of the Honorable Claudia Wilken, located in

4   Courtroom 2, 4th Floor, of the Oakland Division of the United States District Court for the Northern

5   District of California, at 1301 Clay Street, Oakland, California, Plaintiff California Restaurant

6   Association ("Plaintiff" or "CRA") will move, and hereby moves, for an order granting Plaintiff a

7   declaratory judgment and preliminary injunction in Plaintiff's action pursuant to 42 U.S.C. § 1983

8   and California Code of Civil Procedure § 1060 enjoining the Santa Clara County Public Health

9   Department from enforcing Santa Clara County's Ordinance No. NS-300.793 on grounds of federal

10  preemption, state preemption and violation of the right to freedom of speech guaranteed by the First

11  Amendment of the United States Constitution and article I, section 2 of the California Constitution.

12      This Amended Notice of Motion and Motion and the supporting papers herewith are filed

13  pursuant to the Court's August 15, 2008 Order Granting Plaintiff's Administrative Motion for an

14  Expedited Briefing Schedule.

15      This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and

16  Authorities submitted in support of the Motion, the Appendix of Exhibits in support of the Motion,

17  the Declaration of Michael Andres, the Declaration of Debra DeMuth and the exhibits thereto, the

18  Declaration of William Holmberg and the exhibit thereto, the Declaration of Stephanie Quirantes

19  and the exhibits thereto, the Declaration of Scott Randolph, the papers and pleadings on file in this

20  action and upon such further briefs, evidence and oral argument as may be presented to the Court in

21  connection with this Motion.

22  Dated: August 18, 2008                          ARNOLD & PORTER LLP

23

24

25                                      By:    _____/s/_____

26                                             Trenton H. Norris
                                               Attorneys for Plaintiff
27                                             CALIFORNIA RESTAURANT
                                               ASSOCIATION

28

# TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ...............................................................................................1

    A.  Nutritional Information in Restaurants ................................................................1

    B.  Santa Clara County Ordinance No. NS-300.793 ...............................................1

    C.  No Evidentiary Support for the Ordinance ........................................................2

SUMMARY OF ARGUMENT ......................................................................................4

LEGAL STANDARD ....................................................................................................5

ARGUMENT .................................................................................................................6

I.    Federal Law Preempts the Ordinance ................................................................6

    A.  Overview of the Nutrition Labeling and Education Act of 1990........................6

    B.  Under the NLEA, Statements Describing the Amount of Calories Are "Claims"...............7

    C.  Under FDA Regulations, Statements Describing the Amount of Calories Are "Claims".......................................................7

    D.  Restaurants Have Flexibility in Disclosing Nutritional Information ...................8

    E.  The NLEA Preemption Provision Applies to the Ordinance ...............................9

    F.  Theories Advanced in *NYSRA* Are Inconsistent with the NLEA and the FDA's Regulatory Definition of "Claim"...............................................9

        1.  NLEA and FDA Regulations Do Not Distinguish Between Qualitative and Quantitative Statements...........................................10

        2.  Definition of "Claim" Does Not Distinguish Between Voluntary and Mandatory Statements................................................12

        3.  21 U.S.C. § 343(r)(1) Does Not "Carve Out" Certain Claims from the Reach of That Provision.......................................13

    G.  Plaintiff's Interpretation Harmonizes Requirements of the NLEA....................18

II.    The California Retail Food Code Preempts the Ordinance......................................19

III.    The Ordinance Violates the First Amendment Rights of Plaintiff's Members...........................20

    A.  The Ordinance Will Cause Irreparable Harm by Impermissibly Compelling Speech...............................................20

    B.  Plaintiff Is Likely to Succeed on the Merits.....................................................22

        1.  The Ordinance Fails Under *Central Hudson* .............................................23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

a.   The Ordinance Does Not Advance the County's Asserted Interest in Preventing Obesity in a "Direct and Material Way" ................................................ 23

b.   The Ordinance's Infringement on Speech Is More Extensive Than Necessary to Serve the County's Asserted Interest ................................................ 24

2.   The Ordinance Fails Under *United Foods* ................................................ 25

3.   Rational Basis Review Is the Wrong Standard ................................................ 26

IV.   The Ordinance Violates the Free Speech Rights of Plaintiff's Members Guaranteed by the California Constitution ................................................ 28

CASE NO. CV-08-03685 CW
NOTICE OF MOTION AND MOTION FOR DECLARATORY RELIEF AND A PRELIMINARY INJUNCTION

1

## <u>TABLE OF AUTHORITIES</u>

2

<b><u>Page(s)</u></b>

3

<u>**Cases:**</u>

4

*Alaska Trojan Partnership v. Gutierrez,*
5
    425 F.3d 620 (9th Cir. 2005).......................................................................... 8, 14
6

*Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n.,*
    461 U.S. 375 (1983) ........................................................................................ 20
7

*ARP Pharmacy Servs., Inc. v. Gallagher Bassett Servs., Inc.,*
    138 Cal. App. 4th 1307 (2d Dist. (Div. 4) 2006) ........................................... 29
8

*Central Hudson Gas & Electric Corp. v. Public Serv. Commission of New York,*
9
    447 U.S. 557 (1980)............................................................................... passim
10

*Christensen v. Harris County,*
    529 U.S. 576 (2000) ........................................................................................ 14
11

*Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993)......................................................................................... 24
12

*Crown Pac. v. Occupational Safety & Health Review Comm'n,*
13
    197 F.3d 1036 (9th Cir. 1999) ........................................................................ 14
14

*Downey v. Crabtree,*
    100 F.3d 662 (9th Cir. 1996)........................................................................... 14
15

*Edenfield v. Fane,*
16
    507 U.S. 761 (1993) ................................................................................. 23, 27
17

*Elrod v. Burns,*
    427 U.S. 347 (1976)........................................................................................ 21
18

*English v. General Electric Co.,*
19
    496 U.S. 72 (1990) ........................................................................................... 6
20

*Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,*
    458 U.S. 141 (1982) .......................................................................................... 6
21

*Gerawan Farming, Inc. v. Kawamura,*
    33 Cal. 4th 1 (2004) ................................................................................... 5, 28
22

*Gerawan Farming, Inc. v. Lyons,*
23
    24 Cal. 4th 468 (2000) ................................................................................... 28
24

*Greater New Orleans Broad. Ass'n v. United States,*
    527 U.S. 173 (1999)......................................................................................... 24
25

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
26
    515 U.S. 557 (1995) ........................................................................................ 21
27

*International Dairy Foods Ass'n v. Amestoy,*
    92 F.3d 67 (2d Cir. 1996)......................................................................... 21, 22

28

**Page(s)**

*IT Corp. v. County of Imperial*,
   35 Cal. 3d 63 (1983) ................................................................................................ 5

*Johanns v. Livestock Mktg. Ass'n*,
   544 U.S. 550 (2005) .............................................................................................. 29

*Jones v. Rath Packing Co.*,
   430 U.S. 519 (1977) ................................................................................................ 6

*Kasky v. Nike, Inc.*,
   27 Cal. 4th 939 (2002) ......................................................................................... 28

*Lorillard Tobacco Co. v. Reilly*,
   533 U.S. 525 (2001) .............................................................................................. 24

*McDermott v. Wisconsin*,
   228 U.S. 115 (1913) ................................................................................................ 6

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ................................................................................................ 6

*National Electric Manufacturers Ass'n v. Sorrell*,
   272 F.3d 104 (2d Cir. 2001) ................................................................................ 26

*New York State Restaurant Ass'n v. New York City Board of Health*,
   509 F. Supp. 2d 351 (S.D.N.Y. 2007) ................................................. 7, 8, 10, 12

*New York State Restaurant Ass'n v. New York City Board of Health*,
   No. 08 Civ. 1000, 2008 WL 1752455 (S.D.N.Y. Apr. 16, 2008) ........................ 10, 12

*Pacific Gas & Electric Co. v. Public Utilities Comm'n of California*,
   475 U.S. 1 (1986) ........................................................................................... 21, 25

*Public Citizen, Inc. v. Shalala*,
   932 F. Supp. 13 (D.D.C. 1996) ........................................................................... 17

*Riley v. National Federation of the Blind of N.C., Inc.*,
   487 U.S. 781 (1988) .............................................................................................. 21

*Rubin v. Coors Brewing Co.*,
   514 U.S. 476 (1995) ........................................................................................ 24, 25

*Sammartano v. First Judicial District Court, in & for County of Carson City*,
   303 F.3d 959 (9th Cir. 2002) ............................................................................... 20

*Sherwin-Williams Co. v. City of Los Angeles*,
   4 Cal. 4th 893 (1993) ........................................................................................... 20

*United States v. Haggar Apparel Co.*,
   526 U.S. 380 (1999) ................................................................................................ 8

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ................................................................................................ 8

*United States v. United Foods, Inc.*,
   533 U.S. 405 (2001) ..................................................................................... passim

**Page(s)**

*White v. Davis,*
   30 Cal. 4th 528 (2003) ................................................................................. 5

*Wooley v. Maynard,*
   430 U.S. 705 (1977) ..................................................................................... 21

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,*
   471 U.S. 626 (1985) ...................................................................... 21, 26, 27

**Statutes, Rules and Other Administrative Materials:**

Nutrition Labeling & Education Act, Pub. L. No. 101-535, 106 Stat. 4501 (1990) ........ passim

21 U.S.C. § 321(k) ............................................................................................. 17

21 U.S.C. § 321(m) ............................................................................................ 17

21 U.S.C. § 343 ................................................................................................... 6

21 U.S.C. § 343(q) ....................................................................................... 6, 7, 15

21 U.S.C. § 343(r) ...................................................................................... passim

21 U.S.C. § 343-1(a) ................................................................................. passim

21 C.F.R. § 101.9 ....................................................................................... passim

21 C.F.R. § 101.10 ..................................................................................... passim

21 C.F.R. § 101.13 ..................................................................................... passim

21 C.F.R. § 101.45 ................................................................................... 8, 16

38 Fed. Reg. 2125 (Jan. 19, 1973) .................................................................. 6

41 Fed. Reg. 51001 (Nov. 19, 1976) ............................................................... 6

58 Fed. Reg. 2302 (Jan. 6, 1993) ............................................................ 11, 12

61 Fed. Reg. 40320 (Aug. 2, 1996) ................................................................ 17

Cal. Const. art. I, § 2 ................................................................................. 5, 28

Cal. Const. art. XI, § 7 ................................................................................... 19

Cal. Health & Safety Code § 113703 ......................................................... 4, 19

Cal. Health & Safety Code § 113705 ......................................................... 4, 19

Cal. Health & Safety Code § 114089 ......................................................... 4, 19

San Francisco Health Code §§ 468-468.8 ...................................................... 10

Santa Clara County Ord. Code §§ A18-351–366 ....................................... passim

- v -

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF FACTS

**A.    Nutritional Information in Restaurants**

Most restaurants in the unincorporated area of the County of Santa Clara publish no nutrition information at all about their food. Santa Clara County (the "County") does not wish to alter that fact. Instead, it has targeted a small number of restaurants that are affiliated with large chains—many of which have, for years, published comprehensive nutrition information about their food in brochures available at the restaurants, on posters, on packaging, on tray liners and on websites.[1] The County wants to alter the way in which these few targeted restaurants convey nutrition information and has passed a new law, Santa Clara County Ordinance No. NS-300.793 (the "Ordinance"), requiring them to display statements showing calories on their menu boards and, in some cases, calories, saturated fat, trans fat, carbohydrates and sodium on their menus.

These restaurants strongly disagree with the County's approach. They question the efficacy of the Ordinance in reducing obesity—the County's stated goal in passing the new law. They believe that there are better ways to communicate with their customers about health and nutrition, and that the new law may be counterproductive, with an overemphasis on a limited number of nutrients that can interfere with a healthy, balanced diet. *See, e.g.,* DeMuth Decl. ¶ 12; Quirantes Decl. ¶¶ 15-18. The restaurants' views are earnestly held and well grounded.

**B.    Santa Clara County Ordinance No. NS-300.793**

The Ordinance amends Division A18 of the Santa Clara County Ordinance Code to require chain restaurants within the unincorporated area of the County with 14 or more establishments in the State of California to make statements showing select nutritional information on their menu boards, menus and food tags in the precise manner prescribed by the law. On their menu boards

---

[1] *See, e.g.,* Declaration of Michael Andres in Support of Plaintiff's Motion for Declaratory Relief and a Preliminary Injunction, dated July 17, 2008 ("Andres Decl.") ¶ 4; Declaration of Debra DeMuth in Support of Plaintiff's Motion for Declaratory Relief and a Preliminary Injunction, dated July 16, 2008 ("DeMuth Decl.") ¶¶ 5-9; Declaration of William Holmberg in Support of Plaintiff's Motion for Declaratory Relief and a Preliminary Injunction, dated July 17, 2008 ("Holmberg Decl.") ¶ 3; Declaration of Stephanie Quirantes in Support of Plaintiff's Motion for Declaratory Relief and a Preliminary Injunction, dated July 15, 2008 ("Quirantes Decl.") ¶¶ 7-13.

and food tags, these restaurants must make statements showing calorie content next to each menu item, in a size and typeface at least as prominent as that used for the name or price of the menu item. Santa Clara County Ord. Code § A18-353(c)(i). On their menus, these restaurants must make statements showing calorie content, saturated fat, trans fat, carbohydrates and sodium next to or beneath each menu item, also in a size and typeface at least as prominent as that used for the name or price of the menu item. *Id.* § A18-353(b)(i). Menus must further include a clear and conspicuous statement of the recommend daily limits for both saturated fat and sodium in a 2,000 calorie daily diet. *Id.* § A18-353(b)(ii).[2] Failure to make these disclosures subjects restaurants to governmental sanction. *Id.* § A18-354.

The Ordinance has established an inflexible regime. The new law rigidly requires prominent display of calories on both menu boards and food tags and calories, saturated fat, trans fact, carbohydrates and sodium on menus. It applies equally to customized and combination offerings. In such cases, the new law requires the restaurants' statements to show a "range," minimum to maximum, of the possible calories for each size offered for sale. *Id.* § A18-353(d). These "range" postings have been criticized as not useful to customers. Holmberg Decl. ¶ 4; Declaration of Scott Randolph in Support of Plaintiff's Motion for Declaratory Relief and a Preliminary Injunction, dated July 16, 2008 ("Randolph Decl.") ¶ 11.

**C.**    **No Evidentiary Support for the Ordinance**

No one knows how to reverse the trend of increasing obesity in the United States. Even on subjects as seemingly simple as the communication of nutrition information and how (or whether) consumers use the information, there are questions but no answers. After more than a decade of comprehensive nutrition labeling on packaged foods mandated by federal law, the incidence of obesity continues to rise. With respect to the much more complicated issue of foods sold by the variety of restaurants in the United States, one recent government-sponsored report concluded that

---

[2] The Ordinance further requires the restaurants that use menu boards or food tags to make statements about calories, saturated fat, trans fat, carbohydrates and sodium in printed menus, pamphlets, brochures, posters or similar documents that are plainly visible to consumers at the point of ordering. Santa Clara County Ord. Code § A18-353(c)(ii).

1    there is no public health consensus on how consumers use nutrition information in restaurants or

2    whether such information could help reduce the incidence of obesity:

> There is a clear need for more research regarding how the provision
> of nutrition information, claims (such as "low calorie"), and symbols
> influence consumer preference and choice for away-from-home food
> consumption situations.  Of particular concern is how, when, and why
> consumers use nutrition information and claims during their decision-
> making processes.  More specifically, a better understanding is
> needed of the types of factors that moderate consumers' responses to
> the provision of nutrition information and claims for away-from-home
> foods.

9    *The Keystone Forum on Away-From-Home Foods: Opportunities for Preventing Weight Gain and*

10    *Obesity, Final Report*, The Keystone Center, Washington, D.C. (May 2006), at 13 ("Keystone

11    Report"), attached hereto as Appendix Exhibit I.  The Report suggests many unanswered questions:

12    How and where should information be provided?  Under what circumstances is current behavior

13    influenced and under what circumstances is future behavior influenced?  For example, if consumers

14    consume an extra 100 calories at lunch, will they eat a lighter dinner?  Or, if they consume 100

15    fewer calories at lunch, will they replace these calories at other meals or between meals?  Will they

16    exercise more, or less?  *See* Keystone Report 84.

17        Dr. David Allison, one of the country's leading authorities on obesity, echoed this

18    conclusion in analyzing the efficacy of a regulation adopted by the New York City Board of Health,

19    which is similar to Santa Clara County's Ordinance.  Dr. Allison concluded, based on an extensive

20    review of the scientific literature, that no evidence supported the hope that posting calories on menu

21    boards would lead to reduced obesity:

> [T]here is no body of data showing that implementation of R81.50
> [New York City's regulation] would affect actual behavior or weight
> either in the short-term or long-term nor is there any body of evidence
> that the specific manner in which the R81.50 would require provision
> of caloric information would lead to better results in the short-term or
> long-term than any other method.  **Thus, I conclude that there is not
> competent and reliable evidence that providing restaurant
> patrons with calorie information on menu items will reduce
> individual or population levels of obesity.  Nor is there evidence
> that the method of providing caloric information mandated by
> R81.50 will reduce levels of obesity more than the methods**

**currently used by the affected restaurants to provide this
information.**

Exhibit E pp. 29-30 ("Allison Decl.") to DeMuth Decl. (emphasis in original).  Dr. Allison went on
to state that only "conjecture" could be drawn from the existing research.  *Id.* at 33.

## SUMMARY OF ARGUMENT

*First*, the Ordinance is preempted by federal law.  By its terms, the Nutrition Labeling and
Education Act of 1990 ("NLEA") subjects restaurants to regulations promulgated by the Food and
Drug Administration ("FDA") concerning "nutrition claims."  21 U.S.C. § 343(r)(2); *see* 21 C.F.R.
101.13(b)(1).  Further, that federal statute expressly preempts state laws like the Ordinance, in
which a state or local entity "directly or indirectly" establishes any requirement respecting nutrition
claims that is "not identical" to the regulatory requirements of federal law.  21 U.S.C. § 343-1(a)(5).
Because the Ordinance imposes food labeling requirements different from (*i.e.* not "identical to")
the federal regulations, it is expressly preempted by the NLEA and void under the Supremacy
Clause.

*Second*, the Ordinance is also preempted by California state law.  The California Retail Food
Code, Cal. Health & Safety Code § 113703 *et seq*. ("CRFC"), fully occupies the field of "health and
sanitation standards for retail food facilities . . . ."  Cal. Health & Safety Code § 113705.  The
"whole field" occupied by the CRFC includes the labeling of food in restaurants, including nutrition
information.  *See* Cal. Health & Safety Code § 114089(a), (b)(5).  The requirements of the
Ordinance thus fall within this fully occupied field of state regulation.

*Third*, the Ordinance violates the First Amendment rights of Plaintiff's members by
compelling them to speak and to convey a viewpoint with which they do not agree.  The Supreme
Court has consistently reviewed burdens on lawful and non-misleading commercial speech by
requiring the government to prove that its regulation will directly advance a substantial public
interest in a manner that is narrowly drawn to achieve the government's objective.  *Central Hudson
Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 564 (1980).  More recently,
the Supreme Court has questioned whether this level of intermediate scrutiny is adequate to protect
commercial speech and has applied even stricter scrutiny to laws that compel commercial speech.

1  *United States v. United Foods, Inc.*, 533 U.S. 405, 409-11 (2001).  The Ordinance cannot survive

2  under either standard of review.

3        Under *Central Hudson*, the County cannot carry its burden of demonstrating that the

4  Ordinance will be effective in advancing the County's stated purpose of reducing obesity rates.

5  Additionally, under *Central Hudson*, the County cannot explain why reasonable and less

6  burdensome alternatives would be ineffective.  The Ordinance also cannot pass muster under the

7  holding of *United Foods.*  There, the Supreme Court held that, even in the context of commercial

8  speech, the government may not force a private party to convey the *government's* message as if it

9  were the private party's message when the private party wants to convey a different message or no

10  message at all.

11        *Fourth*, the Ordinance violates Plaintiff's free speech rights guaranteed by Article I, section

12  2 of the California Constitution.  Article I's free speech clause, which is "broader and greater" than

13  the First Amendment, affords *at least* intermediate scrutiny (*i.e.*, *Central Hudson*) to cases

14  implicating free speech rights of commercial speakers.  *Gerawan Farming, Inc. v. Kawamura*, 33

15  Cal. 4th 1, 15, 22 (2004) (internal quotations omitted).  Thus, under this standard, the Ordinance

16  violates the Plaintiff's members' free speech rights guaranteed by the California Constitution.

17  **LEGAL STANDARD**

18        Generally, a court determining whether to issue a preliminary injunction looks at two

19  interrelated factors.  *See White v. Davis,* 30 Cal. 4th 528, 554 (2003) (citing *IT Corp. v. County of*

20  *Imperial*, 35 Cal. 3d 63, 69-70 (1983)).  First, the court considers the likelihood that the plaintiff

21  will prevail on the merits at trial.  *Id*.  Second, the court balances the interim harm that the plaintiff

22  is likely to sustain if an injunction is denied with the harm that the defendant may suffer if an

23  injunction is issued.  *Id*.  "The ultimate goal of any test to be used in deciding whether a preliminary

24  injunction should issue is to minimize the harm which an erroneous interim decision may cause."

25  *IT Corp.*, 35 Cal. 3d at 73.

26

27

28

**ARGUMENT**

I.    **FEDERAL LAW PREEMPTS THE ORDINANCE**

The Supremacy Clause permits Congress to preempt any state law that conflicts with the exercise of federal power. "Pre-emption fundamentally is a question of congressional intent and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990) (citation omitted). Federal regulations "have no less a pre-emptive effect than federal statutes." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Enforcement of a preempted law imposes irreparable harm. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

A.    **Overview of the Nutrition Labeling and Education Act of 1990**

The federal government has been regulating the labeling of foods in interstate commerce since Congress enacted the Pure Food and Drug Act of 1906; and since that time, there have been state labeling laws that have been impliedly and expressly preempted by federal law. *See, e.g., McDermott v. Wisconsin*, 228 U.S. 115 (1913); *Jones v. Rath Packing Co.*, 430 U.S. 519, 540-43 (1977). For many years, the FDA has regulated nutrition labeling for foods in interstate commerce, including restaurant foods. *See* 38 Fed. Reg. 2125 (1973); 41 Fed. Reg. 51001 (1976).

In 1990, Congress enacted the Nutrition Labeling and Education Act. 21 U.S.C. §§ 301, 343, 343-1. The NLEA has two principal substantive provisions, each of which has a corresponding preemption provision. The provision relevant here requires the FDA to regulate health and nutrition "claims" made about food. 21 U.S.C. § 343(r). This power extends to all food in interstate commerce, including restaurant food (with limited exceptions not applicable here). 21 U.S.C. § 343(r)(5)(B). State laws about making nutrient content claims in the labeling of food— including restaurant food—are preempted to the extent that they impose requirements that are not identical to the federal regulatory regime. 21 U.S.C. § 343-1(a)(5).

Another provision of the NLEA sets forth detailed requirements for nutrition information labels (*i.e.*, the familiar "Nutrition Fact Panel" on packaged food). 21 U.S.C. § 343(q). The NLEA does not require restaurants to post nutrition information labels, and restaurant food is excluded

1    from operation of the corresponding express preemption provision.  21 U.S.C. §§ 343(q)(5)(A),

2    343-1(a)(4).

3           Thus, the dispositive preemption issue is this:  when restaurants post statements of

4    nutritional amount on their menus—*e.g.*, "100 calories"—are such statements "claims" within the

5    meaning of the NLEA and implementing regulations?  *See* 21 U.S.C. § 343(r)(1); 21 C.F.R.

6    § 101.13(b)(1).  If so, they are covered by the express preemption provision that corresponds to

7    subsection 343(r), and non-identical state laws are preempted.  21 U.S.C. § 343-1(a)(5).  If the

8    statements are not "claims" within the meaning of the statute, state laws about them are not

9    preempted by the NLEA's express preemption provisions.  21 U.S.C. § 343-1(a)(4).

10          **B.     Under the NLEA, Statements Describing the Amount of Calories Are "Claims"**

11          Subsection (r) declares food "misbranded" if it bears a "claim" unless the claim comports

12   with applicable regulations.  *See* 21 U.S.C. §§ 343(r)(1), (r)(2)(A)(i).  The statute goes on to instruct

13   the FDA to promulgate regulations that "permit statements describing the amount and percentage of

14   nutrients in food which are not misleading and are consistent with the terms defined in [§ 343(r)]."

15   NLEA, Pub. L. No. 101-535, § 3(b)(1)(A)(iv), 106 Stat. 4501 (set out in Historical Notes to 21

16   U.S.C.A. § 343).  Thus, Congress specifically intended that the FDA promulgate regulations

17   governing "statements describing the amount" of calories and other nutrients—such as "100

18   calories."  Such statements are "claims" under the statute if they meet the FDA's regulatory

19   definitions of "claims."

20          **C.     Under FDA Regulations, Statements Describing the Amount of Calories Are**
21                   **"Claims"**

22          Consistent with these statutory directives, FDA regulations confirm that a statement

23   describing the amount of calories in numerical terms is a "claim" within the meaning of the statute

24   and regulations.  In 21 C.F.R. § 101.13(b)(1), the FDA defines an "expressed nutrient content

25   claim" as "any direct statement about the level (or range) of a nutrient in the food, e.g., 'low

26   sodium' or **'*contains 100 calories*.'**"  21 C.F.R. § 101.13(b)(1) (emphasis supplied).  Thus, the

27   statement "contains 100 calories" is a claim.  *See New York State Rest. Ass'n v. New York City Bd.*

28   *of Health,* 509 F. Supp. 2d 351, 359-60 (S.D.N.Y. 2007) ("*NYSRA I*") ("[The definition in Section

1    101.13(b)(1)] appears to cover both an obvious characterization ('low sodium') as well as a simple

2    statement about the amount of a nutrient in a food ('contains 100 calories')....Thus the FDA

3    regulations treat a simple factual statement as to a nutrient amount as within the scope of § 343(r)

4    and subject to (although expressly permitted by) FDA regulations.").

5           The FDA's regulations, promulgated after notice and comment, are of "controlling weight,"

6    *United States v. Haggar Apparel Co.*, 526 U.S. 380, 392 (1999), "binding in the courts unless

7    procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute."

8    *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); *see Alaska Trojan P'ship v. Gutierrez*, 425

9    F.3d 620, 628 (9th Cir. 2005) ("When a statute or regulation defines a term, that definition controls,

10   and the court need not look to the dictionary or common usage.").

11          **D.      Restaurants Have Flexibility in Disclosing Nutritional Information**

12          The FDA has promulgated a special rule for nutrient content claims by restaurants.  21

13   C.F.R. § 101.10.  The rule expressly grants restaurants flexibility to present accurate information

14   concerning nutrient claims in any reasonable manner:

15                  Nutrition labeling in accordance with § 101.9 [specifying nutrition
                    facts required on labels] shall be provided upon request for any
16                  restaurant food or meal for which a nutrient content claim . . . is
                    made, except that information on the nutrient amounts that are the
17                  basis for the claim (e.g., "low fat, this meal provides less than 10
                    grams of fat") may serve as the functional equivalent of complete
18                  nutrition information as described in § 101.9.  Nutrient levels may be
                    determined by nutrient data bases, cookbooks, or analyses or by other
19                  reasonable bases that provide assurance that the food or meal meets
                    the nutrient requirements for the claim.  Presentation of nutrition
20                  labeling may be in various forms, including those provided in
                    § 101.45 [concerning certain unprocessed foods] and other reasonable
21                  means.

22

23   21 C.F.R. § 101.10.  Thus, the FDA has given restaurants great flexibility to decide how to

24   communicate nutrient information to customers and how to determine nutrient levels.  For example,

25   a restaurant may communicate nutrition information through in-store signs, posters, brochures,

26   notebooks or charts, as contemplated in 21 C.F.R. § 101.45.  Restaurants also may communicate

27   nutrition claims through various "Nutritional Facts" formats set out in 21 C.F.R. § 101.9.

28

Section 101.10 allows restaurants to present nutrition information through "other reasonable means" as well.

### E.    The NLEA Preemption Provision Applies to the Ordinance

The NLEA expressly preempts state laws like Santa Clara County's Ordinance, in which a state or local entity "directly or indirectly" establishes any requirement respecting nutrition "claims" that is "not identical to" the regulatory requirements of federal law.  21 U.S.C. § 343-1(a)(5). Because the Ordinance imposes requirements different from (*i.e.*, "not identical to") the federal regulations, it is expressly preempted by the NLEA and void under the Supremacy Clause.

The preemption statute provides, in part:

> no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce —
>
> * * *
>
> (5) any requirement respecting any claim of the type described in section 343(r)(1) of this title, made in the label or labeling of food that is ***not identical to*** the requirement of section 343(r) of this title, except a requirement respecting a claim made in the label or labeling of food which is exempt under section 343(r)(5)(B) [concerning certain kinds of claims by restaurants about cholesterol, saturated fat and dietary fiber and nutrients determined by the FDA to increase the risk of disease]….

21 U.S.C. § 343-1(a)(5) (emphasis supplied).

There can be no doubt that the Ordinance imposes requirements "respecting any claim of the type described in section 343(r)(1)" because statements of the amount of calories, saturated fat, trans fat, carbohydrates and sodium ***are*** nutrient content "claims."  And the Ordinance imposes requirements not "identical" to those of the federal law and its accompanying regulations.  21 C.F.R. § 101.10.  In contrast to the significant flexibility afforded by § 101.10, the County dictates the content and presentation of nutritional claims.

### F.    Theories Advanced in *NYSRA* Are Inconsistent with the NLEA and the FDA's Regulatory Definition of "Claim"

Santa Clara County's Ordinance is not the first of its kind.  New York City promulgated a

1  similar regulation in December 2006.[3]  After a federal district court struck down that regulation on

2  preemption grounds (*NYSRA I*, 509 F. Supp. 2d at 362-63), New York passed a revised version.

3  The district court then upheld the revised regulation.  *See New York State Rest. Ass'n v. New York*

4  *City Bd. of Health*, No. 08 Civ. 1000, 2008 WL 1752455 (S.D.N.Y. Apr. 16, 2008) ("*NYSRA II*").

5  The decision in *NYSRA II* is on appeal to the Second Circuit.

6       In the *NYSRA* cases, New York City and its *amici* have advanced three theories against

7  preemption.  These theories all center on the question whether a statement of nutritional amount—

8  *e.g.*, "100 calories"—is a "claim" within the meaning of the statute and regulations.  *First*, New

9  York City argued that only *qualitative* statements (*e.g.* "low in fat") should be considered "claims"

10  and that *quantitative* statements (*e.g.*, "100 calories") should not be considered "claims" under the

11  statute.  The District Court rejected that theory in *NYSRA I*.  *Second*, New York City argued that

12  statements of nutrition "mandated" by a state or municipality are not "claims."  Although the

13  District Court in *NYSRA II* adopted that theory, New York City effectively abandoned it on appeal.

14  *Third*, the Second Circuit invited the FDA to file an *amicus* brief.  Although the FDA agreed that

15  these first two arguments are incorrect, the FDA offered a third argument against preemption:  there

16  is a provision of the NLEA that excludes from the category of "claims" statements of nutrient

17  amounts that appear as part of Nutrition Fact Panels; and that provision should also apply to

18  statements on restaurant menus.  (The Second Circuit has yet to rule on this theory.)  We discuss

19  these theories below.

20
21  **1.    NLEA and FDA Regulations Do Not Distinguish Between Qualitative and Quantitative Statements**

22       The first theory offered by New York City was that the statement "100 calories" is not a

23  "claim" within the meaning of the NLEA because it is a "quantitative" statement rather than a

24  "qualitative" statement.  This theory ignores the FDA's controlling regulations.  The FDA defines

25  an "expressed nutrient content claim" as "***any direct statement*** about the level (or range) of a

---

[3] The City and County of San Francisco enacted a comparable ordinance, Ordinance 40-08 (amending San Francisco Health Code §§ 468-468.8), on March 24, 2008.  On July 3, 2008, Plaintiff filed an action challenging the constitutionality of Ordinance 40-08 in the United States District Court for the Northern District of California.

1   nutrient in the food, e.g., 'low sodium' or '***contains 100 calories***.'" 21 C.F.R. § 101.13(b)(1)

2   (emphasis supplied).  "Any direct statement" is different from "any qualitative statement."

3   　　　The FDA did not merely define "claim" to include "any direct statement" such as "contains

4   100 calories."  It also went on to add regulations governing what are permissible and what are

5   impermissible express and implied claims.  Subsection 101.13(i) thus provides that a label "may

6   contain a ***statement*** about the ***amount*** or percentage of a nutrient," so long as "[t]he statement does

7   not in any way implicitly characterize the level of the nutrient in the food [such implicit

8   characterizations being subject to other subparagraphs] and it is not false or misleading in any

9   respect (e.g., '***100 calories***' or '***5 grams of fat***')."  21 C.F.R. § 101.13(i)(3) (emphasis supplied).  In

10  short, the FDA regulations promulgated under authority of subsection (r) define a "claim" to include

11  "contains 100 calories" and expressly permit a claim of "100 calories."

12  　　　Section 3(b)(1)(A)(iv) of the NLEA specifically instructed the FDA to promulgate such a

13  regulation—*i.e.*, one that would "permit statements ***describing the amount and percentage of***

14  ***nutrients*** in food which are not misleading and are consistent with the terms defined in [§ 343(r)]."

15  Pub. L. No. 101-535, § 3(b)(1)(A)(iv), 106 Stat. 4501 (emphasis supplied) (set out in Statutory Note

16  to 21 U.S.C.A. § 343).  This provision also instructs the agency that its regulations "shall identify

17  claims described in section [343(r)(1)(A)] which comply with section [343(r)(2)]."  *Id.*

18  § 3(b)(1)(A)(i).

19  　　　The FDA's notice of final rulemaking for these regulations confirms the agency's intent to

20  govern simple factual information like "100 calories."  During the notice and comment period, the

21  FDA was asked to *exclude* statements about "simple factual information" from the definition of

22  "nutrient content claim" on the theory that such a statement is not "a claim that 'characterizes the

23  level of any nutrient'" within the meaning of the statute.  58 Fed. Reg. 2302, 2303 (Jan. 6, 1993).

24  The comment argued that "a statement of the type contained in nutrition labeling—for example, that

25  a food contains 25 calories per serving…—is not a claim characterizing the level of the nutrient."

26  *Id.*  Based on the statutes discussed above, the FDA rejected that contention, embraced the view that

27  a quantitative factual statement about the amount of a nutrient is a "claim" that "characterizes the

28  level" of the nutrient within the meaning of the statute, and promulgated final and binding

- 11 -

regulations to that effect.   The comment had argued that section 403(r)(1) of the Act excluded from

the category of claims quantitative statements like those that appear in the Nutrition Fact Panel.  But

the FDA pointed out that the words of 403(r)(1) as well as the legislative history of the provision

> specifically state[] that the identical information [i.e., the identical
> information that would be required in the nutrition fact panel required
> by subsection (q)] will be subject to the descriptor requirements if it is
> included in a statement in another portion of the label (136 Cong-
> ressional Record H5841 (July 30, 1990)).... Furthermore, section
> 3(b)(1)(A)(iv) of the 1990 amendments provides that the mandated
> regulations "shall permit statements describing the amount and
> percentage of nutrients in food which * * * are consistent with the
> terms defined in section 403(r)(2)(A)(i) of such Act."  Again, if
> statements of the amount and percentage of nutrients were not subject
> to section 403(r)(1)(A) of the act, there presumably would have been
> no need for Congress to express its desire that such claims be
> permitted by the regulations.  Accordingly, FDA concludes that
> section 403(r)(1)(A) of the act and therefore these final regulations
> apply to statements of the amount of a nutrient in food as well as to
> statements of the level of a nutrient in food.

58 Fed. Reg. at 2303-04 (emphasis supplied).  The court in *NYSRA I* found these regulations

dispositive on this argument.  *NYSRA I*, 509 F. Supp. 2d at 359-60.

### 2.      Definition of "Claim" Does Not Distinguish Between Voluntary and Mandatory Statements

In deciding *NYSRA I*, the district court suggested in *dicta* that the NLEA's definition of

"claims" covers only "voluntary" statements, and that statements "mandated" by state law are not

"claims."  New York City altered its regulation as the *NYSRA I* court had suggested.  In *NYSRA II*,

the district court upheld the altered regulation.  *NYSRA II*, 2008 WL 1752455, at *5.

The district court's decision in *NYSRA II* that only "voluntary" statements are "claims"

under the NLEA ignores the FDA's regulatory definition of "claim" (which definition the district

court correctly found controlling in *NYSRA I*).  The "voluntary/mandatory" theory cannot be

reconciled with the FDA's dispositive definition.  The FDA's definition says that a "claim" is "***any***

direct statement."  21 C.F.R. § 101.13(b)(1).  It does not say that a "claim" is "any ***voluntary*** direct

statement."  Furthermore, the FDA's regulations *do* use the word "voluntary" in another section.  In

permitting (but not mandating) certain statements on the nutrition information fact panel, section

101.9 specifies that those "permitted" statements on the nutrition panel are "voluntary."  In each

instance, the word appears as "VOLUNTARY" in capital letters.  21 C.F.R. § 101.9(c).  In contrast, the word "voluntary" does *not* appear at all in the regulatory definition of claims, further emphasizing that "claim" is not limited to "voluntary" statements.[4]

Further, the purpose of a preemption statute is to preclude state mandates.  If the "voluntary/mandatory" distinction were accepted, the very thing the preemption statute is designed to prevent—state mandates—would be removed from the coverage of the statute by the very fact that the state mandates it.  A federal statute that expressly prohibits non-identical state mandates would become ineffective by the very fact that a locality adopts a non-identical state mandate.  That is not a sensible way to read a preemption statute.

Finally, the "voluntary/mandatory" distinction would lead to an anomalous conflict between state and federal law with regard to statements that all agree are "claims" under the NLEA.  Under the "voluntary/mandatory" theory, states or localities could mandate sellers of packaged foods to "disclose" on the front label the number of calories (or any other nutrient).  Similarly, if a state or locality were to "mandate" labeling of "low sodium" foods, the preemption statute would not apply because the statements would not be "voluntary" and thus would not be "claims" under the "voluntary/mandatory" distinction.  Yet it is beyond dispute that "low sodium" is a "claim" under the NLEA—one of the very examples used in the definition of expressed nutrient "claims" in section 101.13(b)(1) of the FDA's regulations.

### 3.   21 U.S.C. § 343(r)(1) Does Not "Carve Out" Certain Claims from the Reach of That Provision

At the request of the Second Circuit, the FDA submitted an *amicus* brief in the appeal of *NYSRA II*.  The FDA rejected the two theories advanced by New York City.  However, it came up with a third theory against preemption.  The FDA argued that the statement "100 calories" on a menu is not a "claim" because a portion of the statute "carves [it] out of the scope of nutrient

---

[4] Section 101.9(c) of the FDA's regulations lists those statements that <u>must</u> be on the fact panel and those that are permitted but not mandated.  The former include "calories."  The latter (non mandatory) are:  21 C.F.R. § 101.9(c)(1)(iii) (calories from saturated fat), (2)(iii) (polyunsaturated fat), (2)(iv) (monounsaturated fat), (5) (potassium), (6)(i)(A) (soluble fiber), (6)(i)(B) (insoluble fiber), (6)(iii) (sugar alcohol), (6)(iv) (other carbohydrates).

1   content claims." Brief of *Amicus Curiae* Food and Drug Administration at 12, *New York State*

2   *Restaurant Ass'n v. New York City Bd. of Health*, No. 08-1892-cv (2d Cir. May 29, 2008) ("FDA

3   Br."). According to the *amicus* brief, the carve-out appears in the unnumbered portion of section

4   343(r)(1), which provides, in part:

5               **[1]** A statement of the type required by paragraph (q) **[2]** that appears
            as part of the nutrition information required or permitted by such
6               paragraph is not a claim….

7   21 U.S.C. § 343(r)(1).

8               To come within the carve-out, the statement must meet both portions of the statutory

9   sentence. It is true that a statement such as "100 calories" is "[a] statement of the type required by

10  paragraph (q)." But such a statement in isolation on a menu does not "appear as part of the nutrition

11  information required or permitted by such paragraph." In its Second Circuit brief, the FDA argued

12  (incorrectly) that a statement of calories on the menu in a restaurant "appears as part of the nutrition

13  information required or permitted by such paragraph [(q)]" (21 U.S.C. § 343(r)(1))—and is

14  therefore "not a claim"—on the theory that a menu is "a place appropriate for such information at

15  the point of purchase." FDA Br. 12. The FDA's *amicus* brief warrants no deference, as it does not

16  comport with the statute or the FDA's regulations, is contrary to what the FDA said in its notice of

17  rulemaking (p. 12 *supra*) and was not "arrived at after, for example, a formal adjudication or notice-

18  and-comment rulemaking." *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000).[5]

19              Contrary to the FDA's *amicus* brief theory, the statute does not say "appears in a place

20  appropriate for such information at the point of purchase." It says "appears as part of the nutrition

21

22  [5] *See also Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 628, 630 (9th Cir. 2005) ("[a]n agency's
    interpretation of a regulation must 'conform with the wording and purpose of the regulation'";
23  rejecting agency's interpretation of regulatory term as it created internal inconsistency within the
    regulation as a whole) (citation omitted); *Crown Pac. v. Occupational Safety & Health Review*
24  *Comm'n*, 197 F.3d 1036, 1038-40 (9th Cir. 1999) ("we need not defer to the Secretary [of Labor]'s
    interpretation where an 'alternative reading is compelled by the regulation's plain language'";
25  declining to defer in the case before it, as the Secretary's construction "stretches the plain language
    of the regulation beyond its 'plain and natural' meaning") (citation omitted); *Downey v. Crabtree*,
26  100 F.3d 662, 666 (9th Cir. 1996) (where Bureau of Prison's program statements "are not subject to
    the 'rigors of the Administrative Procedure Act,'" they are, "only 'entitled to some deference'";
27  rejecting agency's interpretation of statutory term because, "[w]hen the Bureau's 'interpretation
    is...in conflict with the plain language of the statute, deference is [not] due'") (citations omitted;
28  alteration to text in original).

- 14 -

1    information required or permitted by such paragraph [(q)]." 21 U.S.C. § 343(r)(1).  An isolated

2    statement of nutritional amount does not "appear[] as part of the nutrition information required or

3    permitted by [subsection (q)]."  Subsection (q) does not require or permit such isolated statements.

4    Rather, it requires a comprehensive and uniform set of nutrition information, requiring the

5    presentation of *complete* nutrition information and permitting the inclusion of certain optional

6    nutrients (*e.g.*, potassium).  Subsection (q) reads, in part:  "nutrition information that provides—the

7    serving size, * * * the number of servings…per container, * * * the total number of calories…in

8    each serving, * * * the amount of the following nutrients:  [t]otal fat, saturated fat, cholesterol,

9    sodium, total carbohydrates, complex carbohydrates, sugars, dietary fiber, and total protein

10    contained in each serving, * * * [and] any vitamin, mineral, or other nutrient required [or permitted

11    by regulation]."  21 U.S.C. § 343(q)(1); *see* NLEA, Pub. L. No. 101-535, § 2(b)(1)(C) (1990) (set

12    out in historical notes after 21 U.S.C.A. § 343).  Isolated statements of calories or other nutrients do

13    not "appear as part" of the comprehensive nutrition information demanded by subsection (q).

14    Rather, they highlight the importance of limited aspects of the food.

15          Following enactment of the NLEA, the FDA promulgated a regulation implementing the

16    statutory text quoted above.  21 C.F.R. § 101.13(c).  The regulation represents the FDA's

17    interpretation of the statute and was promulgated after notice and comment.  That regulation

18    contains three elements controlling when the "carve out" applies and when it does not.  The

19    regulation provides:

20          **[1]** Information that is required or permitted by § 101.9…to be
21          declared in nutrition labeling, and **[2]** that appears as part of the
          nutrition label, is not a nutrient content claim and is not subject to the
22          requirements of this section.  **[3]** If such information is declared
          elsewhere on the label or in labeling, it is a nutrient content claim and
23          is subject to the requirements for nutrient content claims.

24    21 C.F.R. § 101.13(c) (emphasis supplied).  The County's Ordinance does not satisfy any of these

25    three elements.

26          **1.**      Section 101.13(c) makes clear that the "carve out" applies only to "[i]nformation that

27    is required or permitted by § 101.9…to be declared in nutrition labeling."  21 C.F.R. § 101.13(c)

28    (element **[1]** quoted above).  The FDA promulgated section 101.9 under instructions from Congress

that the agency ensure that the public can understand the "relative significance [of the information] in the context of a total daily diet."  NLEA, § 2(b)(1)(A) (set out in Historical and Statutory Notes to 21 U.S.C.A. § 343).  Section 101.9 thus specifies that the "nutrition information" to be declared in "nutrition labeling" must reflect uniformly determined serving sizes (§ 101.9(b)), must declare a uniform and comprehensive set of information (§ 101.9(c)), and must appear in specified formats (§ 101.9(d)).

The Ordinance fails to meet these requirements.  To begin, the Ordinance does not apply "per serving," but instead requires total number of calories, total number of grams of saturated fat, total number of grams of trans fat, total number of grams of carbohydrates and total number of milligrams of sodium.  Santa Clara County Ord. Code § A18-353(a).  The Ordinance requires menus to list the gross number of nutrients in any menu item—even an item intended to be shared.

In addition, the Ordinance requires only selected statements of nutritional amount, not the uniform set of nutrition information demanded in 21 C.F.R. § 101.9(c).  Section 101.9(c) states that "nutrition information" in nutrition labels and nutrition labeling "shall contain" a uniform set of nutrition information required by subsection (q) of the statute.  The required nutrients are:  calories, calories from fat, fat, saturated fat, trans fat, cholesterol, sodium, carbohydrate, dietary fiber, sugars, protein, vitamins and minerals.  21 C.F.R. § 101.9(c).  The regulation also specifies that "[n]o nutrients or food components other than those listed in this paragraph as either mandatory or voluntary may be included within the nutrition label."  *Id.*

Finally, section 101.9(d) sets out the formatting requirements for the presentation of the "[n]utrient information specified in paragraph (c) of this section."  21 C.F.R. § 101.9(d)(1).  The regulations include the familiar Nutrition Fact Panel as a "sample label [that] illustrates the provisions of paragraph (d) of this section."  21 C.F.R. § 101.9(d)(12).  The regulations also specify a format for "nutrition labeling information" for certain multiple items.  Such information "may be presented in charts with horizontal or vertical columns or as a compilation of individual nutrition labels."  21 C.F.R. § 101.45(a)(3).  Restaurants may present nutritional information in conformity with section 101.45.  *See* 21 C.F.R. § 101.10.  The Ordinance is different from these formatting

1  requirements.  It requires statements of nutritional amount "next to" each menu item, in the case of

2  menu boards, or  "next to or beneath" each menu item, in the case of menus.

3    Thus, the Ordinance fails to meet the first element of section 101.13(c).  It does not mandate

4  "information that is required or permitted by § 101.9…to be declared in nutrition labeling," because

5  it does not meet the serving size, uniform content, or formatting requirements of section 101.9.

6    **2.**    The Ordinance fails to meet the second element of section 101.13(c):  the statement

7  must "appear as part of the nutrition label."  The statute defines "labels" and "labeling."  The statute

8  defines a "label" as any "display of written, printed, or graphic matter ***upon the immediate***

9  ***container*** of any article."  21 U.S.C. § 321(k) (emphasis supplied).  In contrast, it defines "labeling"

10  more broadly—as "all labels ***and*** other written, printed, or graphic matter (1) upon any article or

11  any of its containers or wrappers, or (2) accompanying such article."  21 U.S.C. § 321(m) (emphasis

12  supplied).  Menus are not "labels," even though they are "labeling."  *See Public Citizen, Inc. v.*

13  *Shalala,* 932 F. Supp. 13, 16-17 (D.D.C. 1996); Food Labeling; Nutrient Content Claims and Health

14  Claims; Restaurant Foods, 61 Fed. Reg. 40320, 40322-23 (Aug. 2, 1996).

15    The regulation chose the word "label" for its second element, and a menu is not a "label."

16  Because a menu is not part of a "label," a statement on a menu cannot be part of a "nutrition label."

17  (Of course, the result would be the same if the regulation used the phrase "appears as part of the

18  nutrition label or the nutrition labeling," because the regulations repeatedly refer to "nutrition

19  labeling" to encompass the gamut of requirements under section 101.9.)

20    **3**.    The third element of the regulation provides that if the information is "declared

21  elsewhere on the label or in labeling, it is a nutrient content claim."  21 C.F.R. § 101.13(c) (element

22  **[3]** quoted above).  In other words, if the statement appears anywhere other than in the nutrition

23  labels, it *is* a "claim."  Recently, sellers of some packaged foods have begun listing the number of

24  calories per serving on the front panel of their foods—particularly in "100 calorie" packages of

25  snack foods.  The FDA agrees that, under the NLEA and its implementing regulations, these

26  statements—"100 calories"—are "claims."  FDA Br. 16.  It makes no sense that the isolated

27  statement "100 calories" on the front of a package would be a "nutrient content claim" but the same

28

1   isolated statement "100 calories" on a menu in a restaurant would not be a claim. That distinction

2   ignores the common-sense meaning of "claim" and the whole point of regulating claims.

3            The only time the statute and regulations carve out a quantitative statement from the

4   definition of "claim" is when that statement appears as part of the comprehensive nutrition

5   information containing the complete set of information contemplated by subsection (q) and

6   complying with section 101.9's requirements for serving size, content, and format. That limitation

7   makes sense. The nutrition information panel is uniform and consistent for all foods. A statement

8   within a nutrition information panel is not a "claim," because such a statement is not "claiming"

9   anything. It is not a selective message about one aspect of the food, but is part of a comprehensive

10  statement about *all* the information. An isolated statement about a single nutrient is different—such

11  a statement uses the isolated fact to communicate a specific message about the food. This is  as true

12  for restaurants as it is for packaged foods.

13           **G.       Plaintiff's Interpretation Harmonizes Requirements of the NLEA**

14           In both *NYSRA I* and *NYSRA II*, the New York City Board of Health argued that, under

15  NYSRA's theory of the case, states would be preempted from taking any action at all concerning

16  nutrition labeling in restaurants, thus rendering the exclusion for restaurants under section 343-

17  1(a)(4) meaningless. This is incorrect.

18           Section 343-1(a)(5) permits a role for the states with respect to nutrition information

19  labeling in restaurants. A state or local law that requires full nutrition information labeling in

20  accordance with subsection (q) and sections 101.9 and 101.10 of the FDA's regulations would not

21  be preempted. Complete nutrition labeling falls within the unnumbered portion of section 343(r)(1),

22  which excludes from the definition of a "claim"—and thus from the preemptive scope of

23  section 343-1(a)(5)—a statement that "appears as part of the nutrition information required or

24  permitted by [paragraph (q)]." 21 U.S.C. § 343(r)(1) [unnumbered portion]. By operation of

25  section 101.10, a restaurant could comply with the formatting and presentation requirements of such

26  a law using "reasonable means." 21 C.F.R. § 101.10 ("Presentation of nutrition labeling may be in

27  various forms, including those provided in § 101.45 and other reasonable means."). Under such a

28  state law, restaurants would be required to disclose full nutrition information—something they are

1   not required to disclose by federal law.  But they would be afforded the flexibility that the FDA

2   deemed appropriate for restaurants.

3        Any other reading would subject restaurants to multiple, inconsistent local regulations about

4   both the content and format of nutrition information.  The FDA cannot force restaurants into the

5   comprehensive national regulatory regime, but states and localities can require restaurants to

6   comply with the federal regime.  Allowing states and localities to pick and choose among the

7   features of subsection (q) would undermine the NLEA's goal of comprehensive, uniform nutrition

8   information and would impose the potential chaos and confusion of scores, hundreds, or even

9   thousands of localities with differing requirements for what has to be disclosed and how.

10  **II.    THE CALIFORNIA RETAIL FOOD CODE PREEMPTS THE ORDINANCE**

11       The County's Ordinance is further preempted by the California Retail Food Code.  Article

12  XI, section 7 of the California Constitution provides that "[a] county or city may make and enforce

13  within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with

14  general laws."  Cal. Const. art. XI, § 7.  When there is a conflict between a local law and state law,

15  the state law preempts the local law.

16       The CRFC, Cal. Health & Safety Code § 113703 *et seq.*, regulates the retail sale of food,

17  including food served at restaurants, on a statewide basis.  The CRFC provides that, with certain

18  exemptions not applicable here, "it is the intent of the Legislature to occupy the whole field of

19  health and sanitation standards for retail food facilities, and the standards set forth in this part and

20  regulations adopted pursuant to this part shall be exclusive of all local health and sanitation

21  standards relating to retail food facilities."  Cal. Health & Safety Code § 113705.

22       The "whole field" occupied by the CRFC includes the labeling of food in restaurants,

23  including nutrition information.  *See* Cal. Health & Safety Code § 114089(a), (b)(5).  The CRFC

24  does not call for statements of calories or other nutrition information on menus or elsewhere in

25  restaurants.  By contrast, the Ordinance requires that certain nutrition information be displayed on

26  menus and elsewhere within the restaurant.

27       The requirements of the Ordinance thus fall within the CRFC's fully occupied field of

28  "health and sanitation standards for retail food facilities."  The absence of a requirement under the

1   CRFC to display calories and other information on menus does not mean that localities are free to

2   impose it.  California's legislature addressed nutrition information in restaurants and chose not to

3   include menu labeling or the other requirements that the County wishes to impose.  Last year, the

4   California state legislature passed a bill that would have imposed menu labeling requirements in

5   restaurants, but Governor Schwarzenegger vetoed it.[6]  The state's specific decision to forgo menu

6   labeling regulation is preemptive.  *Sherwin-Williams Co. v. City of Los Angeles*, 4 Cal. 4th 893, 897

7   (1993) ("A conflict exists if the local legislation duplicates, contradicts, or enters an area fully

8   occupied by general law, either expressly or by legislative implication.") (internal quotations

9   omitted); *cf. Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983)

10  (under the Supremacy Clause, "a federal decision to forgo regulation in a given area may imply an

11  authoritative federal determination that the area is best left *un*regulated, and in that event would

12  have as much preemptive force as a decision to regulate.").

13  **III.    THE ORDINANCE VIOLATES THE FIRST AMENDMENT RIGHTS OF PLAINTIFF'S MEMBERS**

14          **A.    The Ordinance Will Cause Irreparable Harm by Impermissibly Compelling
                    Speech**

15

16          When a preliminary injunction is sought to prevent infringement of First Amendment rights,

17  a plaintiff "can establish irreparable injury sufficient to merit the grant of relief by demonstrating

18  the existence of a colorable First Amendment claim."  *Sammartano v. First Judicial District Court,*

19  *in and for County of Carson City*, 303 F.3d 959, 973 (9th Cir. 2002) (internal quotations and

20  citations omitted).  Even if the merits of a plaintiff's First Amendment claim are not clearly

21  established at the preliminary injunction stage of litigation, "the fact that a case raises serious First

22  Amendment questions compels a finding that there exists the potential for irreparable injury, or that

23  at the very least the balance of hardships tips sharply in [plaintiff's] favor."  *Id.* (internal quotations

24  and citations omitted).   For purposes of the issuance of a preliminary injunction "'[t]he loss of First

25

26

27  _____
    [6] Veto Message by Governor Schwarzenegger of California Senate Bill 120 (Oct. 14, 2007),
    attached hereto as Appendix Exhibit H ("Inflexible mandates applied sporadically are not an

28  effective way to continue our progress in educating Californians about healthy living.").

1  Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

2  injury.'" *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

3          The Ordinance infringes on the restaurants' First Amendment freedoms, causing them

4  irreparable harm by compelling them to speak.  The First Amendment guarantees "both the right to

5  speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714

6  (1977).  The right to refrain from speaking "serves the same ultimate end as freedom of speech in its

7  affirmative aspect."  *Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California*, 475 U.S. 1,

8  11 (1986) (citation and internal quotations omitted).  Compelled speech, like bans on speech,

9  violates "the fundamental rule of protection under the First Amendment," namely "that a speaker

10  has the autonomy to choose the content of his own message."  *Hurley v. Irish-American Gay,*

11  *Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 573 (1995).

12          The right not to speak "applies not only to expressions of value, opinion, or endorsement,

13  but equally to statements of fact the speaker would rather avoid."  *Hurley*, 515 U.S. at 573-74

14  (citations omitted); *see Riley v. National Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797-98

15  (1988) (refusing to distinguish earlier cases "simply because [these cases] involved compelled

16  statements of opinion while here we deal with compelled statements of 'fact': either form of

17  compulsion burdens protected speech.").

18          This protection against compelled speech also extends to commercial speech.  *See United*

19  *States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001); *Zauderer v. Office of Disciplinary Counsel*

20  *of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985) ("[U]njustified or unduly burdensome

21  disclosure requirements might offend the First Amendment by chilling protected commercial

22  speech."); *International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996) ("The right

23  not to speak inheres in political and commercial speech alike....").

24          The Ordinance impermissibly compels speech in violation of the Plaintiff's First

25  Amendment rights.  That total numbers of calories, fat, carbohydrates and sodium are statements of

26  "fact" does not change the analysis.  In requiring restaurants to present calorie counts on menu

27  boards prominently next to the menu item, the County's Ordinance forces restaurants to voice two

28  different government viewpoints:  (1) patrons *must* consider the caloric content of food when

1    ordering in a restaurant; and (2) calories are the only nutritional criterion that patrons must consider

2    when making their food selections.  On menus, the Ordinance demands that customers focus only

3    on the calories, saturated fat, trans fat, sodium and carbohydrates—not on the complete set of

4    nutrients covered under federal law.

5            By design and effect, the Ordinance forces customers to look at the number of calories in a

6    meal before they order food in a restaurant.  Under the Ordinance, it will not be possible to buy a

7    meal in certain restaurants without being forced to look at calorie counts, regardless of whether the

8    individual wants to look at them or not.  Additionally, by forcing restaurants to post calories on their

9    menu boards, the County is requiring them to speak in a way that communicates the County's

10   message regarding the *significance* of calories.  Many restaurants affected by the Ordinance already

11   voluntarily provide calorie information to their consumers side-by-side with other pertinent

12   nutritional information, as required by the FDA.  Calories stated in isolation, divorced from other

13   nutritional content, present a very different message, namely that calories should be the only

14   nutritional criterion that consumers should consider when making their food selection.  Plaintiff

15   strongly disagrees with this message.  In compelled-speech cases, the message triggering First

16   Amendment scrutiny may be the *significance* of the facts.  *See International Dairy*, 92 F.3d at 71-72

17   (striking down a law that required labeling to disclose the presence of rBST growth hormone in

18   milk and accepting plaintiff's argument that the law "compel[led] them 'to convey a message

19   regarding the ***significance*** of rBST use that is expressly contrary to their views.'") (emphasis

20   supplied; internal quotations omitted).

21           **B.      Plaintiff Is Likely to Succeed on the Merits**

22           For nearly 30 years, the Supreme Court has reviewed burdens on lawful and non-misleading

23   commercial speech by requiring the government to prove that its regulation will directly advance a

24   substantial public interest in a manner that is narrowly drawn to achieve the government's objective.

25   *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 564 (1980).

26   More recently, the Supreme Court has questioned whether this intermediate level of scrutiny is

27   adequate to protect commercial speech and has applied stricter scrutiny to laws that compel

28

1   commercial speech. *United Foods*, 533 U.S. at 409-11. Under either standard, the County's

2   Ordinance cannot survive review.

3                    **1.    The Ordinance Fails Under *Central Hudson***

4         In *Central Hudson*, the Supreme Court articulated a four-part test for determining whether a

5   government restriction on commercial speech violates the First Amendment. *See Central Hudson*,

6   447 U.S. at 566. This test applies to all regulations on speech—speech that is restricted as well as

7   speech that is compelled. Under this test, a court must determine:  (1) whether the regulated

8   expression concerns lawful activity and is not misleading; (2) whether the asserted governmental

9   interest is substantial; (3) whether the regulation directly advances the asserted interest; and

10  (4) whether it is not more extensive than is necessary to serve that interest. *Id.*

11        The first two factors of the *Central Hudson* test cannot be disputed. The County cannot

12  contend that menu boards without calorie information are misleading or concern unlawful activity:

13  menus are speech plainly within the protection of the First Amendment. For its part, Plaintiff

14  agrees that the state has a substantial interest in public health. The County promulgated the

15  Ordinance in order to further its public health goal of "combat[ing] the serious public health crisis

16  resulting from obesity." Santa Clara County Ord. Code § A18-351. The County, however, is not

17  able to satisfy the last two factors of the *Central Hudson* test. It cannot demonstrate that the

18  Ordinance directly advances public health to a material degree or that the Ordinance is narrowly

19  tailored to achieve its stated goal.

20                    **a.    The Ordinance Does Not Advance the County's Asserted Interest
21                            in Preventing Obesity in a "Direct and Material Way"**

22        To survive scrutiny under *Central Hudson*, the County must prove that the Ordinance

23  advances the government's asserted, substantial interest in a "direct and material way." *Edenfield v.*

24  *Fane*, 507 U.S. 761, 767 (1993). The burden of justifying a restriction on commercial speech rests

25  with the proponent of the restriction. *Id.* at 770. "[M]ere speculation or conjecture" will not suffice

26  to sustain this burden. *Id.* Rather, the County "must demonstrate that the harms it recites are real

27  and that its restriction will in fact alleviate them to a material degree." *Id.* at 771. Otherwise, "'a

28  State could with ease restrict commercial speech in the service of other objectives that could not

---

- 23 -

1    themselves justify a burden on commercial expression.'" *Rubin v. Coors Brewing Co.*, 514 U.S.

2    476, 487 (1995) (quoting *Edenfield*, 507 U.S. at 771); *accord Greater New Orleans Broad. Ass'n v.*

3    *United States*, 527 U.S. 173, 188 (1999).

4        Nowhere does the County assert that requiring restaurants to post calorie, saturated fat, trans

5    fat, carbohydrate, or sodium information will have a direct effect on obesity rates or the health of its

6    citizens.  In fact, the County cites to no authority or literature to support this contention.  As Dr.

7    David B. Allison of the University of Alabama stated, "**there is not competent and reliable**

8    **evidence that providing restaurant patrons with calorie information on menu items will**

9    **reduce individual or population levels of obesity**."  Allison Decl. pp. 29-30 (emphasis in

10   original).  Dr. Allison went on to state that the only things that could be drawn from current

11   knowledge are speculation and "conjecture."  *Id.* at 33.

12       If the Ordinance *were* supported by evidence, why limit a law—passed to address a "health

13   crisis"—to only a handful of the County's restaurants?[7]  If posting calories actually reduces obesity

14   rates, why does the County not apply the Ordinance to all restaurants, rather than just a few?  Under

15   the *Central Hudson* test, the Supreme Court has struck down laws based in part on the fact that the

16   government applied laws differently to different groups without being able to put forth a cogent

17   reason for the discrepancy.  *See Greater New Orleans Broad. Ass'n*, 527 U.S. at 191, 193;

18   *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 425-28 (1993).  Here, the County has no

19   convincing reason why its Ordinance hinges on whether the restaurants are affiliated with chains.

20                    **b.**      **The Ordinance's Infringement on Speech Is More Extensive Than**
                                  **Necessary to Serve the County's Asserted Interest**
21

22       Even when the government can demonstrate that a law advances the state interest in a

23   "direct and material way," it must still employ a means "narrowly tailored to achieve the desired

24   objective."  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) (internal quotations omitted).

25

26   ───────────────
27   [7] Santa Clara County Supervisor Don Gage of the Santa Clara County Board of Supervisors has
     stated that the County's Ordinance will affect "between six and eight" restaurant chains.  Bay City
     News, *South Bay Leaders To Chain Restaurants: Show Us The Calories* (June 3, 2008), *available at*
28   http://www.nbc11.com/news/16479021/detail.html, attached hereto as Appendix Exhibit G.

1    A restriction on speech is "more extensive than necessary" if "less intrusive" alternatives are

2    available. *Rubin*, 514 U.S. at 491.

3         In this case, there are many alternatives for providing customers with caloric information in

4    restaurants that would not so heavily burden restaurants' First Amendment rights by co-opting their

5    most important communication tool and using it to convey a message with which they disagree.

6    These alternatives include signs directing consumers to comprehensive nutritional information at

7    the restaurants, posters with complete nutritional information, food wrappers with such information,

8    counter mats with such information, stanchions and flip-charts with such information, and

9    prominently displayed brochures. All these alternatives are acceptable under the FDA's regulation

10   governing restaurants' claims. 21 C.F.R. § 101.10. The Ordinance, by contrast, requires restaurants

11   to make statements of the amount of calories on menu boards in the specific manner compelled by

12   the Ordinance.

13              **2.    The Ordinance Fails Under *United Foods***

14        In *United Foods*, the Supreme Court held that a monetary assessment imposed on mushroom

15   growers pursuant to a federal act to fund advertisements of mushrooms violated the First

16   Amendment because it compelled certain growers to subsidize commercial speech with which they

17   disagreed. *United Foods*, 533 U.S. at 411-16. The government used the assessments to pay for

18   generic advertising to promote the sale of mushrooms. *Id.* at 408. The plaintiff objected because it

19   did not want to support a generic advertising campaign that promoted all mushrooms; it wanted to

20   convey a message that its mushrooms were superior to mushrooms grown by other producers. *Id.* at

21   411.

22        As the Supreme Court explained, even in the context of commercial speech, the government

23   simply may not force a private party to convey the *government's* message as if it were the private

24   party's message when the private party wishes to convey a different message or no message at all.

25   *Id.*; *accord Pacific Gas*, 475 U.S. at 15. Indeed, this is a stronger case of compelled speech than

26   *United Foods*. As the Court recognized in *United Foods*, forcing a party to speak is *worse* than the

27   injury in *United Foods*, where the plaintiff was "required simply to support speech by others, not to

28   utter the speech itself." 533 U.S. at 413. Here, the restaurants are being forced to convey the

County's message from their own signage, inevitably leading consumers to mistakenly assume that the posting of calories conveys the restaurants' *own* point of view.

### 3.    Rational Basis Review Is the Wrong Standard

The Supreme Court has consistently applied either intermediate or heightened scrutiny to restrictions on commercial speech.  In contrast, rational basis review, a standard that is highly deferential to government regulation, is rarely invoked in First Amendment analysis.  The Supreme Court has found that this weakest level of scrutiny can only be used in circumstances when there is a need to protect consumers who might otherwise be misled.  *See Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).  This case is not one of those circumstances.

In *Zauderer*, the state disciplined a lawyer for advertising that the client would pay "no fee" if the case was unsuccessful, but did not reveal that clients would be liable for litigation costs even if their law suits were unsuccessful.  *Id* at 635.  The court upheld this disclosure requirement based on its finding that omission of this information could mislead consumers into thinking that the attorney's representation was entirely free of charge.  *Id*. at 652-53.  In upholding the state rule, the Court explained that "an advertiser's [First Amendment] rights are adequately protected as long as disclosure requirements are reasonably related to the *State's interest in preventing deception of consumers.*"  471 U.S. at 651 (footnote omitted; emphasis supplied).

In *NYSRA II*, the court applied the rational basis test, relying on *National Electric Manufacturers Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001), a Second Circuit case which dramatically extended *Zauderer* by stating that the government need only satisfy a rational basis test in order to compel commercial disclosures.  272 F.3d at 114-15.  That is an incorrect reading of *Zauderer*, which does not hold that *all* commercial disclosure requirements are subject to only a rational basis test.  *Zauderer* held that disclosure requirements can be mandated by the State when they further the "State's interest in preventing deception of consumers."  *Zauderer*, 471 U.S. at 651 (footnote omitted).  In the many years since *Zauderer*, the Supreme Court has never applied the rational basis standard to non-misleading commercial speech.  Indeed, in *United Foods*—decided 16 years after *Zauderer*—the Court expressly rejected a wider application of rational basis review

1   and limited the *Zauderer* standard to laws necessary to prevent deception. The Court noted there

2   was no suggestion that the compelled speech at issue in *United Foods* was "somehow necessary to

3   make voluntary advertisements nonmisleading for consumers." *United Foods*, 533 U.S. at 416.

4       Moreover, the Supreme Court's commercial speech cases decided after *Zauderer* reflect an

5   increasing recognition that commercial speech is of vital importance to First Amendment values.

6   As the Supreme Court explained in *United Foods*, "[t]he subject matter of the speech may be of

7   interest to but a small segment of the population; yet those whose business and livelihood depend

8   in some way upon the product involved no doubt deem First Amendment protection to be just as

9   important for them as it is for other discrete, little noticed groups in a society which values the

10  freedom resulting from speech in all its diverse parts." 533 U.S. at 410. *See Edenfield*, 507 U.S. at

11  767.

12      In this case, the analytical framework required by *Central Hudson* and its progeny is more

13  than adequate to balance the government's interests against the free-speech interests of Plaintiff's

14  members. There is no reason to believe that other important disclosure requirements would be

15  jeopardized by continuing to apply *Central Hudson* as the Supreme Court has instructed, leaving

16  *Zauderer* to the field of misleading commercial speech. The most familiar commercial disclosure

17  requirements protect consumers from being misled. Others arise out of government findings,

18  following extensive study, that the products have a potential to cause harm, as with cigarettes or

19  alcohol. These disclosure requirements easily pass muster under *Central Hudson*. Unlike those

20  products, calories are not inherently dangerous. To the contrary, people cannot survive without

21  consuming calories. Disclosures concerning inherently dangerous products are fundamentally

22  different from what is happening here: the County is forcing only a handful of the County's

23  vendors to highlight prominently one aspect of their products (calories) that is not dangerous *per se*

24  for the express purpose of discouraging consumers from buying the product. Additionally, there is

25  a vast difference between a government-mandated label in a standardized format (which no one

26  would confuse as the vendor's own speech) and the government-mandated statements of calories

27  here, on the restaurants' most prominent and valuable communications tool—menu boards—in a

28  format designed to force customers to digest the government's message before they buy a meal.

1
2

**IV.    THE ORDINANCE VIOLATES THE FREE SPEECH RIGHTS OF PLAINTIFF'S MEMBERS GUARANTEED BY THE CALIFORNIA CONSTITUTION**

3    The California Constitution guarantees the right for "[e]very person [to] freely speak, write

4    and publish his or her sentiments on all subjects, being responsible for the abuse of this right.  A law

5    may not restrain or abridge liberty of speech or press."  Cal. Const. art. I, § 2(a).  "[A]rticle I's free

6    speech clause is ""'broader' and 'greater'"" than the First Amendment [to the U.S. Constitution]."

7    *Gerawan Farming, Inc. v. Kawamura*, 33 Cal. 4th 1, 15 (2004) ("*Gerawan II*").  The California

8    Constitution's protection of speech "on all subjects" extends without limitation to non-misleading

9    commercial speech.  *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 959 (2002).  Article I, section 2

10    "comprises both a right to speak freely and also a right to refrain from doing so at all, and is

11    therefore put at risk both by prohibiting a speaker from saying what he otherwise would say and

12    also by compelling him to say what he otherwise would not say."  *Gerawan Farming, Inc. v. Lyons*,

13    24 Cal. 4th 468, 491 (2000) ("*Gerawan I*").

14    As described above, the Ordinance compels Plaintiff's members to speak a message,

15    dictated by the government, that they would rather not deliver and to say things they would not

16    otherwise say.  Such a limitation on free speech triggers review under article I, section 2:

17
18
19
> [A]rticle I's right to freedom of speech, without more, would *not* allow compelling one who engages in commercial speech to say through advertising what he otherwise would not say, when his message is about a lawful product or service and is not otherwise false or misleading.

20    *Gerawan I*, 24 Cal. 4th at 509 (emphasis in original).  In other words, lawful, non-misleading

21    commercial speech is protected by article I, section 2.  *Id.*  Restaurant food is a lawful product and

22    there is nothing misleading about a menu (*i.e.*, "Hamburger, $1.99").

23    Article I, section 2 affords *at least* intermediate scrutiny to cases implicating article I rights

24    of commercial speakers.  In *Gerawan II*, the California Supreme Court specifically rejected the

25    argument that a compelled subsidy can "pass muster simply because it is rationally based."  33 Cal.

26    4th at 22.  There, the California Supreme Court adopted the *Central Hudson* test as the standard for

27    evaluating compelled subsidies and struck down the law there at issue, even though it passed muster

28    under the First Amendment.  *Id.*

1    Compelled speech is more odious than compelled subsidization of speech. *See United*

2    *Foods*, 533 U.S. at 413 (complainant was "required simply to support speech by others, not to utter

3    the speech itself"); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005) (distinguishing

4    compelled speech cases in order to apply reduced scrutiny to a compelled subsidy).  Therefore, the

5    standard for compelled speech is at least as strict as for a compelled subsidy. *See, e.g., ARP*

6    *Pharmacy Servs., Inc. v. Gallagher Bassett Servs., Inc.*, 138 Cal. App. 4th 1307, 1316 (2d Dist.

7    (Div. 4), 2006) (for a commercial reporting requirement, "[t]he constitutional validity of the

8    regulation of commercial speech is tested under an intermediate standard, articulated by the United

9    States Supreme Court in *Central Hudson*, and adopted by the California Supreme Court.").

10   Regardless whether the Ordinance survives under the First Amendment, it cannot survive under

11   article I, section 2, which requires—at a minimum—application of the *Central Hudson* test.

12   Dated:  August 18, 2008                          ARNOLD & PORTER LLP

13

14

15                                     By:    _____/s/_____

16                                            Trenton H. Norris
                                              Attorneys for Plaintiff
17                                     CALIFORNIA RESTAURANT
                                              ASSOCIATION
18

19

20

21

22

23

24

25

26

27

28

1   Trenton H. Norris (California State Bar No. 164781)
    Sarah Esmaili (California State Bar No. 206053)
2   ARNOLD & PORTER LLP
    90 New Montgomery Street, Suite 600
3   San Francisco, CA  94105
    Telephone:  (415) 356-3000
4   Facsimile:  (415) 356-3099
    Email:  trent.norris@aporter.com
5   Email:  sarah.esmaili@aporter.com

6   Peter L. Zimroth (*pro hac vice*)
    Kent A. Yalowitz (*pro hac vice*)
7   Nancy G. Milburn (*pro hac vice*)
    ARNOLD & PORTER LLP
8   399 Park Avenue
    New York, NY  10022
9   Telephone:  (212) 715-1000
    Facsimile:  (212) 715-1399
10  Email:  peter.zimroth@aporter.com
    Email:  kent.yalowitz@aporter.com
11  Email:  nancy.milburn@aporter.com

12  Attorneys for Plaintiff
    CALIFORNIA RESTAURANT ASSOCIATION

13

14                  **UNITED STATES DISTRICT COURT**

15              **NORTHERN DISTRICT OF CALIFORNIA**

16                      **OAKLAND DIVISION**

17

18  CALIFORNIA RESTAURANT          )   No. CV-08-03685 CW
    ASSOCIATION,                   )   (Related to No. CV-08-03247 CW)
19                                 )
                   Plaintiff,      )   **[PROPOSED] ORDER GRANTING**
20                                 )   **PLAINTIFF'S MOTION FOR**
           v.                      )   **DECLARATORY RELIEF AND A**
21                                 )   **PRELIMINARY INJUNCTION**
    THE COUNTY OF SANTA CLARA and  )
22  THE SANTA CLARA COUNTY PUBLIC  )   Hearing Date:   August 28, 2008
    HEALTH DEPARTMENT,             )   Hearing Time:   2:00 p.m.
23                                 )   Courtroom:      Courtroom 2, 4th Floor
                                   )
24                 Defendants.     )      The Honorable Claudia Wilken
                                   )
25                                 )   Complaint filed:  July 22, 2008
                                   )   Notice of Removal filed:  August 1, 2008
26                                 )
                                   )
27                                 )
28

1

**PROPOSED ORDER**

2        This matter came before the Court on Plaintiff's motion for declaratory and injunctive relief.

3   Plaintiff has shown a substantial likelihood of success on the merits and that Plaintiff is likely to

4   sustain irreparable harm if an injunction is denied.

5        The Court HEREBY DECLARES THAT:

6        1.        Santa Clara County Ordinance No. NS-300.793, which amends Division A18 of the

7   Santa Clara County Ordinance Code, is preempted by the Nutrition Labeling and Education Act of

8   1990, and therefore, of no force.

9        2.        Ordinance No. NS-300.793 is preempted by the California Retail Food Code and,

10  therefore, of no force.

11       3.        Ordinance No. NS-300.793 denies Plaintiff's member restaurants the right of

12  freedom of speech and thereby violates the First Amendment of the United States Constitution, as

13  incorporated by the Fourteenth Amendment.

14       4.        Ordinance No. NS-300.793 denies Plaintiff's member restaurants the right to

15  freedom of speech guaranteed by article I, section 2 of the California Constitution.

16       Good cause having been shown, it is THEREFORE ORDERED THAT:

17       Defendants the County of Santa Clara and the Santa Clara County Public Health Department

18  are preliminarily enjoined from enforcing Ordinance No. NS-300.793.

19

20       IT IS SO ORDERED.

21  Dated: _____

22

23

24                                    _____
                                      UNITED STATES DISTRICT JUDGE

25

26

27

28

- 2 -