MONIQUE OLIVIER
THE STURDEVANT LAW FIRM
354 Pine Street, Fourth Floor
San Francisco, CA 94104
Telephone    (415) 477-2410
Facsimile    (415) 477-2420
Email:    molivier@sturdevantlaw.com

DEEPAK GUPTA
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
Tel.    (202) 588-7739
Fax.    (202) 588-7795
Email:    dgupta@citizen.org
*Attorneys for Amici Curiae Congressman Henry Waxman, David Kessler, M.D.,*
*Public Citizen, Center for Science and the Public Interest, et al.*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

_____

| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION,       ) | |
|           *Plaintiff*,    ) | |
|           ) | |
|     v.           ) | Case No. Civ. 08-3685 CW |
|           ) | |
| THE COUNTY OF SANTA CLARA and THE SANTA CLARA COUNTY PUBLIC HEALTH DEPARTMENT,    ) | |
|           *Defendants*.    ) | |

_____ )

**JOINT MOTION OF CONGRESSMAN HENRY WAXMAN, PROFESSOR ROBERT POST, AND THE CITY OF NEW YORK FOR LEAVE TO FILE THE *AMICUS CURIAE* BRIEFS FILED IN THE RELATED SAN FRANCISCO ACTION AS *AMICUS CURIAE* BRIEFS IN THIS ACTION**

_____

Congressman Henry Waxman, Professor Robert Post of Yale Law School,

and the City of New York hereby seek leave to file their attached *amicus curiae*

briefs filed in the related action, *California Restaurant Association v. City and County of San Francisco*, Case No. Civ-08-3247 ("San Francisco action"), as *amicus curiae* briefs in this action. Counsel for the defendants, Jennifer Sprinkles, consents to this motion.  Plaintiff's counsel, Kent Yalowitz, was asked if plaintiff would stipulate that the *amicus* briefs filed in the San Francisco action be considered as *amicus* briefs in this action, but did not provide a definitive answer before the filing of this motion.

In this case, the California Restaurant Association (CRA) challenges a Santa Clara County ordinance that requires chain restaurants to display certain nutritional information.  CRA also commenced the related San Francisco action, challenging a similar City of San Francisco ordinance that requires restaurants in San Francisco with twenty or more establishments in the State of California to display certain nutritional information.

In the San Francisco action, three *amicus* briefs were filed in support of the defendants, one by the City of New York and other entities,[1] one by Congressman Henry Waxman and other individuals and entities,[2] and one by

---

[1] The City of New York is joined by The International Municipal Lawyers Association, The National League of Cities, The National Association of Local Boards of Health, The National Association of County and City Health Officials, San Mateo County, California, and Montgomery County, Maryland.

[2] Congressman Waxman is joined by former FDA Commissioner David Kessler, M.D., Public Citizen, Center for Science in the Public Interest, American College of Preventive Medicine, American Diabetes Association, California Center for Public Health Advocacy, Trust for America's Health, and Professors of Medicine, Nutrition, and Public Health.

Professor Robert Post of Yale Law School and other individuals.[3]  All three briefs are attached hereto.

Because the legal issues raised in both cases are identical, and in the interest of judicial economy, the lead *amici* in the San Francisco action hereby move for leave to file their *amicus* briefs in support of the defendants in this action.

## CONCLUSION

For the foregoing reasons, the *amicus* briefs filed in the related San Francisco action should also be considered as *amicus* briefs in this action.

August 20, 2008

Respectfully submitted,

*/s/ Monique Olivier*
Monique Olivier
THE STURDEVANT LAW FIRM

Deepak Gupta
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
Tel. (202) 588-7739
Fax. (202) 588-7795
dgupta@citizen.org
*Attorneys for Amici Curiae Congressman Henry Waxman, David Kessler, M.D., Public Citizen, Center for Science and the Public Interest, et al.*

---

[3] Professor Post is joined by Jennifer L. Pomeranz and Kelly D. Brownell of the Rudd Center for Food Policy and Obesity at Yale University.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s/ Scott Pasternack*

 Scott Pasternack

Michael A. Cardozo,

Corporation Counsel of the City of New York

NEW YORK CITY LAW DEPARTMENT

100 Church Street

New York, New York 10007

Tel. (212) 676-8517

Fax:  (212) 788-1054

spastern@law.nyc.gov

*Attorneys for the City of New York*

*/s/ Barbara Jane Chisholm*

Barbara Jane Chisholm

ALTSHULER BERZON LLP

177 Post Street, Suite 300

San Francisco, California 94108

(415) 421 7151

bchisholm@altshulerberzon.com

*Attorney for Amici Curiae Robert Post, et al.*

DEEPAK GUPTA
(*pro hac vice* application to be filed)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
Telephone:      (202) 588-1000
Facsimile:      (202) 588-7795
Email:          dgupta@citizen.org

JAMES C. STURDEVANT (State Bar # 94551)
MONIQUE OLIVIER (State Bar # 190385)
THE STURDEVANT LAW FIRM
354 Pine Street, Fourth Floor
San Francisco, CA 94104
Telephone      (415) 477-2410
Facsimile      (415) 477-2420
Email:          molivier@sturdevantlaw.com
*Counsel for Amici Curiae*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION,<br>　　　　　　　　*Plaintiff,*<br><br>　　　v.<br><br>THE CITY AND COUNTY OF SAN FRANCISCO and THE SAN FRANCISCO DEPARTMENT OF PUBLIC HEALTH,<br>　　　　　　　　*Defendants.* | Case No. Civ-08-3247 CW<br><br>Date:　Sept. 4, 2008<br>Time:　2:00 p.m.<br>Place:　Courtroom 2, 4th Floor |

**BRIEF OF *AMICI CURIAE* CONGRESSMAN HENRY WAXMAN, FORMER FDA COMMISSIONER DAVID KESSLER, M.D., PUBLIC CITIZEN, CENTER FOR SCIENCE IN THE PUBLIC INTEREST, AMERICAN COLLEGE OF PREVENTIVE MEDICINE, AMERICAN DIABETES ASSOCIATION, CALIFORNIA CENTER FOR PUBLIC HEALTH ADVOCACY, TRUST FOR AMERICA'S HEALTH, AND PROFESSORS OF MEDICINE, NUTRITION, AND PUBLIC HEALTH IN SUPPORT OF DEFENDANTS**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTEREST AND IDENTITY OF *AMICI CURIAE* .................................................... 1

INTRODUCTION ........................................................................................................ 2

BACKGROUND ........................................................................................................... 5

      A.  The NLEA's distinction between mandatory disclosure
           of nutrition information and voluntary claims.............................5

      B.  The NLEA's exemption of restaurant foods from federal
           nutrition disclosure requirements .........................................9

      C.  The NLEA's preemption provisions .................................10

ARGUMENT ............................................................................................................... 13

    I.     The Restaurant Association bears an especially heavy burden to
          show "clear and manifest" congressional intent to preempt
          state and local nutrition disclosure requirements for
          restaurants. ............................................................................13

    II.    The NLEA leaves San Francisco free to enact mandatory nutrition
          disclosure requirements for restaurant food. .......................16

    III.   San Francisco's ordinance does not regulate voluntary "claims"
          that use descriptive "terms" to "characterize" nutrient levels
          or health effects. ...................................................................19

    IV.   The Restaurant Association's First Amendment theory
          stands the commercial-speech doctrine on its head. ...........27

CONCLUSION ............................................................................................................ 31

APPENDIX LISTING OF *AMICI CURIAE*

APPENDIX OF STATUTORY AND REGULATORY PROVISIONS

APPENDIX OF FDA CORRESPONDENCE

# TABLE OF AUTHORITIES

## Cases

*AT&T Communications of Illinois, Inc. v. Illinois Bell Telephone Co.,*
    349 F.3d 402 (7th Cir. 2003). ............................................................... 15

*Bates v. Dow Agrosciences LLC,*
    544 U.S. 431 (2005) .......................................................................... 15, 18

*BellSouth Advertising & Publishing Corp. v. Tennessee,*
    79 S.W.3d 506 (Tenn. 2002) ................................................................. 30

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,*
    447 U.S. 557 (1980) .............................................................................. 28

*Chemical Specialties Manufacturers Association, Inc. v. Allenby,*
    958 F.2d 941 (9th Cir. 1992) ................................................................. 13

*Department of Taxation and Finance of New York v. Milhelm Attea & Bros., Inc.,*
    512 U.S. 61 (1994) ............................................................................... 18

*Desiano v. Warner-Lambert & Co.,*
    467 F.3d 85 (2d Cir. 2007) .................................................................... 14

*District of Columbia v. John R. Thompson Co.,*
    346 U.S. 100 (1953) ............................................................................. 14

*Dutchess/Putnam Rest. & Tavern Ass'n, Inc. v. Putnam County Dep't of Health,*
    178 F. Supp.2d 396 (S.D.N.Y. 2001) .................................................... 30

*Entertainment Software Association v. Blagovech,*
    469 F.3d 641 (7th Cir. 2006) ................................................................. 30

*Environmental Defense Center, Inc. v. E.P.A.,*
    344 F.3d 832 (9th Cir. 2003) ...................................................... 4, 27, 28

*Freightliner Corp. v. Myrick,*
    514 U.S. 280 (1995) ............................................................................. 19

*Hillsborough County v. Automated Medical Labs., Inc.,*
    471 U.S. 707 (1985) ............................................................................. 14

*Ibanez v. Florida Department of Business and Professional Regulation,*
    471 U.S. 707 (1985) ............................................................................. 27

*Johanns v. Livestock Marketing Association,*
    544 U.S. 550 (2005) ............................................................................. 30

*Jones v. Rath Packing Co.,*
    430 U.S. 519 (1977) ............................................................................. 13

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) .......................................................................... 15, 18

*National Electrical Manufacturers Association v. Sorrell,*
    272 F.3d 104 (2d Cir. 2001) ............................................................4, 27, 28, 30

*New State Ice Co. v. Liebmann,*
    285 U.S. 262 (1932).........................................................................................14

*New York State Restaurant Association v. New York City Board of Health,*
    2008 WL 1752455 (S.D.N.Y. April 16, 2008)) ................................................2

*Pelman v. McDonald's Corporation,*
    237 F. Supp. 2d 512 (S.D.N.Y. 2003)..............................................................19

*Pharmaceutical Care Management Association v. Rowe,*
    429 F.3d 294 (1st Cir. 2005) ...........................................................................29

*Public Citizen v. Shalala,*
    932 F. Supp. 13 (D.D.C. 1996) ........................................................................10

*Puerto Rico Department of Consumer Affairs,*
    485 U.S. 495 (1988)..........................................................................................19

*Rice v. Norman Williams Co.,*
    458 U.S. 654 (1982)..........................................................................................18

*Rogers v. Consolidated Rail Corp.,*
    948 F.2d 858 (2d Cir. 1991) ............................................................................12

*Rubin v. Coors Brewing Co.,*
    514 U.S. 476 (1995)..........................................................................................28

*Sprietsma v. Mercury Marine,*
    537 U.S. 51 (2002)............................................................................................19

*UAW-Labor Employment & Training Corp. v. Chao,*
    325 F.3d 360 (D.C. Cir. 2003) .........................................................................29

*United States v. Lopez,*
    514 U.S. 549 (1995)..........................................................................................14

*United States v. United Foods, Inc.,*
    481 U.S. 739 (1987).....................................................................................29, 30

*United States v. Wenger,*
    292 F. Supp. 2d 1296 (D. Utah 2003) ..............................................................29

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,*
    425 U.S. 748 (1976)..........................................................................................27

*Zauderer v. Office of Disciplinary Counsel,*
    471 U.S. 626 (1985)..........................................................................................27

**Statutes**

7 U.S.C. § 2105(a) ................................................................................21

7 U.S.C. § 2617(f)(2) ............................................................................22

21 U.S.C. § 343(a) ...........................................................................6, 21

Nutrition Labeling and Education Act of 1990,
    Pub. L. No. 101-535, 104 Stat. 2535

    21 U.S.C. § 343(q)............................................................... *passim*

    21 U.S.C. § 343(q)(1)(C) .......................................................6, 16, 21

    21 U.S.C. § 343(q)(1)(D) ..................................................................6

    21 U.S.C. § 343(q)(5)(A)(i) ...........................................3, 7, 19, 16, 17, 21

    21 U.S.C. § 343(r) ................................................................. *passim*

    21 U.S.C. § 343(r)(1)...........................................................................21

    21 U.S.C. § 343(r)(1)(A) ................................................................7, 8

    21 U.S.C. § 343(r)(1)(B) ................................................................7, 9

    21 U.S.C. § 343(r)(2)(A)(i) ............................................................8, 21

    21 U.S.C. § 343(r)(4)........................................................................19

    21 U.S.C. § 343-1 ............................................................................25

    21 U.S.C. § 343-1, note ..........................................................12, 15

    21 U.S.C. § 343-1(a)(4)...................................................... *passim*

    21 U.S.C. § 343-1(a)(5)...................................................... *passim*

**Regulations**

21 C.F.R. § 101.9.................................................................................6

21 C.F.R. § 101.10...............................................................................10

21 C.F.R. § 101.13.......................................................................8, 24, 25

21 C.F.R. § 101.14...............................................................................9

21 C.F.R. § 101.60.......................................................................24, 25

21 C.F.R. § 101.54.......................................................................8, 24

21 C.F.R. § 101.56...............................................................................8

56 Fed. Reg. 60528-0 (Nov. 27, 1991) ..........................................26

58 Fed. Reg. 2066 (Jan. 6, 1993).......................................................9

58 Fed. Reg. 2302-01 (Jan. 6, 1993) ............................................8, 25

58 Fed. Reg. 2462-01 (Jan. 6, 1993) ...............................................26

58 Fed. Reg. 33055 (June 15, 1993) ..................................................9

61 Fed. Reg. 40320 (Aug. 2, 1996)....................................................9

24 R.C.N.Y. Health Code Reg. § 81.50..........................................1, 12, 17

### Legislative History

H.R. Rep. No. 538, 101st Cong., 2d Sess. 7 (1990),
     *reprinted in* 1990 U.S.C.C.A.N. 3336 ..........................................6

*FDA's Continuing Failure to Regulate Health Claims for Food: Hearings
     Before the Subcomm. on Human Resources and Intergovernmental
     Relations of the House Comm. on Gov't Relations*,
     101st Cong., 2d Sess. (1989) .......................................................7

1990 U.S.C.C.A.N. 3354-1 .................................................................5

136 Cong. Rec. H12953 (Oct. 26, 1990) ........................................11

136 Cong. Rec. S16607-02 (Oct. 24, 1990) ...........................3, 11, 12

136 Cong. Rec. H5836-01 (July 30, 1990) .......................................8

### Miscellaneous

*American Heritage Dictionary of the English Language*, 4th ed. (2006) ....................23

Michelle M. Bradley,
     *The States' Role in Regulating Food Labeling and Advertising:
     The Effect of the Nutrition Labeling and Education Act of 1990*,
     49 Food & Drug L.J. 649 (1994)....................................................11

Dan Burk,
     *The Milk-Free Zone, Federal and Local Interests in Regulating Recombinant BST*,
     22 Colum. J. Envt'l L. 227 (1997) ..................................................26

Richard M. Cooper, Richard L. Frank & Michael J. O'Flaherty,

*History of Health Claims Regulation.*
45 Food Drug Cosm. L.J. 655 (1990) ............................................................6

Caswell et al.,
*The Impact of New Labeling Regulations on the Use of Voluntary Nutrient-Content
Claims and Health Claims by Food Manufacturers,*
22 J. Pub. Pol'y & Marketing 147 (2003)........................................................6

Betsy J. Grey,
*Make Congress Speak Clearly: Federal Preemption of State Tort Remedies,*
77 B.U. L. Rev. 559 (1997) ....................................................................... 13-14

Elizabeth Toni Guarino,
*Nutrient Descriptor and Disease Claims for Foods Under the New
FDA and USDA Rules,*
48 Food & Drug L.J. 665 (1993)...........................................................5, 20, 25

S. Candice Hoke,
*Preemption Pathologies and Civic Republican Values,*
71 B.U. L. Rev. 685 (1991) ......................................................................14

Roderick M. Hills,
*Against Preemption: How Federalism Can Improve the
National Legislative Process,* 82 N.Y.U. L. Rev. 1 (2007)..............................14

Peter Barton Hutt,
*A Brief History of FDA Regulation Relating to the Nutrient Content
of Food,* in R. Shapiro, ed., *Nutrition Labeling Handbook* (1995) ...................7

Institute of Medicine, National Academy of Sciences,
*Food Labeling: Toward National Uniformity* (1992) .........................................26

Craig Jordan,
*Preemption and Uniform Enforcement of Food Marketing Regulations,*
49 Food & Drug L.J. 401 (1994)...............................................................11, 25

Steve Keane,
*Can a Consumer's Right to Know Survive the WTO?:
The Case of Food Labeling,*
16 Transnat'l L. & Contemp. Probs. 291, 295 (2006)............................. 20-21

Keystone Forum,
*The Keystone Forum on Away-from-Home Foods:
Opportunities for Preventing Weight Gain and Obesity* (2006),
*available at* http://www.cfsan.fda.gov/~dms/nutrcal.html...........2, 17, 19

Michael A. McCann,
*Economic Efficiency and Consumer Choice Theory in Nutritional
Labeling,* 2004 Wis. L. Rev. 1161 (2004) .........................................................19

Laura S. Sims,
*The Politics of Fat: Food and Nutrition Policy in America* (1988) ......7, 9, 10, 11

U.S. Food and Drug Administration,
*A Guide for Restaurants and Other Retail Establishments* (August 1995),
*available at* http://www.cfsan.fda.gov/~frf/qatext2.html.........................3

U.S. Food and Drug Administration,
*Calories Count: Report of the Working Group on Obesity* (2004),
*available at* http://www.cfsan.fda.gov/~dms/owg-toc.html.......10, 17, 19

U.S. Food and Drug Administration,
*Claims that Can Be Made for Conventional Foods and Dietary
Supplements* (2003),
*available at* http://www.cfsan.fda.gov/~dms/hclaims.html...................25

U.S. Food and Drug Administration,
*Definitions of Nutrient Content Claims, Food Labeling Guide – Appendix A*,
http://www.cfsan.fda.gov/~dms/flg-6a.html .........................................24

U.S. Food and Drug Administration,
*Label Claims: Nutrient Content Claims*,
http://www.cfsan.fda.gov/~dms/lab-nutr.html.l...................................20

U.S. Food and Drug Administration,
*Labeling Guide for Restaurants and Other Retail Establishments Selling
Away-From-Home Foods* (April 2008),
available at http://www.cfsan.fda.gov/~dms/labrguid.html ...............17

U.S. Food and Drug Administration,
*FDA Backgrounder: Keystone Forum on Away-From-Home Foods,
Preventing Weight Gain and Obesity Report* (2006),
*available at* http://www.cfsan.fda.gov/~lrd/bgowg2.html.......................2

U.S. Food and Drug Administration,
*FDA Talk Paper T96-52* (July 30, 1996), *available at*
http://www.cfsan.fda.gov/~lrd/tpmenus.html ....................................10

*Webster's Third New International Dictionary* (1965) ..........................................21, 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTEREST AND IDENTITY OF *AMICI CURIAE*

In requiring fast-food restaurants to disclose calorie information on their menus, the City of San Francisco has stepped into a regulatory gap that Congress intentionally left open to state and local governments when it enacted the Nutrition Labeling and Education Act (NLEA) in 1990. The following *amici curiae* support both San Francisco's decision and its right to make that decision. A more detailed listing of *amici* is set forth in an appendix to this brief.

- U.S. Congressman Henry Waxman, the lead congressional sponsor of the NLEA and currently the Chairman of the committee in the House of Representatives with oversight over FDA;

- David Kessler, M.D., Commissioner of the FDA from 1990 through 1997, the period in which all of the key FDA regulations implementing the NLEA were promulgated;

- Public Citizen, an advocacy organization with longstanding interests in curtailing exaggerated claims of federal preemption of health regulation and defending consumers' right to know information that affects their health;

- Center for Science in the Public Interest, a nutrition advocacy organization and a leading advocate of both the NLEA and state and local menu labeling legislation;

- Leading medical and public health organizations, including the American College of Preventive Medicine, American Diabetes Association, the American Public Health Association, the California Center for Public Health Advocacy, and Trust for American's Health; and

- Distinguished professors and researchers in the fields of medicine, nutrition, and public health, whose names and biographical information are compiled in the appendix.

## INTRODUCTION

Two years ago, an important FDA-commissioned report declared that "obesity has become a public health crisis of epidemic proportions." *The Keystone Forum on Away-from-Home Foods: Opportunities for Preventing Weight Gain and Obesity* (2006), at 1.[1]  Echoing the consensus view of the U.S. Surgeon General, the National Academies' Institute of Medicine, and the American Medical Association, among others, the report concluded that "restaurants should provide consumers with calorie information in a standard format that is easily accessible and easy to use," allowing consumers to view the information "when standing at a counter, while reviewing a menu board, in a car when reading a drive-through menu, or when sitting down at a table reviewing a menu." *Id.* at 76, 77-78.  The report recognized that "the FDA *does not have regulatory authority* to require nutrition information in restaurants," but that "state legislatures *do have the authority* to require the provision of nutrition information, and a number of these elected bodies have considered nutrition labeling bills [that] would require calories and/or other nutrition information to be listed on menus or menu boards." *Id.* at 74 (emphasis added).

In this lawsuit, the fast-food industry repeats arguments that were recently rejected in its challenge to an indistinguishable New York City ordinance. *See N.Y. State Rest. Ass'n v. New York City Bd. of Health*, 2008 WL 1752455 (S.D.N.Y. April 16, 2008), *pending on appeal*, Case No. 08-1892-cv (2d Cir.).  Here, as it did there, the industry asks the Court to hold that federal law preempts states and local authorities from doing what the federal government

---

[1] *Available at* http://www.cfsan.fda.gov/~dms/nutrcal.html ("*Keystone Report*"); *see also FDA Backgrounder,* http://www.cfsan.fda.gov/~lrd/bgowg2.html.

itself lacks authority to do—to hold, in other words, that Congress created a permanent regulatory vacuum on the important issue of mandatory nutrition labeling of restaurant food. Congress did no such thing. To the contrary, Congress focused closely on the issues of preemption and coverage for restaurants during its consideration of the NLEA and enacted carefully limited express preemption provisions that carved out room for state and local government to fill the gaps left by the statute. 21 U.S.C. § 343-1(a)(4); *id.* § 343(q)(5)(A)(i). As the legislation's chief sponsor in the Senate explained just moments before the final vote: "Because food sold in restaurants is exempt from the nutrition labeling requirements of [the NLEA], the bill does not preempt any State nutrition labeling requirements for restaurants." 136 Cong. Rec. S16607-02, S16608 (Oct. 24, 1990) (Sen. Metzenbaum).

Over the nearly two decades since the NLEA's enactment, the FDA has consistently taken the same position—most recently in response to the Second Circuit's request for an *amicus* brief concerning New York's menu labeling ordinance. *See FDA Amicus Brief* (June 16, 2008) (Declaration of Tara Steeley, Exhibit 2); *accord* FDA, *A Guide for Restaurants and Other Retail Establishments* (August 1995), *available at* http://www.cfsan.fda.gov/~frf/qatext2.html ("[B]ecause the act exempts restaurant foods that do not bear a claim from mandatory nutrition labeling, State requirements for the nutrition labeling of such foods would not be preempted."). Indeed, the restaurant industry lobbied the FDA to oppose New York's menu labeling ordinance as early as April 2007. The FDA, however, concluded that opposition was unwarranted, citing the agency's "limited authority" concerning restaurants, "the increases in the percentage of food consumed in away-from home foods,

and the general lack of easily accessible nutrition information for these foods." Letter from R.E. Brackett to D. Garren, dated July 8, 2007 (included in the appendix to this brief).[2]

The Restaurant Association nonetheless contends that San Francisco's rule is preempted because it is a requirement respecting "claims" of the type regulated in section 343(r) of the NLEA. That contention rests on a fundamental misunderstanding of the NLEA's structure, which is premised on a distinction between requirements that food manufacturers disclose straightforward nutritional information (such as a listing of a total number of calories), on the one hand, and the regulation of descriptive "claims" that industry may choose to make about its food's nutritional content or health effects, on the other. San Francisco's rule is unmistakably the former sort of rule: It concerns the mandatory disclosure of purely factual information, not the regulation of descriptive "terms" that restaurants may choose to make "claims" that "characterize" the nutrients in their food.

The Association also maintains that San Francisco's rule violates the First Amendment. That argument is incompatible with settled law, would turn the commercial speech doctrine upside down, and would jeopardize mandatory disclosure requirements that are ubiquitous in the law—including the very disclosure requirements imposed by section 343(q) of the NLEA. *See Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113-16 (2d Cir. 2001); *see also Envt'l Def. Ctr. v. E.P.A.*, 344 F.3d 832, 848-51 (9th Cir. 2003).

---

[2] The restaurant industry never informed the New York district court of this correspondence, which was received while the industry's challenge to the New York rule was still pending before the court. The correspondence was obtained by *amicus* Center for Science in the Public Interest through a Freedom-of-Information-Act request.

## BACKGROUND

The NLEA produced groundbreaking changes in the way food is labeled in the United States.  It required that basic nutrition facts be disclosed for most foods, prohibited the use of terms that characterize the level of nutrients in a food unless they conform to definitions established by FDA, and required that claims about the relationship between nutrients and health conditions be supported by significant scientific agreement. The Act was introduced in the U.S. House of Representatives by Representative Henry Waxman on July 27, 1989, and signed into law by President George H.W. Bush on November 8, 1990. Although Congress extensively debated a number of issues, including preemption of state law and coverage for restaurants, the basic structure of the legislation—premised on a distinction between the regulation of mandatory nutrition labeling and the regulation of voluntary claims—remained unchanged over the course of the fifteen months during which it was considered.

### A.    The NLEA's Distinction Between Mandatory Disclosure of Nutrition Information and Voluntary Claims

The NLEA and its regulations "encompass two kinds of information—the mandatory information on nutrients which will appear on the nutrition panel of nearly all food labels [under section 343(q)], and the voluntary information [regulated by section 343(r)] that some manufacturers choose to add to their product labels." Guarino, *Nutrient Descriptor and Disease Claims for Foods*, 48 Food & Drug L.J. 665, 671 (1993); *see also* Caswell et al., *The Impact of New Labeling Regulations on the Use of Voluntary Nutrient-Content Claims and Health Claims by Food Manufacturers*, 22 J. Pub. Pol'y & Marketing 147 (2003).

The NLEA's differential treatment of mandatory and voluntary statements flows from Congress's two distinct but complementary purposes—first, "to clarify and to strengthen the Food and Drug Administration's legal authority to *require* nutrition labeling on foods," and second, "to establish the circumstances under which claims *may be made* about nutrients in foods." H.R. Rep. No. 538, 101st Cong., 2d Sess. 7 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3336, 3337 ("*House Report*") (emphasis added).   To carry out these twin purposes, the NLEA added two subsections to the Federal Food, Drug and Cosmetic Act—section 343(q), which mandates specific, uniform disclosures that must be made on food labels, and section 343(r), which regulates the descriptive claims that manufacturers may make about their foods. 21 U.S.C. §§ 343(q), 343(r). The first section governs the mandatory disclosure of factual nutritional information. The second section creates a framework for regulation by the FDA concerning when and how food purveyors may voluntarily make claims using terms that characterize the nutrient levels or health-related effects of their food. Put another way, the first section (§ 343(q)) tells food manufacturers or vendors what facts they *must* disclose about their food, while the second section (§ 343(r)) regulates the descriptive claims they may *choose* to make about their food.

    *1.    Section 343(q): Mandatory Nutrition Labeling.*   The nutrition information labeling provisions of section 343(q) are the heart of the Act. Most American consumers are familiar with the "Nutrition Facts" panel, a uniform chart that most food manufacturers must use to list "the total number of calories" in each serving of food, § 343(q)(1)(C), as well as the amounts of total fat, saturated fat, cholesterol, sodium, total carbohydrate, dietary fiber, sugars, and protein in the food, both as an "amount per serving" and, with the

exception of sugars and protein, as a percent of a dietary reference value, called the "percent

daily value." § 343(q)(1)(D); *see* 21 C.F.R. § 101.9. As discussed below, restaurant food is not

covered by these federal requirements.  21 U.S.C. § 343(q)(5)(A)(i).

    **2.**    ***Section 343(r): Voluntary Nutrient-Content and Health Claims.*** In addition to

requiring the disclosure of nutrition information, Congress also responded to the

proliferation of dubious, misleading, and confusing claims made by food manufacturers

about the nutrition and health effects of their foods.  *House Report* at 3337.[3] That issue is

taken up in the second part of the statute, section 343(r), which distinguishes between two

kinds of claims: nutrient content claims (*e.g.* "low salt") and health-related claims (*e.g.* "fiber

reduces the risk of cancer").  §§ 343(r)(1)(A), 343(r)(1)(B).

    Prior to the NLEA's enactment, the FDA had general authority to prohibit false or

misleading food advertising or labeling. § 343(a). That authority was sufficient to address a

manufacturer's claims about straightforward factual information, such as information

concerning the ingredients or nutrients in a food that was either verifiably true or false. But

"an increasing number of food companies had turned to marketing . . . products bearing

adjectival descriptors such as 'lite,' 'low,' 'reduced,' or 'fat free' because of their perception

that such descriptors would lure consumers who thought such terms meant the products

were more healthful." Sims, *The Politics of Fat: Food and Nutrition Policy in America* 202 (1998).

In the absence of specific federal standards, these claims were often meaningless or

---

[3] *See generally* Hutt, *A Brief History of FDA Regulation Relating to the Nutrient Content of Food*, in R. Shapiro, ed., *Nutrition Labeling Handbook* 1-27 (1995); Cooper, et al., *History of Health Claims Regulation*, 45 Food Drug Cosm. L.J. 655, 657 (1990); *FDA's Continuing Failure to Regulate Health Claims for Food: Hearings Before the Subcomm. on Human Resources and Intergovernmental Relations of the House Comm. on Gov't Relations*, 101st Cong., 2d Sess. (1989).

misleading.  *Id.*  The word "light" might mean light in fat, or light in color, or something else entirely.  Congress aimed to address this problem by ensuring that such "content claims (such as 'low salt' or 'light') would have to be consistent with terms defined by the [FDA]."  *House Report* at 3337.

Section 343(r) prohibits any "claim" on a food label that expressly or by implication "characterizes" the nutrient level of a food unless "the characterization of the level made in the claim uses terms which are defined in regulations of the [FDA]."  § 343(r)(1)(A); § 343(r)(2)(A)(i).  "An example of an express claim covered by [§ 343(r)] would be the statement 'low sodium.'  An example of an implied claim covered by this section would be the statement 'lite,' which implies that the product is low in some nutrient (typically calories or fat), but does not say so expressly, or 'high oat bran,' which conveys an implied high fiber message."  *House Report* at 3349 (section-by-section analysis). The FDA's regulations define nutrient content claims for a range of specific descriptive terms including *free*, *low*, *high*, *good source*, *contains*, *provides*, *reduced*, *less*, *light* or *lite*, *modified*, and *more*.  21 C.F.R. §§ 101.13, 101.54, 101.56.[4]

With respect to health claims, section 343(r) uses the word "claim" in much the same way, to refer to statements manufacturers choose to make that "characterize" the

---

[4] Section 343(r)(1) provides that "[a] statement of the type required by paragraph (q) . . . that appears as part of the nutrition information required or permitted by such paragraph is not a claim which is subject to this paragraph."  § 343(r)(1).  The intent of this sentence was "to make it clear that the information on the nutrition label is not a claim under that provision and therefore is not subject to the disclosure requirements in section 403(r)(2) [343(r)(2)]," although similar statements made outside the nutrition label could be subject to section [343(r) if they otherwise meet the definition of a "claim."  136 Cong. Rec. H5836-01, H5841 (July 30, 1990) (Rep. Waxman); *see also* 58 Fed. Reg. 2302, 2303-04 (Jan. 6, 1993); 21 C.F.R. § 101.13(c).  Thus, voluntary statements relating to the amount of nutrients in a food can potentially constitute "nutrient content claims" if they implicitly or explicitly "characterize" the amount of the nutrient.

relationship between the nutrients in their foods and diseases or health effects. § 343(r)(1)(B). Health claims, however, are regulated somewhat differently. Instead of providing a list of specific descriptive terms that manufacturers may use, FDA authorizes a health claim only when it determines that there is "significant scientific agreement" that scientific evidence supports the health claim. 21 C.F.R. § 101.14(c).

## B. The NLEA's Exemption of Restaurant Foods from Federal Nutrition Information Disclosure Requirements

The extent to which restaurants should be covered by the NLEA's nutrition labeling requirements was a matter of considerable debate in Congress. Many of the legislation's supporters wanted restaurant food to fall under section 343(q)'s mandatory nutrition labeling provisions, but such coverage "was vociferously opposed by the National Restaurant Association," Sims, *Politics of Fat,* at 200, and was not included in the final legislation. *See* § 343(q)(5)(A)(i) (exempting food that is "served in restaurants" from the nutrition labeling requirements of section 343(q)).

As a result, the coverage of restaurants turns on the Act's mandatory-voluntary distinction: As far as federal law is concerned, restaurants are *not* required to provide the kind of nutritional information disclosures—such as listings of the calories or fat in all food items—that is required of packaged foods.[5] But restaurants are not exempted from the Act's

---

[5] In 2004, the FDA's Obesity Working Group explained the implications of the regulatory gap left open by section 343(q)'s exemption for restaurant food: "[U]nder the laws administered by FDA, restaurants are not required to provide nutrition information unless a nutrient content or health claim is made for a food or meal. When claims are made, however, the restaurant need only provide information about the amount of the nutrient that is the subject of the claim. Restaurants may, and many do, provide nutrition information on a voluntary basis. Nevertheless, this nutrition information is often in the form of posters, placemats or menu icons, or on the Internet, rather than (continued on next page)

regulation of "claims." So the only circumstance in which the NLEA affects restaurants is when they choose to make "claims," within the meaning of section 343(r), that "characterize" the nutrients or health effects in the foods they serve using certain descriptive terms—for example, when a restaurant's menu describes an item as "low fat" or "heart healthy." 21 C.F.R. § 101.10; *see* FDA Talk Paper T96-52 (July 30, 1996), *available at* http://www.cfsan.fda.gov/~lrd/tpmenus.html ("This final rule affects only those restauranteurs who place claims such as 'low fat' or 'heart healthy' on their menus.").[6] A restaurant that decides to make such a descriptive claim about its food's nutritional content is obligated only to disclose "the nutrient amounts that are the basis for the claim." 21 C.F.R. § 101.10. Such mandatory quantitative disclosures are considered the "functional equivalent" of the type of nutritional labeling required of packaged foods by section 343(q). *Id.*

---

(footnote continued from previous page)

at the point-of-sale. Such information is not always readily available or observable at the point-of-sale." FDA, *Calories Count: Report of the Working Group on Obesity* (2004), at Part V.B., *available at* http://www.cfsan.fda.gov/~dms/owg-toc.html ("*FDA Calories Count Report*").

  [6] FDA originally decided to exempt restaurant menus—but not restaurant signs, placards or posters—from its regulations implementing section 343(r). 58 Fed. Reg. 2066 (Jan. 6, 1993). In response to a lawsuit filed by Public Citizen and Center for Science in the Public Interest, FDA reversed course just six months later and issued proposed regulations to remove the menu exemption, 58 Fed. Reg. 33055 (June 15, 1993), but the regulations were rejected by the White House Office of Management and Budget under pressure from the restaurant industry. *See* Sims, *Politics of Fat*, at 201. The court in that lawsuit ultimately held that the menu exemption was contrary to the NLEA, *Public Citizen v. Shalala*, 932 F. Supp. 13 (D.D.C. 1996), and, about one month later, the agency issued a final rule that adopted its June 1993 proposal. *See* 61 Fed. Reg. 40320 (Aug. 2, 1996) (adopting final rule).

C.    The NLEA's Preemption Provisions

The Act's mandatory-voluntary distinction is carried over into its preemption provisions as well. As with restaurant coverage, Congress devoted careful attention to preemption during its consideration of the NLEA. *See* Sims, *Politics of Fat*, at 199 ("The preemption issue remained a key area of dispute throughout consideration of the food labeling bill, with the basic issue being how far the legislation should go in setting uniform food labeling regulations that preempt state laws.").[7] In the final moments of the floor debate before the NLEA was formally adopted by the House after its passage in both chambers, Representative Waxman explained that carefully limited federal preemption had been added to the bill to induce industry to support the legislation. 136 Cong. Rec. H12951-02, H12954 (Oct. 26, 1990) ("[I]t was decided that the fairest way to expect the food industry to support a nutrition labeling bill, was to give them *some types of preemption* of *some* burdensome State laws that interfered with their ability to do business in all 50 States.") (emphasis added). Even Senator Orrin Hatch, who was the leading proponent of stronger federal preemption, conceded that "the carefully crafted uniformity section of this legislation is limited in scope."  136 Cong. Rec. S16607-02, S16611 (Oct. 24, 1990).

In an effort to satisfy industry concerns while remaining "sensitive to the regulatory roles played by the States," the Senate reached a compromise that was "refined to provide national uniformity where it is most necessary, while otherwise preserving State regulatory

---

[7] *See generally* Bradley, *The States' Role in Regulating Food Labeling and Advertising: The Effect of the Nutrition Labeling and Education Act of 1990*, 49 Food & Drug L.J. 649, 659 (1994); Jordan, *Preemption and Uniform Enforcement of Food Marketing Regulations*, 49 Food & Drug L.J. 401, 401 (1994).

authority where it is appropriate."  136 Cong. Rec. S16607-02, S16609 (Oct. 24, 1990) (Sen.

Mitchell); *see also* 136 Cong. Rec. S16607-02, S16611 (Oct. 24, 1990) (Sen Hatch) ("[T]he

compromise makes clear that the national uniformity in food labeling that is set forth in the

legislation has absolutely no effect on preemption of State or local requirements that relate

to such things as warnings about foods or components of food.").  That default position—of

"otherwise preserving State regulatory authority"—is reflected in a special rule of

construction limiting the preemptive effect of the NLEA to only state laws that fall within

the NLEA's express preemption provisions:

> The Nutrition Labeling and Education Act of 1990 shall not be construed to
> preempt any provision of State law, unless such provision is expressly
> preempted under section 403A [21 U.S.C. § 343-1(a)] of the Federal Food,
> Drug, and Cosmetic Act.

Pub. L. No. 101-535, § 6(c), 104 Stat. 2535, 2364 (21 U.S.C. § 343-1 note).

Because the NLEA exempts restaurant food from its nutrition labeling regime,

Congress specifically considered the question of state and local authority to regulate

nutrition labeling in restaurants. The final legislation contained a preemption provision that

was carefully drafted to preempt any "requirement for nutrition labeling of food that is not

identical to" section 343(q), "*except* a requirement for nutrition labeling of food which is

exempt" from section 343(q)—that is, *except* a requirement for nutrition labeling of

restaurant food.  § 343-1(a)(4) (emphasis added).  On the day that the NLEA passed the

Senate by a voice vote, the Act's chief Senate sponsor, Senator Howard Metzenbaum of

Ohio, explained the meaning of this exception:

> Because food sold in restaurants is exempt from the nutrition labeling
> requirements of section 403(q)(1)-(4), *the bill does not preempt any state nutrition
> labeling requirements for restaurants.*

136 Cong. Rec. S16607-02, S16608 (Oct. 24, 1990) (Sen. Metzenbaum) (emphasis added).  The

result is an Act that carefully avoids creating a regulatory vacuum:  State law is preempted

only to the limited extent that federal law specifically covers the same territory.

## ARGUMENT

I.    **The Restaurant Association bears an especially heavy burden to demonstrate "clear and manifest" congressional intent to preempt state and local nutrition disclosure requirements for restaurants.**

In its briefing, the California Restaurant Association (CRA) attacks what it describes

as three competing "theories" for why menu-labeling ordinances are not preempted by the

NLEA, and suggests that the City bears the burden of proving one or more of those

"theories." That is exactly backwards. In fact, the burden is on CRA, and it is an especially

heavy one: "Preemption analysis starts with the presumption that the traditional police

powers of states are not displaced by federal law unless displacement was the 'clear and

manifest purpose of Congress.'" *Chem. Specialties Mfrs. Ass'n, Inc. v. Allenby*, 958 F.2d 941,

943 (9th Cir. 1992) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  The

Ninth Circuit has explained that there are two "practical reasons" for that presumption—

first, "Congress has the power to make preemption clear in the first instance," and second,

"if the court erroneously finds preemption, the State can do nothing about it, while if the

court errs in the other direction, Congress can correct the problem." *Id.*

The presumption against preemption is also rooted in an imperative of federalism

implicit in the constitutional plan and embodied, among other places, in the Tenth

Amendment. An insistence on "clear and manifest" Congressional intent "provides

assurance that the 'federal-state balance' will not be disturbed unintentionally by Congress

or unnecessarily by the courts." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977) (quoting

*United States v. Bass*, 404 U.S. 336, 349 (1971)); *see generally* Grey, *Make Congress Speak Clearly*, 77 B.U. L. Rev. 559 (1997); Hoke, *Preemption Pathologies and Civic Republican Values*, 71 B.U. L. Rev. 685 (1991).[8]

San Francisco's regulation "falls squarely within its prerogative to regulate matters of health and safety, which is a sphere in which the presumption against preemption applies, indeed, stands at its strongest." *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 94 (2d Cir. 2007), *aff'd by an equally divided Court*, 128 S.Ct. 1168 (2008) (discussing preemption in context of food and drug law); *see Medtronic v. Lohr,* 518 U.S. 470, 485 (1996). Federal courts presume "that state and local regulation of health and safety matters can constitutionally coexist with federal regulation" because "the regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985). "[T]here is indeed no subject of legislation more firmly identified with local affairs than the regulation of restaurants." *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 113 (1953).

---

[8]CRA urges this Court to strike down San Francisco's rule because it regards it as a novel social science experiment aimed at solving a problem (the obesity epidemic) for which nobody has found a magic bullet. But, as Justice Brandeis famously observed, one of the chief virtues of our system of federalism is that "a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932). It is precisely when "disagreement exists about how best to accomplish [a] goal" that "the theory and utility of our federalism are revealed, for the States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear." *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring); *see generally* Hills, *Against Preemption: How Federalism Can Improve the National Legislative Process*, 82 N.Y.U. L. Rev. 1 (2007). The solution San Francisco is pursuing here, moreover, is one that is supported by an growing scientific and public policy consensus. *See generally* Wootan Decl.

Any analysis of the scope of federal preemption must be guided by the principle that "the purpose of Congress is the ultimate touchstone in every preemption case."  *Lohr*, 518 U.S. at 485 (internal quotation marks omitted).  That purpose, of course, is discerned primarily "from the language of the pre-emption statute and the statutory framework surrounding it."  *Id.* at 486 (internal quotation marks omitted).  In addition, the Court must examine the "structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law."  *Id.* (internal citations and quotation marks omitted).

Here, the analysis must begin and end with the carefully limited language of the NLEA's express preemption clause because Congress made clear that "the Nutrition Labeling and Education Act of 1990 shall not be construed to preempt any provision of State law, unless such provision is expressly preempted" by that language.  Pub. L. No. 101-535, § 6(c), 104 Stat. 2535, 2364 (21 U.S.C. § 343-1 note); *see AT&T Communications of Ill., Inc. v. Ill. Bell Tel. Co.*, 349 F.3d 402, 410 (7th Cir. 2003).  Thus, the Court's only task is to determine whether San Francisco City's rule falls within "'the domain expressly pre-empted' by that language." *Lohr*, 518 U.S. at 484 (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992)).  To the extent that there is any ambiguity—and, as explained below, there is none—this Court has a "duty" to adopt a plausible reading of the statute that preserves local autonomy.  *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) ("[I]ndeed, even if its alternative were just as plausible as our reading of that text . . . we would nevertheless have a duty to accept the reading that disfavors pre-emption.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    The NLEA leaves San Francisco free to enact mandatory nutrition information disclosure requirements for restaurant food.

Section 343(q) of the NLEA requires that food purveyors disclose specific nutrition information about most food products sold in the United States, including "nutrition information that provides . . . the total number of calories . . . derived from any source . . . in each serving size or other unit of measure of the food." § 343(q)(1)(C)(i). Under NLEA's preemption provision, states and local governments are *not* free, as a general matter, to adopt "any requirement for nutrition labeling of food" that is not "identical" to what federal law requires.    § 343-1(a)(4). Thus, San Francisco could not adopt a rule requiring the disclosure of the amount of calories on the front of cereal boxes sold in San Francisco grocery stores.

But San Francisco is not similarly restrained when it comes to regulating local restaurants. As discussed above, Congress sought to avoid a regulatory vacuum by intentionally excepting state requirements for nutrition labeling of restaurant food from NLEA preemption at the same time that it exempted restaurant food from the new federal labeling requirements. The NLEA preempts "any requirement for nutrition labeling of food that is not identical to the requirement of section 343(q) . . . *except a requirement for nutrition labeling of food which is exempt*" under that section—i.e., a requirement for nutrition labeling of restaurant food. § 343-1(a)(4) (emphasis added); *see* § 343(q)(5)(A)(i) (providing that section 343(q)'s nutrition labeling requirements "shall not apply to food . . . which is served in restaurants or other establishments in which food is served for immediate human consumption or which is sold for sale or use in such establishments").

Taken together, these three provisions—sections 343-1(a)(4), 343(q)(5)(A)(i), and 343(q)(1)(C)(i)—demonstrate that Congress intended that the NLEA would not preempt state requirements "for nutrition labeling"—including labeling "that provides . . . the total number of calories"—for "food . . . which is served in restaurants." The NLEA, in other words, specifically does *not* preempt state-law requirements that restaurants disclose nutritional facts, such as the calorie content of their food.

The FDA has consistently taken a position in keeping with that straightforward interpretation. In April 2008, the FDA reissued guidelines, reaffirming its view that states and local governments may "require restaurant foods to bear nutrition labeling even if the food is exempt under Federal requirements . . . . [B]ecause the [NLEA] exempts restaurant foods that do not bear a claim from mandatory nutrition labeling, State requirements for the nutrition labeling of such foods would not be preempted." FDA, *Labeling Guide for Restaurants and Other Retail Establishments Selling Away-From-Home Foods*.[9]  Notably, this FDA statement specifically distinguishes between "mandatory nutrition labeling" of the type required under section 343(q)—from which restaurant food is exempt—and "foods that bear a claim" under section 343(r), and follows the common-sense reading of the statute discussed above. Moreover, prior and subsequent FDA statements, including its most recent amicus brief in the Second Circuit, are fully consistent with that analysis. *See, e.g.*, *Keystone Report* at 74; *FDA Calories Count Report* at V.B.

CRA's motion for a preliminary injunction makes no attempt to reconcile its preemption argument with the savings clause contained in § 343-1(a)(4). As the Supreme

---

[9] *Available at* http://www.cfsan.fda.gov/~dms/labrguid.html

Court has explained, "[t]hat Congress added the remainder of the provision is evidence of its intent to draw a distinction between state labeling requirements that are pre-empted and those that are not." *Bates*, 544 U.S. at 449. Section 343-1(a)(4) distinguishes between "requirement[s] for nutrition labeling of food" that are preempted and those that are not, and specifically places restaurant nutrition-labeling in the latter category. CRA offers no principled basis for distinguishing between the sphere of regulation of nutritional information in restaurants that Congress expressly left open to state and local regulation in section 343-1(a)(4) (the companion preemption provision to section 343(q)), and the types of regulations respecting "claims" within the meaning of sections 343-1(a)(5) (the companion preemption provision to section 343(r)). CRA's position would thus effectively read the savings-clause out of the statute as far as restaurants are concerned.

Not only is there no "clear and manifest" evidence of Congressional intent to preempt restaurant labeling regulations like San Francisco's, *Lohr*, 518 U.S. at 485, but the clearest evidence of Congressional intent—in the form of statutory language, legislative history, and agency interpretation, all addressing precisely the question of preemption of

state nutrition labeling requirements for restaurant food—points decisively away from preemption.[10]

### III. San Francisco's ordinance does not regulate voluntary "claims" that use descriptive "terms" to "characterize" nutrient levels or health effects.

CRA attempts to sidestep Congress's decision to save local restaurant nutrition-labeling requirements from preemption by arguing that the San Francisco rule covers the same ground as section 343(r)'s prohibition of unauthorized or unsubstantiated descriptive "claims" that food purveyors choose to make about their food. *See* § 343(r) (prohibiting any "claim" that "characterizes" the nutrient content of food unless the "characterization" employs specific "terms" defined by the FDA); § 343-1(a)(5) (preempting state law "respecting any claim of the type described in section 343(r)"). For this express preemption

---

[10]CRA obliquely suggests (Mtn. for Prelim. Inj. at 8-9) that San Francisco has somehow interfered with an FDA policy of "flexibility" concerning how restaurants may present nutrition information. But "FDA does not have regulatory authority to require nutrition information in restaurants" in the first place. *Keystone Report* at 74; *see FDA Calories Count Report* at V.B.  Because "the FDA has no statutory authority under the NLEA to mandate nutritional disclosure by the fast food industry," "its reluctance may be explained simply by its lack of authority." Michael A. McCann, *Economic Efficiency and Consumer Choice Theory in Nutritional Labeling*, 2004 Wis. L. Rev. 1161, 1191 n.164 (2004).

"There is no federal pre-emption *in vacuo*." *Puerto Rico Dep't of Consumer Affairs*, 485 U.S. 495, 503 (1988); *see Pelman*, 237 F. Supp. 2d at 525-26 (rejecting McDonald's argument that Congress's decision not to impose mandatory nutrition labeling requirements on restaurants preempts state law nutrition labeling requirements for restaurants); *see also Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002) (holding that it is "quite wrong" to view the Coast Guard's decision not to require propeller guards on motor boats as the "functional equivalent" of a prohibition against state regulation of the subject matter; the decision was "fully consistent with an intent to preserve state regulatory authority"); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995) (where agency had no standard either requiring or prohibiting anti-lock brakes, state claim regarding anti-lock brakes was not preempted). Thus, that FDA has not required nutrition labeling by restaurants in no way precludes cities and states from doing so.

argument to succeed, CRA must demonstrate that San Francisco Ordinance 40-08 is a "requirement respecting any claim of the type described in section 343(r)." § 343-1(a)(5).

But San Francisco's ordinance has nothing to do with such "claims." The San Francisco rule merely requires restaurants to disclose factual nutritional information. It neither prevents nor limits the ability of restaurants to make voluntary, descriptive claims characterizing the nutrient content or health effects of their food.  Restaurants in San Francisco remain just as free as they were in the past to make such descriptive claims, so long as they comply with federal law.

## A.    San Francisco's ordinance has nothing to do with "claims."

Any construction of the word "claim" in section 343(r) must be informed by the distinction between mandatory factual disclosures and voluntary descriptive statements on which the entire structure of the NLEA is premised.   As discussed in Part I above, the NLEA and its regulations "encompass two kinds of information—the mandatory information on nutrients which will appear on the nutrition panel of nearly all food labels, and the voluntary information that some manufacturers choose to add to their product labels." Guarino, *Nutrient Descriptor and Disease Claims for Foods*, 48 Food & Drug L.J. 665, 671 (1993). Both Section 343(q) and San Francisco's rule address the former sort of information, while section 343(r) addresses the latter.

"The difference between requiring certain information on a food label and merely allowing truthful and non-misleading information to appear on the label cannot be understated. Mandatory labels bind all manufacturers of a given product to provide standardized information about their product so that consumers can make essential choices

. . . Voluntary labels, on the other hand, are typically utilized when a manufacturer wishes to distinguish his product from a competing product."  Keane, *The Case of Food Labeling*, 16 Transnat'l L. & Contemp. Probs. 291, 295 (2006).  The San Francisco rule, similarly, binds all covered restaurants to provide standardized factual information about their products to allow consumers to make informed choices, but neither prohibits nor permits descriptive claims that restaurants choose to make about the benefits of their food over that of their competitors.

As used in the NLEA, the word "claim" is a term of art that refers to an express or implied statement about a food product's nutrient content or health effects that is made voluntarily and intentionally by a manufacturer and that may or may not be substantiated; the purpose of the statute is to protect consumers by ensuring that only substantiated, non-confusing statements are made. *See Webster's Third International Dictionary* 414 (2002) (defining "claim" as "an assertion, statement, or implication (as of value, effectiveness, qualification, eligibility) often made or likely to be suspected of being made without adequate justification."). Section 343(r) covers a "claim" made on a food label that "characterizes" the level of a nutrient or the relationship of a nutrient to a disease or health-related condition, providing that such claims "may be made only if the characterization of the level made in the claim uses terms which are defined in regulations of the [FDA]." §§ 343(r)(1), 343(r)(2)(A)(i).

The same or similar use of the word "claim" appears in various places in the U.S. Code to denote assertions made by the vendors or manufacturers of food or agricultural products, both within the NLEA, *see* 21 U.S.C. § 343(q)(5)(C) ("[T]he requirements of such

subparagraphs shall not apply to such food if the label, labeling, or advertising of such food does not make any *claim* with respect to the nutritional value of such food…"), and elsewhere, *see, e.g.*, 7 U.S.C. § 2105(a) ("false or unwarranted *claims* in behalf of cotton or its products or false or unwarranted statements with respect to the quality, value, or use of any competing product."); 7 U.S.C.A. § 2617(f)(2) ("no advertising or sales promotion program shall make any reference to private brand names or use false or unwarranted *claims* in behalf of potatoes or their products") (emphasis added). In these and other instances, the law regulates voluntary advertising claims in contexts where there is some risk that consumers will be deceived by unsubstantiated assertions or confused by the use of ambiguous or misleading terms.

CRA suggests (Mtn. for Prelim. Inj. at 14) that an interpretation of section 343(r) as limited to voluntary statements leads to an "anomalous conflict between state and federal law" because "states or localities could mandate sellers of packaged foods to 'disclose' on the front label the number of calories (or any other nutrient)." But there is no such anomaly because, as described above, San Francisco is restrained from taking that step by section 343-1(a)(4)—which preempts nutrition-information disclosure requirements as to packaged foods—regardless of how one interprets section 343(r).  CRA further posits that a state or city might "'mandate' labeling of 'low sodium' foods," perhaps under circumstances that would conflict with FDA regulation.  *Id.* at 14.   But as to all food, *both* restaurant food *and* packaged food, any problem arising out of that hypothetical scenario would be addressed by section 343(a) of the Food, Drug and Cosmetic Act, which prohibits false or misleading statements.  A statement that a food is "low in fat," when it in fact is not low in fat under the

federal definition of that term, would mislead consumers and would therefore render that food misbranded under section 343(a). Any state law that required a food manufacturer to do something that makes compliance with federal law impossible would be preempted in any event under the doctrine of conflict preemption.

In fact, it is CRA's reading of the statute that leads to absurd results. CRA effectively reads "claims" so broadly that virtually *any* statement containing nutritional information on restaurant food constitutes a claim. But it is difficult to sensibly read the language of section 343(r), or the regulatory scheme that accompanies it, to cover factual nutrition-information disclosures that are mandated by law. An FDA regulation provides that a restaurant that makes a descriptive claim of the type covered by section 343(r) must disclose "the nutrient amounts that are the basis for the claim," which are considered the "functional equivalent" of the type of nutritional information labeling required of packaged foods. 21 C.F.R. § 101.10. But under CRA's construction, there would apparently be no difference between the type of claim that triggers that regulation in the first place and the factual disclosure that must accompany the claim as a result.

**B. San Francisco's ordinance has nothing to do with claims that use descriptive "terms" to "characterize" nutrient levels or health effects.**

Finally, even if it were true that some disclosures compelled by law constituted "claims" under the NLEA, a simple factual disclosure of the number of calories in a food is not a claim that uses descriptive "terms" to "characterize" a nutrient level within the meaning of section 343(r), and thus would not be a "claim of the type described in section 343(r)." § 343-1(a)(5).

Section 343(r) uses the word "characterize" in the sense of "to describe the character or individual quality of," as in, for example, "He characterized her in a few well-chosen words." *American Heritage Dictionary of the English Language* (4th ed. 2006); *see also Webster's Third International Dictionary* 376 (2002) (defining "characterize" as "to describe the essential character or quality of," as in "characterize a friend in a few words"). Thus, factual statements that do not implicitly or explicitly use "terms" to "characterize" the nutrient content of food are not "claims" of the type described in section 343(r).

The FDA's regulations define a nutrient content claim as "[a] claim that expressly or implicitly characterizes the level of a nutrient of a type required to be in nutrition labeling under [the regulations implementing 343(q)]." 21 C.F.R. § 101.13(b). The regulations go on to provide an extensive dictionary of "terms" that "characterize" nutrient levels—including *light, lite, high, rich in, excellent source of, good source of, contains, provides, more, fortified, enriched, added, extra,* and *plus.* 21 C.F.R. §§ 101.54-101.69; *see also* FDA, *Definitions of Nutrient Content Claims, Food Labeling Guide—Appendix A,* http://www.cfsan.fda.gov/~dms/flg-6a.html; FDA, *Label Claims: Nutrient Content Claims,* http://www.cfsan.fda.gov/~dms/lab-nutr.html. The FDA has limited section 343(r)'s coverage to any "claim that expressly or implicitly *characterizes* the level of a nutrient," 21 C.F.R. 101.13(b) (emphasis added), and thus confirms that a statement is a claim within the meaning of section 343(r) only if it uses descriptive terms—such as "low," "more" or "contains"—to characterize the level of nutrients. *See, e.g.,* 21 C.F.R. 101.54(c) (listing "contains" as a descriptive term and limiting its use).

More to the point, and in keeping with the plain meaning of the word "characterize," the same regulation makes clear that section 343(r) does not extend to straightforward listings of calorie amounts that are not accompanied by statements that implicitly "characterize" the calorie content. "The label or labeling of a product may contain a statement about the amount or percentage of a nutrient if:"

> (3) The statement does not in any way implicitly characterize the level of the nutrient in the food and it is not false or misleading in any respect (e.g., "100 calories" or "5 grams of fat"), in which case no disclaimer is required.

21 C.F.R. § 101.13(i)(3).[11] Notably, the regulation uses the bare phrase "100 calories" as an illustration of a statement about the "amount or percentage of a nutrient" that does *not* "characterize" a nutrient level. Again using "100 calories" as an example, the FDA explained the reasoning for the regulation as follows:

> [B]ased on the comments and its review of the 1990 amendments, FDA finds that there are some circumstances in which an amount claim cannot be considered to characterize in any way the level of a nutrient in a food. For example, the statement "100 calories" or "5 grams of fat" on the principal display panel of a food would be a simple statement of amount that, by itself, conveys no implied characterization of the level of the nutrient.

58 Fed. Reg. 2302-01, 2310 (Jan. 6, 1993).

FDA's guidance concerning its regulations expands on the same point: "Nutrient content claims describe the level of a nutrient or dietary substance in the product, using terms such as *free*, *high*, and *low*, or they compare the level of a nutrient in a food to that of another food, using terms such as *more*, *reduced*, and *lite*. An accurate quantitative statement

---

[11]The qualification that a statement may not be "false or misleading in any respect" is a reference to FDA's general authority, under section 343(a), to regulate false or misleading food advertising or labeling. Notably, the NLEA does not list section 343(a) among the provisions of the statute that preempt state law. *See* Jordan, *Preemption and Uniform Enforcement*, 49 Food & Drug L.J. at 402.

(e.g., 200 mg of sodium) that does not 'characterize' the nutrient level may be used to describe any amount of a nutrient present." FDA, *Claims that Can Be Made for Conventional Foods and Dietary Supplements* (2003) (emphasis added), *available at* http://www.cfsan.fda.gov/~dms/hclaims.html; *see also* Guarino, *Nutrient Descriptor and Disease Claims for Foods*, 48 Food & Drug L.J. at 671 (discussing 21 C.F.R. 101.13(i)(3)).

If further confirmation is needed that straightforward disclosures of quantitative calorie information fall outside the scope of section 343(r), it can be found in FDA enforcement letters, a few of which are attached as an appendix to this brief. In one of the attached letters, FDA responded to a request from *amicus* Center for Science in the Public Interest (CSPI) urging the agency to regulate products bearing the statement "0 *trans* fat." *See* Letter to M. Jacobson from B. Schneeman, dated Apr. 14, 2006. The FDA letter noted that CSPI had "refer[red] to these statements (i.e., '0g *trans* fat') as claims" and acknowledged that "there are no approved nutrient content claims for *trans* fat." *Id.* at 1. Nevertheless, the agency rejected the request on the grounds that such bare factual statements concerning the amount of nutrients are not claims at all:

> [T]he label or labeling may contain a factual statement about the amount or percentage of a nutrient in accordance with 21 C.F.R. 101.13(i)(3). The use of this kind of factual statement should not in any way imply that there is a little or a lot of the nutrient in the food and is not false or misleading under section 403(a) of the Act. . . . . The use of descriptive words, such as 'only' or 'contains,' would implicitly characterize the level of the nutrient for which there is no definition. A claim that expressly or implicitly characterizes the level of a nutrient may not be made on the label or labeling foods unless the claim is made in accordance with the regulations (21 C.F.R. 101.13(b)).
>
> **The '0g *trans* fat' statements presented in your letter are considered factual statements, rather than nutrient content claims**, in accordance with § 101.13(i)(3) and the products are not considered misbranded under the Act.

*Id.* at 2 (emphasis added).

In short, San Francisco's rule does not come close to addressing "claims" that restaurants may decide to make about their food, let alone claims that "characterize" nutrient levels using descriptive "terms" of the type regulated by section 343(r) and its implementing regulations. Rather, San Francisco's ordinance compels the disclosure of straightforward factual nutrition information for certain restaurant food, just as section 343(q) mandates similar disclosures for packaged food, and thus falls squarely into the sphere that Congress intentionally left open to the states.

## IV. The Restaurant Association's First Amendment theory stands the commercial-speech doctrine on its head.

To explain why CRA's First Amendment theory is misguided, it would be difficult for us to improve upon *National Electrical Manufacturers Association v. Sorrell*, 272 F.3d 104, 113-16 (2d Cir. 2001), which upheld a Vermont law requiring labeling of mercury-containing lightbulbs, or *Evironmental Defense Center v. EPA*, 344 F.3d 832, 848-51 (9th Cir. 2003), which followed *Sorrell* in upholding a federal requirement that storm-sewer providers disclose information concerning environmental hazards. We write only to highlight the breathtaking implications of the Restaurant Association's position.

Adopting CRA's plea for intermediate or heightened scrutiny would not only run afoul of cases like *Sorrell* and *Environmental Defense*, but would turn the commercial-speech doctrine upside down. In *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976), the first case to establish First Amendment protection for commercial speech, the consumer plaintiffs wanted information about drugs so they could make informed decisions in the marketplace. The Court struck down a statute barring drug-price advertising because the "consumer's interest in the free flow of commercial

information . . . may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Id.* at 763.

The commercial-speech doctrine that grew out of *Virginia Board* has consistently observed a "constitutional presumption favoring disclosure over concealment," *Ibanez v. Fla. Dep't. of Bus. and Prof'l Reg.*, 512 U.S. 136, 145 (1994), because "disclosure furthers, rather than hinders" First Amendment values: "Protection of the robust and free flow of accurate information is the principal First Amendment justification for protecting commercial speech." *Sorrell*, 272 F.3d at 114. It is for this reason that commercial disclosure requirements—including requirements justified by promotion of the public health—are assessed under the reasonable-relationship test of *Zauderer* rather than the intermediate-scrutiny standard of *Central Hudson*. *Id.* at 115 (citing *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557 (1980)); *cf. Rubin v. Coors Brewing Co.*, 514 U.S. 476, 484 (1995) (citing federal nutrition labeling requirements as evidence of a trend "favor[ing] greater disclosure of information, rather than less"). But as *Sorrell* recognized, subjecting purely factual commercial disclosure requirements to heightened scrutiny would upend these settled principles and distort the commercial speech doctrine into a *barrier* to "the free flow of information" critical to promoting public health. *Id.*  No existing law requires such a topsy-turvy result.

CRA's attempts to distinguish *Sorrell*, *Environmental Defense*, and *Zauderer* are unpersuasive.  First, the City ordinance does not "dictate a specific message," *Envt'l Defense*, 344 F.3d at 849, but requires only the disclosure of factual information to consumers.  Fast-food restaurants have every right to disagree with San Francisco about whether disclosing

calorie information helps reduce obesity. The expression of that view—whether in CRA's brief to this Court, or in the public square, or before the City Council—is protected by the First Amendment, and it will continue to be. The City's regulation does not force CRA to express a contrary view any more than the Vermont law in *Sorrell* forced the lightbulb manufacturers to express the view that mercury is dangerous or the EPA's regulation in *Environmental Defense* forced storm-sewer providers to express the view that stormwater discharges are hazardous.  Second, the proposition that *Zauderer* applies only to disclosure requirements that prevent deception is one that has been explicitly rejected in similar cases. *See Sorrell.* 272 F.3d at 115; *accord Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005).  Although the overall goal of the San Francisco ordinance is plainly to reduce obesity, it is analyzed under *Zauderer* because "it is inextricably intertwined with the goal of increasing consumer awareness" of high calorie content in a variety of restaurant foods. *Sorrell*, 272 F.3d at 115.  In any event, San Francisco's rule *is* in fact designed to prevent consumer deception and confusion concerning calorie content, and so *Sorrell* controls even if one applies the cramped (and incorrect) interpretation that CRA urges.

CRA's theory in this case is even more radical than the position rejected in *Sorrell* and *Environmental Defense* because it asks the Court to apply not just intermediate scrutiny, but *strict scrutiny*, on the theory that the San Francisco rule constitutes "compelled speech" under *United States v. United Foods, Inc.*, 533 U.S. 405 (2001). To appreciate just how much CRA's position would disrupt settled law, consider how it would change the outcome in many cases that have adopted *Sorrell*'s approach in the face of compelled-speech challenges to various disclosure and posting laws. *See, e.g., Rowe*, 429 F.3d 294 (1st Cir. 2005)

(upholding Maine law requiring intermediaries between drug companies and pharmacies to disclose conflicts of interest and financial arrangements); *UAW-Labor Employment & Training Corp. v. Chao*, 325 F.3d 360, 365 (D.C. Cir. 2003) (upholding requirement that federal contractors post notices at all of their facilities informing employees of rights under federal labor law that protect employees from being forced to join union or to pay mandatory dues for costs unrelated to representational activities); *United States v. Wenger*, 292 F. Supp. 2d 1296, 1303-04 (D. Utah 2003) (upholding federal securities disclosure requirements); *BellSouth Adver. & Pub. Corp. v. Tenn*, 79 S.W.2d 506, 516-21 (Tenn. 2002) (upholding requirement that "baby Bell" phone company disclose names of its local-phone-company competitors). CRA does not even attempt to grapple with this line of post-*United Foods* cases.

As these cases recognize, "the First Amendment's guarantee of freedom from 'compelled speech' is not absolute. Particularly in the commercial arena, the Constitution permits the State to require speakers to express certain messages without their consent, the most prominent examples being warning and *nutritional information labels*." *Entertainment Software Ass'n v. Blagovech*, 469 F.3d 641, 651 (7th Cir. 2006) (emphasis added) (distinguishing between "opinion-based" compelled speech and "purely factual disclosures," such as "whether a particular chemical is within any given product"); *Dutchess/Putnam Rest. & Tavern Ass'n, Inc. v. Putnam County Dep't of Health*, 178 F. Supp. 2d 396, 406 (S.D.N.Y. 2001) (rejecting "argument that a sign stating that there are health risks to children from secondhand smoke is an 'ideological message'"); *BellSouth*, 79 S.W.3d at 516-21 (*Zauderer*, not *United Foods*, supplies proper standard in cases involving factual

commercial disclosure requirements); *see also Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 557 (2005) (explaining that the Court has recognized only two kinds of compelled-speech cases: "true compelled-speech cases," in which an individual is forced to personally express an opinion with which he disagrees, and "compelled-subsidy cases," like *United Foods*).

Under CRA's expansive theory of compelled speech, countless federal, state, and local laws mandating disclosure on a wide range of subjects—from tobacco, pesticides, and pollutants, to hand-washing by restaurant employees—would fall, after being exposed to "searching scrutiny by unelected courts." *Sorrell*, 272 F.3d at 116. As *Sorrell* noted, even the mandatory nutrition labeling provisions of the NLEA would be among those laws. *Id.* (citing 21 U.S.C. 343(q)). "Such a result is neither wise nor constitutionally required." *Id.*

### CONCLUSION

For the foregoing reasons, the Court should reject the California Restaurant Association's request to invalidate San Francisco Health Ordinance 40-08.

Respectfully submitted,

*/s/ Monique Olivier*
Monique Olivier
THE STURDEVANT LAW FIRM

Deepak Gupta
PUBLIC CITIZEN LITIGATION GROUP

July 31, 2008                    *Counsel for Amici Curiae*

## APPENDIX LISTING *AMICI CURIAE*

This brief is submitted on behalf of the following *amici*:

**Congressman Henry Waxman** was the chief sponsor of the Nutrition Labeling and Education Act (NLEA) in the U.S. House of Representatives and has long been a leader in Congress on nutrition and food policy issues. He has represented California's 30th District since 1974 and is currently the Chairman of the House Committee on Oversight and Government Reform, which has oversight authority over all federal agencies, including the U.S. Food and Drug Administration.

**David A. Kessler, M.D.** was appointed Commissioner of the U.S. Food and Drug Administration by President George H.W. Bush in 1990. He was sworn in as Commissioner on the same day that President Bush signed the NLEA into law, oversaw the promulgation of regulations implementing the NLEA, and served as FDA Commissioner through 1997, when he became Dean of the Yale School of Medicine. Dr. Kessler is currently Professor of Pediatrics, Epidemiology, and Biostatistics, at the School of Medicine, University of California, San Francisco. Prior to his tenure at FDA, Dr. Kessler, who is also a lawyer, was a lecturer in food and drug law at Columbia Law School.

**Public Citizen** is a non-profit consumer advocacy organization with a longstanding interest in fighting exaggerated claims of federal preemption of state health and safety regulation and defending consumers' rights to know information that affects their health. Public Citizen's lawyers have argued several significant federal preemption cases before the United States Supreme Court and the lower federal courts, and have also argued several of the seminal cases involving the commercial speech doctrine, including *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976), and *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).

**Center for Science in the Public Interest** (CSPI) is a national, non-profit advocacy organization for nutrition and health, food safety, and sound science. CSPI's advocacy was instrumental in getting Congress to consider nutrition labeling legislation in 1989 and in securing passage of the NLEA in 1990, and CSPI has tirelessly advocated for effective FDA enforcement of the NLEA in the seventeen years since its enactment. In addition, CSPI led the advocacy efforts on behalf of the New York City and San Francisco restaurant calorie labeling rules and is working with other cities and states across the nation on similar measures.

The **American College of Preventive Medicine**, established in 1954, is the national professional society for physicians committed to disease prevention and health promotion. To address the lack of nutrition labeling and the rising obesity rates in adults and children, ACPM introduced the menu-labeling resolution that was passed by the AMA's House of Delegates last month.

The **American Diabetes Association** is a nationwide non-profit organization founded in 1940 to advance the interests of the now nearly 21 million Americans with diabetes. ADA's mission is to prevent and cure diabetes and to improve the lives of all people affected by diabetes. It is the nation's leading voluntary health organization supporting diabetes research, information and advocacy. ADA believes that providing calorie information available through postings on menu boards is a critical step in helping people get the information they need to understand how foods they eat impact their weight and overall nutrition goals.

The **American Public Health Association** is the oldest, largest and most diverse organization of public health professionals in the world and has been working to improve public health since 1872. The Association aims to protect all Americans and their communities from preventable, serious health threats. APHA believes that requiring nutrition labeling at fast-food and other chain restaurants is particularly important given how many of our calories are consumed at restaurants, the large portion sizes and high calorie contents often served at restaurants, and the lack of nutrition information at restaurants.

**California Center for Public Health Advocacy** is a non-profit organization established in 1999 by California's two public health associations to raise awareness about critical public health issues and is currently the lead supporter of a bill before the California State Legislature to require nutrition labeling on menus and menu boards in chain restaurants.

**Trust for America's Health** is a non-profit, non-partisan organization dedicated to saving lives by protecting the health of every community and working to make disease prevention a national priority.

**Sharon Akabas**, Ph.D., is Director of the Masters of Science in Nutrition Program, and Associate Director of the Institute of Human Nutrition, at Columbia University's College of Physicians and Surgeons, where her research focuses on childhood obesity prevention.

**George L. Blackburn, M.D., Ph.D.,** holds the S. Daniel Abraham Chair in Nutrition Medicine at Harvard Medical School, where his research focuses on obesity and clinical nutrition. He is also the Chief of the Nutrition Laboratory and Director of the Center for the Study of Nutrition Medicine at the Beth Israel Deaconess Medical Center, Boston.

**Marion Nestle, Ph.D., M.P.H.,** is the Paulette Goddard Professor of Nutrition, Food Studies, and Public Health at New York University, where her research focuses on the role of food marketing as a determinant of dietary choice. Her books include *Food Politics: How the Food Industry Influences Nutrition and Health* (2002, revised 2007); and *What to Eat* (2006).

**Barry M. Popkin, Ph.D.,** is the Carla Steel Chamblee Distinguished Professor of Global Nutrition at the University of North Carolina, Chapel Hill, where he directs the

Interdisciplinary Center for Obesity and the Division of Nutrition Epidemiology and studies dynamic changes in diet, physical activity, and body composition, with a focus on rapid changes in obesity.

**APPENDIX OF STATUTORY AND REGULATORY PROVISIONS**

**21 U.S.C. § 343.  Misbranded food.**

A food shall be deemed to be misbranded--

**21 U.S.C. § 343(q).  Nutrition information**

**(1)** Except as provided in subparagraphs (3), (4), and (5), if it is a food intended for human consumption and is offered for sale, unless its label or labeling bears nutrition information that provides--

\*        \*        \*

**(C)** the total number of calories--
**(i)** derived from any source, and
**(ii)** derived from the total fat,
in each serving size or other unit of measure of the food,

\*        \*        \*

**(5)(A)** Subparagraphs (1), (2), (3), and (4) shall not apply to food—
**(i)** which is served in restaurants or other establishments in which food is served for immediate human consumption or which is sold for sale or use in such establishments[.]

**21 U.S.C. § 343(r).  Nutrition levels and health-related claims**

**(1)** Except as provided in clauses (A) through (C) of subparagraph (5), if it is a food intended for human consumption which is offered for sale and for which a claim is made in the label or labeling of the food which expressly or by implication--

**(A)** characterizes the level of any nutrient which is of the type required by paragraph (q)(1) or (q)(2) to be in the label or labeling of the food unless the claim is made in accordance with subparagraph (2), or

**(B)** characterizes the relationship of any nutrient which is of the type required by paragraph (q)(1) or (q)(2) to be in the label or labeling of the food to a disease or a health-related condition unless the claim is made in accordance with subparagraph (3) or (5)(D).

A statement of the type required by paragraph (q) of this section that appears as part of the nutrition information required or permitted by such paragraph is not a claim which is subject to this paragraph and a claim subject to clause (A) is not subject to clause (B).

**(2)(A)** Except as provided in subparagraphs (4)(A)(ii) and (4)(A)(iii) and clauses (A) through (C) of subparagraph (5), a claim described in subparagraph (1)(A)--

**(i)** may be made only if the characterization of the level made in the claim uses terms which are defined in regulations of the Secretary[.]

**21 U.S.C. §§ 343-1.  National uniform nutrition labeling**

(a) Except as provided in subsection (b) of this section, no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce—

*       *       *

(4) any requirement for nutrition labeling of food that is not identical to the requirement of section 343(q) of this title, except a requirement for nutrition labeling of food which is exempt under subclause (i) or (ii) of section 343(q)(5)(A) of this title, or

(5) any requirement respecting any claim of the type described in section 343(r)(1) of this title, made in the label or labeling of food that is not identical to the requirement of section 343(r) of this title, except a requirement respecting a claim made in the label or labeling of food which is exempt under section 343(r)(5)(B) of this title.

**21 U.S.C. § 343-1, note**

The Nutrition Labeling and Education Act of 1990 shall not be construed to preempt any provision of State law, unless such provision is expressly preempted under section 403A [21 U.S.C. 343-1(a)] of the Federal Food, Drug, and Cosmetic Act.

**21 C.F.R. 101.10.  Nutrition labeling of restaurant foods.**

Nutrition labeling in accordance with § 101.9 shall be provided upon request for any restaurant food or meal for which a nutrient content claim (as defined in § 101.13 or in subpart D of this part) or a health claim (as defined in § 101.14 and permitted by a regulation in subpart E of this part) is made, except that information on the nutrient amounts that are the basis for the claim (e.g., "low fat, this meal provides less than 10 grams of fat") may serve as the functional equivalent of complete nutrition information as described in § 101.9. Nutrient levels may be determined by nutrient data bases, cookbooks, or analyses or by other reasonable bases that provide assurance that the food or meal meets the nutrient requirements for the claim. Presentation of nutrition labeling may be in various forms, including those provided in § 101.45 and other reasonable means.

**21 C.F.R. 101.13.  Nutrition content claims—General principles**

(a) This section and the regulations in subpart D of this part apply to foods that are intended for human consumption and that are offered for sale, including conventional foods and dietary supplements.

(b) A claim that expressly or implicitly characterizes the level of a nutrient of the type required to be in nutrition labeling under § 101.9 or under § 101.36 (that is, a nutrient content claim) may not be made on the label or in labeling of foods unless the claim is made in accordance with this regulation and with the applicable regulations in subpart D of this part or in part 105 or part 107 of this chapter.

(1) An expressed nutrient content claim is any direct statement about the level (or range) of a nutrient in the food, e.g., "low sodium" or "contains 100 calories."

(2) An implied nutrient content claim is any claim that:

(i) Describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (e.g., "high in oat bran"); or

(ii) Suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (e.g., "healthy, contains 3 grams (g) of fat").

\*      \*      \*

(i) Except as provided in § 101.9 or § 101.36, as applicable, or in paragraph (q)(3) of this section, the label or labeling of a product may contain a statement about the amount or percentage of a nutrient if:

\*      \*      \*

(3) The statement does not in any way implicitly characterize the level of the nutrient in the food and it is not false or misleading in any respect (e.g., "100 calories" or "5 grams of fat"), in which case no disclaimer is required.

**21 C.F.R. 101.60.  Nutrient content claims for the calorie content of foods.**

(a) *General requirements.* A claim about the calorie or sugar content of a food may only be made on the label or in the labeling of a food if:

(1) The claim uses one of the terms defined in this section in accordance with the definition for that term;

(2) The claim is made in accordance with the general requirements for nutrient content claims in § 101.13;

(3) The food for which the claim is made is labeled in accordance with § 101.9, § 101.10, or § 101.36, as applicable; and

(4) For dietary supplements, claims regarding calories may not be made on products that meet the criteria in § 101.60(b)(1) or (b)(2) for "calorie free" or "low calorie" claims except when an equivalent amount of a similar dietary supplement (e.g., another protein supplement) that the labeled food resembles and for which it substitutes, normally exceeds the definition for "low calorie" in § 101.60(b)(2).

(b) *Calorie content claims.*  (1) The terms "calorie free," "free of calories," "no calories," "zero calories," "without calories," "trivial source of calories," "negligible source of calories," or "dietarily insignificant source of calories" may be used on the label or in the labeling of foods, provided that:

(i) The food contains less than 5 calories per reference amount customarily consumed and per labeled serving.

(ii) As required in § 101.13(e)(2), if the food meets this condition without the benefit of special processing, alteration, formulation, or reformulation to lower the caloric content, it is labeled to disclose that calories are not usually present in the food (e.g., "cider vinegar, a calorie free food").

(2) The terms "low calorie," "few calories," "contains a small amount of calories," "low source of calories," or "low in calories" may be used on the label or in labeling

of foods, except meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that:

    (i)(A) The food has a reference amount customarily consumed greater than 30 grams (g) or greater than 2 tablespoons and does not provide more than 40 calories per reference amount customarily consumed; or

    (B) The food has a reference amount customarily consumed of 30 g or less or 2 tablespoons or less and does not provide more than 40 calories per reference amount customarily consumed and, except for sugar substitutes, per 50 g (for dehydrated foods that must be reconstituted before typical consumption with water or a diluent containing an insignificant amount, as defined in § 101.9(f)(1), of all nutrients per reference amount customarily consumed, the per 50 g criterion refers to the "as prepared" form).

    (ii) If a food meets these conditions without the benefit of special processing, alteration, formulation, or reformulation to vary the caloric content, it is labeled to clearly refer to all foods of its type and not merely to the particular brand to which the label attaches (e.g., "celery, a low calorie food").

(3) The terms defined in paragraph (b)(2) of this section may be used on the label or in labeling of meal products as defined in § 101.13(l) or main dish products as defined in § 101.13(m), provided that:

    (i) The product contains 120 calories or less per 100 g; and

    (ii) If the product meets this condition without the benefit of special processing, alteration, formulation, or reformulation to lower the calorie content, it is labeled to clearly refer to all foods of its type and not merely to the particular brand to which it attaches.

(4) The terms "reduced calorie," "reduced in calories," "calorie reduced," "fewer calories," "lower calorie," or "lower in calories" may be used on the label or in the labeling of foods, except as limited by § 101.13(j)(1)(i) and except meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that:

    (i) The food contains at least 25 percent fewer calories per reference amount customarily consumed than an appropriate reference food as described in § 101.13(j)(1); and

    (ii) As required in § 101.13(j)(2) for relative claims:

        (A) The identity of the reference food and the percent (or fraction) that the calories differ between the two foods are declared in immediate proximity to the most prominent such claim (e.g., reduced calorie cupcakes "33 1/3 percent fewer calories than regular cupcakes"); and

        (B) Quantitative information comparing the level of the nutrient per labeled serving size with that of the reference food that it replaces (e.g., "Calorie content has been reduced from 150 to 100 calories per serving.") is declared adjacent to the most prominent claim or to the nutrition label, except that if the nutrition label is on the information panel, the quantitative information may be located elsewhere on the information panel in accordance with § 101.2.

    (iii) Claims described in paragraph (b)(4) of this section may not be made on the label or labeling of foods if the reference food meets the definition for "low calorie."

(5) The terms defined in paragraph (b)(4) of this section may be used on the label or in the labeling of meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that:

(i) The food contains at least 25 percent fewer calories per 100 g of food than an appropriate reference food as described in § 101.13(j)(1); and

(ii) As required in § 101.13(j)(2) for relative claims:

(A) The identity of the reference food and the percent (or fraction) that the calories differ between the two foods are declared in immediate proximity to the most prominent such claim (e.g., Larry's Reduced Calorie Lasagna, "25 percent fewer calories per oz (or 3 oz) than our regular Lasagna"); and

(B) Quantitative information comparing the level of the nutrient in the product per specified weight with that of the reference food that it replaces (e.g., "Calorie content has been reduced from 108 calories per 3 oz to 83 calories per 3 oz.") is declared adjacent to the most prominent claim or to the nutrition label, except that if the nutrition label is on the information panel, the quantitative information may be located elsewhere on the information panel in accordance with § 101.2.

(iii) Claims described in paragraph (b)(5) of this section may not be made on the label or labeling of food if the reference food meets the definition for "low calorie."

1    SCOTT PASTERNACK (California State Bar No. 202111)
2    Assistant Corporation Counsel
3    New York City Law Department
4    100 Church Street
5    New York, New York 10007
6    (212) 676-8517
7    Facsimile: (212) 788-1054
8    spastern@law.nyc.gov
9
10   Attorney for Amicus Curiae
11   The City of New York
12
13                UNITED STATES DISTRICT COURT
14               NORTHERN DISTRICT OF CALIFORNIA
15                      OAKLAND DIVISION
16
-------------------------------------------------------------------x

                                        CASE NO. CV-08-3247CW

                                        BRIEF OF AMICI CURIAE
                                        CITY OF NEW YORK, THE
CALIFORNIA RESTAURANT ASSOCIATION,      NATIONAL ASSOCIATION
                                        OF COUNTY AND CITY
                          Plaintiff,    HEALTH OFFICIALS, THE
                                        INTERNATIONAL
          -against-                     MUNICIPAL LAWYERS
                                        ASSOCIATION, THE
THE CITY AND COUNTY OF SAN              NATIONAL LEAGUE OF
FRANCISCO, and THE SAN FRANCISCO        CITIES, THE NATIONAL
DEPARTMENT OF PUBLIC HEALTH             ASSOCIATION OF LOCAL
                                        BOARDS OF HEALTH,
                          Defendants.   MONTGOMERY COUNTY,
                                        MARYLAND, AND SAN
                                        MATEO COUNTY, CA.


                                        Hearing Date: September 4, 2008
                                        Time: 2:00 p.m.
                                        Judge: Hon. Claudia Wilken
-------------------------------------------------------------------x  Place:  Ctrm 2, 4th Floor

17

1                              **TABLE OF CONTENTS**

2                                                                              **Page**

3   TABLE OF AUTHORITIES ......................................................................... ii

4   PRELIMINARY STATEMENT ..................................................................1

5   INTEREST OF AMICI CURIAE ................................................................1

6   POINT I

7               RESTAURANT NUTRITION DISCLOSURE LEGISLATION IS
8               SOUND PUBLIC POLICY AND REFLECTS A NATIONAL
9               CONSENSUS SHARED BY THE FDA AND HEALTH
10              EXPERTS THAT PROVIDING CUSTOMERS WITH THE
11              INFORMATION THEY NEED TO MAKE HEALTHFUL
12              EATING CHOICES IS A USEFUL STRATEGY IN REDUCING
13              OBESITY........................................................................... 9

14  POINT II

15              CONTRARY TO THE CALIFORNIA RESTAURANT
16              ASSOCIATION'S ARGUMENT, THE POSITION TAKEN BY
17              THE CITY OF NEW YORK IN THE  NYSRA II APPEAL WAS
18              FULLY CONSISTENT WITH THE REASONING OF THE
19              DISTRICT COURT IN NYSRA II AND WITH THE POSITION
20              TAKEN BY THE FDA. ...................................................................20

21  CONCLUSION................................................................................24

# TABLE OF AUTHORITIES

**Federal Cases**

Auer v. Robbins,
  519 U.S. 452 (1997) ........................................................... 22

Chervon USA, Inc. v. Natural Resources Defense Council,
  467 U.S. 837 (1984) ........................................................... 21

Desiano v. Warner-Lambert & Co.,
  467 F.3d 85, at 97, fn. 9 (2d Cir. 2007),
  *aff'd*, 128 S. Ct. 1168 (2008) .............................................. 23

New York State Restaurant Assoc. v. NYC Bd. of Health,
  *No. 08 civ. 1000, 2008 WL 1752455 (S.D.N.Y. 4/16/08)* ................... 4,23

New York State Restaurant Assoc. v. NYC Bd. of Health
  *509 F. Supp 351 (S.D.N.Y. 2007)* ........................................... 3

Skidmore v. Swift & Co.,
  323 U.S. 134 (1944) ........................................................... 22


**Statutes and Regulations**

21 U.S.C. § 343(q) .............................................................. 21-23

21 U.S.C. § 343(r) .............................................................. 21-23

21 U.S.C. § 343-1(a)(4) ......................................................... 21-23

21 U.S.C. § 343-1(a)(5) ......................................................... 21-23

21 C.F.R. § 101.13(b)(1) .......................................................... 22


**Journals**

A. Peeters, et al., *Overweight and Obesity by Middle Age Are Associated With A
  Shortened Lifespan*
  138 Ann Intern. Med 24 (2003) ................................................... 8

C. Zoumas-Morse,. et al.
*Children's Patterns of Macronutrient Intake and Associations with Restaurant and Home Eating.*
101 Journal of the American Dietetic Association 923 (2001)........................... 12

Cynthia L. Ogden et al.
*Prevalence of Overweight and Obesity in the United States, 1999-2004*
295 J. MED. ASS'N 1549 (2006)...........................................................................5

Eric A. Finkelstein et al.
*State-Level Estimates of Annual Medical Expenditures Attributable to Obesity*
12 OBESITY RESEARCH 18 (2004)........................................................................9

F.B. Hu, et al.
*Diet, Lifestyle, and the Risk of Type 2 Diabetes Mellitus in Women*
345 NEW ENGLAND J. MED. 790 (2001) ...............................................................8

J.A. Ello-Martin, et al.
*The Influence of Food Portion Size and Energy Density on Energy Intake: Implications for Weight Management.*
The American Journal of Clinical Nutrition 2005; 82(1 Suppl.):236S-241S. ....13

J.F. Guthrie, et al.
*Role Of Food Prepared Away From Home In The American Diet, 1977-78 Versus 1994-96: Changes And Consequences*
34(3) Journal of Nutrition Education and Behavior  140 (2002)........................ 13

Katherine M. Flegal et al.
*Excess Deaths Associated with Underweight, Overweight, and Obesity*
293 J. AM. MED. ASS'N 1861 (2005).....................................................................8

Kenneth E. Thorpe, et al.
*Trends: The Impact of Obesity on Rising Medical Spending*
HEALTH AFFAIRS W480 (2004) ...........................................................................8

L.R. Young and M. Nestle.
*The Contribution of Expanding Portion Sizes to the US Obesity Epidemic, American*
92(2) Journal of Public Health 246 (2002)........................................................ 13

iii

L.R. Young and M. Nestle
*Portion Sizes and Obesity: Responses of Fast-Food Companies.*
28 Journal of Public Health Policy 238 (2007) ....................................13

M. Bassett
*Purchasing Behavior and Calorie Information at Fast-Food Chains in New York City, 2007.*
American Journal of Public Health 2008, Vol. 98, No. 8, pp. 1-3. ................... 17

M. Schmidt, et al.
*Fast-Food Intake and Diet Quality in Black and White Girls*
159 Archives Of Pediatric And Adolescent Med. 626 (2004) ........................... 14

M.P. St-Onge, et al..
*Changes In Childhood Food Consumption Patterns: A Cause For Concern In Light Of Increasing Body Weights.*
78 American Journal of Clinical Nutrition 1068 (2003) ................................... 12

Martha T. Conklin, et al.
*College Students' Use of Point of Selection Nutrition Information*
2 TOPICS IN CLINICAL NUTRITION 20 (2005) ....................................... 18

Michael M. McCann
*Economic Efficiency and Consumer Choice Theory in Nutritional Labeling*
2004 WIS. L. REV. 1161 (2004) ......................................................... 16

R. Milich, et al.
*Effects of Visual Presentation of Caloric Values on Food Buying by Normal and Obese Persons*
42 Perceptual and Motor Skills 155 (1976) ....................................... 18

R.A. Krukowski, et al. *Consumers May Not Use Or Understand Calorie Labeling In Restaurants.*
106(6) J Am Diet Assoc 917 (2006) ............................................... 19

Rebecca S. Fribush
*Putting Calorie and Fat Counts on the Table: Should Mandatory Nutritional Disclosure Laws Apply to Restaurant Foods?*
73 GEO. WASH. L. REV. 377 (2005)...................................................... 16

iv

1   S. Bowman , B. Vinyard
2   *Fast Food Consumption Of US Adults: Impact On Energy And Nutrient Intakes*
3   *And Overweight Status.*
4   23(2) Journal of the American College of Nutrition 163 (2004) ........................ 14

5   S. Paeratakul, et al.
6   *Fast-Food Consumption Among U.S. Adults and Children: Dietary and Nutrient*
7   *Intake Profile*
8   103 J. of the Am. Dietetic Ass'n 1332 (2003) ...................................................... 13

9   S.A. French, et al.
10  *Fast Food Restaurant Use Among Women In The Pound Of Prevention Study:*
11  *Dietary, Behavioral And Demographic Correlates.*
12  24 International Journal of Obesity 1353( 2000).. ...................................... 12, 14

13  S.A. French, et al.
14  *Fast Food Restaurant Use Among Adolescents:  Associations With Nutrient*
15  *Intake, Food Choices And Behavioral And Psychosocial Variables.*
16  25 International Journal of Obesity 1823 (2001) ................................................. 14

17  S.J. Nielsen *and* B. M. Popkin.
18  *Patterns And Trends In Food Portion Sizes 1977-1998*
19  289 JAMA 450 ( 2003).......................................................................................13

20  S. Burton, et al
21  *What Consumers Don't Know Can Hurt Them: Consumer Evaluations And*
22  *Disease Risk Perceptions Of Restaurant Menu Items.*
23  38(1) The Journal of Consumer Affairs 121 (2004) .......................................... 15

24  S. Burton, et al.
25  *Attacking the Obesity Epidemic: The Potential Health Benefits of Providing*
26  *Nutrition Information in Restaurants*
27  96 AM. J. PUB. HEALTH 1669 (2006) ....................................................... 15,17,18

28

29  **Other References**

30

31  Alan S. Levy & Brenda M. Derby
32  *The Impact of the NLEA on Consumers: Recent Findings from FDA's Food*

*Label and Nutrition Tracking System*
  (FDA Office of the Commissioner 1996) …............. …………………………………..17

American Diabetes Assn.,
*Economic Costs of Diabetes in the U.S. in 2002*....................................................8

C. Barnes & Co.
  2008 Barnes reports: U.S. Fast Foods Restaurants Industry (NAICS 72221) .... 13

Centers for Disease Control and Prevention (CDC), U.S. Dep't of Health & Human
  Servs.
  U.S. Obesity Trends 1985-2007 ...................................................................... 5,6

Centers for Disease Control and Prevention (CDC), U.S. Dep't of Health and
  Human Servs.
  Defining Overweight and Obesity........................................................................5

Centers for Disease Control and Prevention (CDC), U.S. Dep't of Health and
  Human Servs.
  Behavioral Risk Factor Surveillance System Survey Data (2006) ................... 6,7

Center for Science in the Public Interest
*Anyone's Guess: The Need For Nutrition Labeling At Fast-Food And Other*
*Chain Restaurants.*
  Washington, DC: Center for Science in the Public Interest, 2003...................... 17

Harvard Forums on Health
 *Obesity as a Public Health Issue: A Look at Solutions.*
 *National Poll by Lake, Snell, Perry & Associates. June 2003*.......................... 17

Institute of Medicine
  Preventing Childhood Obesity: Health in the Balance
  (Jeffrey P. Coplan et al. eds., 2004) .................................................... 10

Institute of  Medicine
*Industry Can Play A Role In Preventing Childhood Obesity*.............................. 11

International Food Information Council (IFIC) Foundation
*Food & Health Survey: Consumer Attitudes Toward Food, Nutrition & Health.*
  Washington, DC: 2007. ...................................................................... 16

1  Jeffrey R. Backstrand, et al.
2     Fat Chance
3     (Ctr. for Science in the Public Interest 1997)...................................... 15

4  Keystone Ctr., The Keystone Forum On Away-From-Home Foods: Opportunities
5     For Preventing Weight Gain and Obesity (2006) …... ................... 10,11,12,15,19

6  Los Angeles County Dep't of Public Health
7     2005 Los Angeles County Health Survey (2005) ...................................7

8  Nat'l Ctr. for Health Statistics, CDC
9     Healthy People 2000 Final Review (2001) ....................................... 43

10 Nat'l Ctr. for Health Statistics, CDC
11    Nat'l Diabetes Surveillance System, Prevalence of Diabetes
12    (1980-2005) ....................................................................8

13 President's Cancer Panel, Promoting Helahty Lifestyles, Policy,Program and
14    Personal and Recoomendations for Reducing Cancer Risk. 2006-2007 Annual
15    Resport, U.S. Dept. of Health, National Institutes of Health, National Cancer
16    Institute. Bethesda, Maryland, 2007.................................. 17

17 Simon et al., Los Angeles County Dep't of Public Health
18    Menu Labeling as a Potential Strategy for Combating the Obesity Epidemic
19    (2008)...........................................................................7

20 U.S. Dep't of Health & Human Servs.
21    The Surgeon General's Call To Action To Prevent and Decrease Overweight and
22    Obesity (2001) ............................................................... 5,12

23

24
25
26

27

28

BRIEF OF AMICI CURIAE CITY OF NEW YORK, et al.,
IN SUPPORT OF DEFENDANT SAN FRANCISCO
Case No. CV-08-3247CW

1          **PRELIMINARY STATEMENT**

2          Amici Curiae, the City of New York, The International Municipal Lawyers

3    Association, The National League of Cities, The National Association of Local Boards of Health,

4    The National Association of County and City Health Officials, San Mateo County, California

5    and Montgomery County, Maryland, respectfully submit this brief in support of the defendants,

6    the City and County of San Francisco and the San Francisco Department of Health ("San

7    Francisco").[1]

8          **INTEREST OF AMICI CURIAE**

9          In January 2008, in response to the growing obesity epidemic in New York City

10   and the associated increase in the health problems related to obesity, the Department of Health

11   and Mental Hygiene of the City of New York ("NYC Department of Health") adopted Health

12   Code section 81.50.  Restaurants which are one of a group of fifteen or more food service

13   establishments offering for sale substantially the same menu items are required to post calorie

14   information on their menus and menu boards.

15         The City of New York believes that its experience in implementing section 81.50

16   - the first to be implemented in the United States- may assist this Court in resolving the issues

17   presented in plaintiff's motion for declaratory relief and a Preliminary Injunction.  Further, the

18   City has an interest in correcting assertions made by plaintiff herein, the California Restaurant

19   Association, regarding the position taken by the City in the New York litigation challenging

20   section 81.50.

---

[1] In an order entered July 23, 2008, this Court granted the City of New York leave to file an amicus brief on behalf of the City of New York and other governmental entities and associations.

1

1    The following amici who have signed onto this brief share a common interest in

2    supporting San Francisco's effort to address the rapidly growing public health crisis of obesity by

3    requiring disclosure of nutrition information for restaurant foods.

4    The National League of Cities ("NLC") is the country's largest and oldest

5    organization serving municipal governments, with more than 1,600 direct member cities and 49

6    state municipal leagues that collectively represent more than 18,000 United States communities.

7    Founded in 1924, NLC strengthens local governments through research, information sharing, and

8    advocacy on behalf of hometown America.

9    The National Association of Local Boards of Health ("NALBOH") represents the

10    interests of local boards of health in the United States.  There are over 3,200 local boards of

11    health across the United States with over 20,000 citizen volunteers working to improve the

12    health of their communities.  NALBOH's mission is to prepare and strengthen boards of health,

13    empowering them to promote and protect the health of their communities through education,

14    training, and technical assistance. NALBOH is dedicated to the development of effective public

15    health policy at the community level.

16    The National Association of County and City Health Officials (NACCHO) is the

17    national organization representing the approximately 2,860 local health departments nationwide.

18    NACCHO's mission is to support efforts that protect and improve the health of all people and all

19    communities by promoting national policy, developing resources and programs, seeking health

20    equity, and supporting effective local public health practice and systems. NACCHO is the

21    national voice and the national connection for local public health.

22    The International Municipal Lawyers Association ("IMLA") is a non-profit,

23    nonpartisan, professional organization consisting of more than 2,500 members comprised of

2

1    local government entities, including cities and counties, and subdivisions thereof, as represented

2    by their chief legal officers; state municipal leagues; and individual attorneys who represent

3    municipalities, counties, and other local government entities.

4          Amicus Montgomery County has proposed restaurant nutrition legislation.

5                              **BACKGROUND FACTS**

6    A.  **The New York City Litigation**

7          In 2006, the NYC Department of Health adopted the predecessor to the present

8    Health Code section 81.50.  That predecessor section ("2006 HC 81.50") required restaurants

9    which had already voluntarily published calorie information to post calorie amounts on menus

10   and menu boards.  The New York State ("NYS") Restaurant Association challenged the 2006

11   HC 81.50 on the grounds that it was preempted by the Nutrition Labeling and Education Act

12   ("NLEA") and that it violated the First Amendment.

13         The United States District Court for the Southern District of New York (Holwell,

14   U.S.D.J.) concluded "that the City has the power to mandate nutritional labeling by restaurants,"

15   but that 2006 HC 81.50 "offends the federal statutory scheme for voluntary nutritional claims"

16   set forth in the NLEA and thus was preempted.  *New York State Restaurant Ass'n v. New York*

17   *City Board of Health*, 509 F. Supp. 2d 351, 352-53 (S.D.N.Y. 2007) ("NYSRA I").  The District

18   Court held that the restaurants' voluntary act of making this calorie information available meant

19   that these restaurants were making nutrient content claims governed by 21 U.S.C. § 343(r) and

20   its preemption provision, and that 2006 HC 81.50 could thus not regulate how they were made.

21   509 F. Supp. 2d at 363.  *See also*, 21 U.S.C. § 343-1(a)(5); 21 C.F.R. § 101.10.

22         In January 2008, the Board of Health repealed 2006 HC 81.50 and reenacted a

23   new Health Code §81.50.  Restaurants which are one of a group of fifteen or more food service

3

1    establishments offering for sale substantially the same menu items are required to post calorie

2    information on their menus and menu boards.  Unlike 2006 HC 81.50, the revised section 81.50

3    mandated the posting of calorie information on menus and menu boards by all covered

4    restaurants and was not limited in its application to those restaurants which were already

5    voluntarily disclosing the information in other forums, i.e., the internet.

6            The NYS Restaurant Association challenged this new provision on the grounds

7    that it was preempted by the NLEA and that it violated the First Amendment.  It sought

8    declaratory relief on its preemption claim and preliminary injunctive relief on its preemption and

9    First Amendment claims.

10           On April 16, 2008, the United States District Court for the Southern District of

11    New York (Holwell, U.S.D.J.) granted the City's cross-motion for summary judgment on

12    plaintiff's preemption claim and denied plaintiff's application for a preliminary injunction on its

13    First Amendment claim (NYSRA II).  *New York State Restaurant Association v. NYC Board of*

14    *Health*, No. 08 Civ. 1000, 2008 U.S. Dist. LEXIS 31451, 2008 WL 1752455 (S.D.N.Y., Apr. 16,

15    2008).

16           The NYS Restaurant Association appealed and the United States Court of

17    Appeals for the Second Circuit expedited the appeal.  At the Court's request, the United States

18    Food and Drug Administration ("FDA") filed a brief.  As discussed in Point II, infra, contrary to

19    plaintiff's argument herein, the City in the Second Circuit did not abandon the District Court's

20    reasoning and the City's position was not inconsistent with the reasoning of the FDA in its brief.

21           On June 12, 2008, the appeal was argued and is presently *sub judice*.  On June 16,

22    2008, the Second Circuit denied the NYS Restaurant Association's motion to stay the imposition

23    of fines for violations of Section 81.50 pending determination of its appeal.

4

1    B.    **States' Response to Soaring Obesity Rates.**

2                    According to measured height and weight data from the National Health and

3    Nutrition Examination Survey (NHANES), the obesity rate among U.S. adults more than

4    doubled over the past three decades.[2]  While 14.5 % of Americans were obese in 1971-1974, the

5    proportion rose to 32.2 % by 2003-2004.[3]    In the last decade, obesity rates have increased in

6    *every* state in the nation.[4]

7                    In response to this trend, in the last year, at least 14 states – Arizona, California,

8    Connecticut, Hawaii, Illinois, Maine, Massachusetts, Michigan, New Jersey, New Mexico, New

9    York, Pennsylvania, Tennessee, and Vermont– have introduced nutrition labeling legislation for

10   restaurants. [5]  Five other cities and counties – Chicago, Montgomery County, MD, Philadelphia,

---

[2] Obesity is defined as a body mass index (BMI) of 30 or higher, or about 30 pounds overweight
for a 5'4" person. BMI is a number calculated from a person's weight and height (kg / m$^2$) and is
used to screen for weight categories that may lead to health problems.
Source: http://www.cdc.gov/nccdphp/dnpa/bmi/adult_BMI/about_adult_BMI.htm; accessed June
28, 2007.

[3] Ogden CL, Carroll MD, Curtin LR, McDowell MA, Tabak CJ, Flegal KM.  *Prevalence Of
Overweight And Obesity In The United States*, 1999-2004. JAMA 2006; 295:1549-1555.

[4] U.S. DEP'T OF HEALTH & HUMAN SERVS., THE SURGEON GENERAL'S CALL TO ACTION TO
PREVENT AND DECREASE OVERWEIGHT AND OBESITY (2001), *available at*
http://www.surgeongeneral.gov/topics/obesity/calltoaction/ CalltoAction.pdf.

[5] Senate Bill 1436, Arizona, 48th Legislature, First Regular Session (introduced 1/29/07); Senate
Bill 1420, California, 2008-2009 Legislature (introduced 2/21/08); Senate Bill 686, Connecticut,
January Session 2007 (introduced 4/11/07); House Bill 54, Hawaii 24th Legislature (introduced
1/18/07); House Bill 389, Illinois, 95th General Assembly, 2007-2008 Session (amended
3/20/07); Legislative Document 1774, Maine, 123rd Maine (3/29/07); Senate Bill 1290, Mass
185th Session (1/10/07); House Bill 4791, Michigan 94th Legislature, Regular Session
(5/17/07);Assembly Bill 1407, New Jersey, 213th Legislature, 2008 Session (1/8/08); House Bill
1203, Mexico, 48th Legislature, First Session (2/26/07); Assembly Bill 729, New York State,
2007-2008 Regular Session (1/3/07); Senate Bill 3787, New York 2007-2008 Regular Session
(3/16/07); House Bill 1108, Pennsylvania 2007-2008 Session (4/18/07); Senate Bill 1696,

1    Washington D.C., and Westchester County, NY – have introduced nutrition labeling legislation.[6]

2    In addition to New York City and  San Francisco, Santa Clara County, CA. and King County,

3    WA have adopted restaurant nutrition labeling legislation.[7]

4             The increase in the rate of obesity in just these states which have introduced

5    legislation highlights the seriousness of the problem.  Since 1991, the percentage of obese adults

6    in these states increased as follows:

7         • Arizona – doubled to 25%
8         • California – doubled to 23%
9         • Connecticut – nearly doubled to 21%
10        • Hawaii – nearly doubled to 21%
11        • Illinois – doubled to 25%
12        • Maine – doubled to 24%
13        • Massachusetts – nearly tripled to 21%
14        • Michigan – nearly doubled to 27%
15        • New Jersey – nearly tripled to 23%
16        • New Mexico – nearly tripled to 24%
17        • New York – doubled to 25%
18        • Pennsylvania – doubled to 27%
19        • Tennessee – nearly tripled to 30%
20        • Vermont – nearly doubled to 21%[8]

---

Tennessee 105th General Assembly (2/8/07); House Bill 477, Vermont 2007-2008 Session
(3/1/07); Senate Bill 6505.

[6] Ordinance 2008-1841, Chicago City Council (introduced 3/12/08); Bill 080167, Philadelphia
City Council (introduced 2/14/08); Bill 19-07, Montgomery County (MD) City Council
(7/31/07); Bill 17-0139, Council of Washington, DC (3/6/07); Chapter 708, Board of Legislators
of Westchester County, New York (1/22/08).

[7] Board f Health Regulation 08-02, King County, WA. (adopted 4/17/08); Board of Supervisors
of the County of Santa Clara, CA, Ordinance No. NS-300.793 (effective 9/1/08).

[8] Centers for Disease Control and Prevention (CDC), U.S. Dep't of Health & Human Servs.,
U.S. Obesity Trends 1985-2007,
http://www.cdc.gov/nccdphp/dnpa/obesity/trend/maps/index.htm. (follow "PowerPoint slide
presentation format" hyperlink); CDC, U.S. DEP'T OF HEALTH AND HUMAN SERVS.,
BEHAVIORAL RISK FACTOR SURVEILLANCE SYSTEM SURVEY DATA (2006),
http://apps.nccd.cdc.gov/brfss/.

6

1

2          When the number of people who are overweight is added to those who are obese,

3    the figures are even more staggering.  In Arizona, New Jersey and New Mexico, at least 60% of

4    adults are overweight or obese.   In Michigan and Tennessee, 65% of adults are obese or

5    overweight.  In Massachusetts, the state with the *lowest* rate among the fifteen states, 56% of

6    adults are obese or overweight.[9]

7          The statistics for individual cities and counties are similarly alarming.  In three of

8    the cities that have introduced nutrition labeling legislation in the last year – Chicago,

9    Philadelphia, and Washington D.C. – more than 55% of adults were obese or overweight as of

10   2006.[10]  In Los Angeles County, 57% of adults were overweight or obese as of 2005, and 23% of

11   school children were obese.[11]

12   C.   **The Burden That The Obesity Crisis Places On States And Localities.**

13         People who are overweight or obese are at increased risk for type 2 diabetes, heart

14   disease, stroke, arthritis, gall bladder disease, osteoarthritis, sleep apnea, respiratory problems,

15   depression, and colon, breast, endometrial, and prostate cancers.   As of 2005, 15.8 million

---

[9] CDC, BEHAVIORAL RISK FACTOR SURVEILLANCE SYSTEM SURVEY DATA, *supra* note 8.

[10] Prevalence rates of obesity and overweight in those metropolitan areas were as follows: Chicago, 61%; District of Columbia, 59%; Philadelphia, 57%.  *See* CDC, BEHAVIORAL RISK FACTOR SURVEILLANCE SYSTEM SURVEY DATA, *supra* note 8.

[11] LOS ANGELES COUNTY DEP'T OF PUBLIC HEALTH, 2005 LOS ANGELES COUNTY HEALTH SURVEY (2005), *available at* http://www.lapublichealth.org/ha/ docs/bmi2005.xls; SIMON ET AL., LOS ANGELES COUNTY DEP'T OF PUBLIC HEALTH, MENU LABELING AS A POTENTIAL STRATEGY FOR COMBATING THE OBESITY EPIDEMIC (2008), *available at* http://www.lapublichealth.org/docs/ Menu_Labeling_Report_2008.pdf.

1    Americans had diabetes, almost triple the number from 1980.[12]  Between 50% and 80% of

2    diabetes cases are associated with obesity, unhealthy eating and physical inactivity.[13]

3            Obesity and overweight in adulthood are associated with large decreases in life

4    expectancy.[14]  A 2005 study by the Centers for Disease Control and Prevention (CDC) estimated

5    that approximately 112,000 deaths are associated with obesity each year in the United States,

6    making obesity the second leading contributor to premature death, behind only tobacco.[15]

7            This epidemic is also generating extraordinary financial costs to society. A 2002

8    study by the American Diabetes Association estimates that direct and indirect costs of diabetes

9    were $132 billion.[16] These sums are far larger if other obesity-related diseases and lost

10   productivity are taken into account. Health care spending among people who are obese has been

11   estimated to be 37% higher than among those with normal weight, and increases in the

12   proportion of and spending on obese people relative to people of normal weight accounted for

13   27% of the rise in inflation-adjusted per capita health care spending between 1987 and 2001.[17]

---

[12] NAT'L CTR. FOR HEALTH STATISTICS, CDC, NAT'L DIABETES SURVEILLANCE SYSTEM, PREVALENCE OF DIABETES (1980-2005), http://www.cdc.gov/diabetes/statistics/prev/national/tablepersons.htm.

[13] F.B. Hu, et al., *Diet, Lifestyle, and the Risk of Type 2 Diabetes Mellitus in Women*, 345 NEW ENGLAND J. MED. 790-97 (2001).

[14] Peeters A, Barendregt JJ, Willekens F, Mackenbach JP, Al Mamun A, Bonneux L. *Overweight And Obesity By Middle Age Are Associated With A Shortened Lifespan.*  Ann Intern Med 2003; 138:24-32.

[15] Katherine M. Flegal et al., *Excess Deaths Associated with Underweight, Overweight, and Obesity*, 293 J. AM. MED. ASS'N 1861, 1861-67 (2005).

[16] American Diabetes Assn., *Economic Costs of Diabetes in the U.S. in 2002.*Diabetes Care, v.26, n.3. March 2003.

[17] Thorpe KE, Florence CS, Howard DH, Joski P. *The Impact Of Obesity On Rising Medical Spending.* Health Aff (Millwood). 2004 Jul-Dec;Suppl Web Exclusives:W4-480-6.

8

1    State governments pay a large portion of the health care costs associated with the

2    obesity epidemic.  In the fourteen states that have introduced nutrition disclosure legislation,

3    their annual medical expenditures attributable to obesity from state Medicare and Medicaid funds

4    are estimated as follows:

5    • Arizona – $396 million
6    • California – $3.5 billion
7    • Connecticut – $665 million
8    • Hawaii – $120 million
9    • Illinois – $1.8 billion
10   • Maine – $203 million
11   • Massachusetts – $1.1 billion
12   • Michigan – $1.6 billion
13   • New Jersey – $1.2 billion
14   • New Mexico – $135 million
15   • New York – $4.9 billion
16   • Pennsylvania – $2.4 billion
17   • Tennessee – $921 million
18   • Vermont – $69 million[18]

19                                    **POINT I**

20   **RESTAURANT NUTRITION DISCLOSURE**
21   **LEGISLATION IS SOUND PUBLIC POLICY**
22   **AND REFLECTS A NATIONAL CONSENSUS**
23   **SHARED BY THE FDA AND HEALTH**
24   **EXPERTS THAT PROVIDING CUSTOMERS**
25   **WITH THE INFORMATION THEY NEED TO**
26   **MAKE HEALTHFUL EATING CHOICES IS A**
27   **USEFUL STRATEGY IN REDUCING**
28   **OBESITY.**

29   Although the California Restaurant Association argues that there is no evidence

30   that menu labeling requirements will have likely health benefits, the U.S. Surgeon General, the

31   FDA, and the Institute of Medicine have all recommended nutritional labeling of restaurant foods

---

[18] Eric A. Finkelstein et al., *State-Level Estimates Of Annual Medical Expenditures Attributable To Obesity*, 12 Obesity Research 18, 22-23 (2004).

1    as a useful strategy for addressing obesity.  Further, as discussed below, nutritional labeling for

2    restaurant foods is sound public policy because (1) an increasing proportion of calories is being

3    consumed away from home; (2) presently people underestimate calories; (3) evidence indicates

4    that consumers want nutritional information and will use it to make food choices; and (4) making

5    calorie information readily accessible to diners will likely result in the development of healthier

6    menu offerings.

7    A.    **Leading Scientific Authorities Recommend That Calorie Information Be Readily**
8          **Available In Restaurants, Including At Point Of Purchase**

9          The California Restaurant Association's argument that more research should be

10   conducted before localities and states take action to curb the obesity epidemic is contrary to the

11   recommendation of the scientific community.  For example, the Institute of Medicine concluded

12   in its 2004 report on childhood obesity that because "[t]he obesity epidemic is a serious public

13   health problem calling for immediate reduction in obesity prevalence and in its health and social

14   consequences, … actions should be based on the best available evidence—as opposed to waiting

15   for the best possible evidence."[19]

16         Additionally, the final report of the FDA-commissioned Keystone Forum on

17   Away-From-Home Foods recommends that: "Away-from-home food establishments should

18   provide consumers with calorie information in a standard format that is easily accessible and

19   easy to use."[20]  This was the *first* recommendation in Chapter 4 of the report, "Providing

---

[19] Institute of Medicine. *Preventing Childhood Obesity: Health in the Balance* (Jeffrey P. Coplan et al. eds., 2004).

[20]The Keystone Center. The Keystone Forum on Away-From-Home Foods: Opportunities for Preventing Weight Gain and Obesity. Final Report. May 2006. Washington, D.C. [Report commissioned by the U.S. Food and Drug Administration.] URL: http://www.keystone.org/spp/documents/Forum_Report_FINAL_5-30-06.pdf.  A copy of the

10

1  Consumers with Nutrition Information."  Putting calorie information on menus and menu boards

2  is consistent with this recommendation.  As the report noted when providing operational tips for

3  accomplishing its recommendation:

4           Information should be provided in a manner that is
5           easy for consumers to see and use as part of their
6           purchasing and eating decisions. Consumer might
7           view such information, for example, when standing
8           at a counter, while reviewing a menu board, in a car
9           when reading a drive-through menu, or when sitting
10          down at a table reviewing a menu, a table tent, or
11          others means of providing information.

12  *Id.* at 77.

13          The California Restaurant Association cites other parts of the report, such as the

14  desirability of further research, but omits the report's conclusion that "while the knowledge base

15  needs to be improved, enough is known to recommend many important actions. . . . reasonable

16  strategies to assist consumers with healthy energy intake *should be pursued now*, and then

17  augmented going forward as new information becomes available." Id. at 29 (emphasis added).

18          In addition to the FDA Keystone Forum report, the Institute of Medicine, the

19  Surgeon General, and the President's Cancer Panel, have recommended that nutrition

20  information be available in restaurant settings, to address the nation's obesity epidemic,

21  including at the point of purchase.  The Institute of Medicine recommended that: "Fast-food and

22  full-service restaurants should expand healthier meal, food, and beverage food options (including

23  children's meals) and provide calorie content and general nutrition information at point of

---

Report is annexed as Exhibit "F" to the Appendix filed by California Restaurant Association with
its Motion for Declaratory and Injunctive Relief.

11

1    purchase."[21]    The Surgeon General of the United States has called for industry to "increase

2    availability of nutrition information for foods eaten and prepared away from home."[22]    The 2006-

3    2007 report of the President's Cancer Panel, in light of the increasing contribution of obesity to

4    cancer, recommends: "Make nutrition information on restaurant foods readily available on

5    menus and understandable to consumers."[23]

6    B.    **An Increasing Proportion of Calories Is Being Consumed Away From Home**

7            Eating out, and eating extra calories while eating out, contributes

8    disproportionately to the excess calorie intake that fuels the obesity epidemic.[24,25]    Increasingly,

9    Americans are eating meals away from home.    In 1970, Americans spent 26% of their food

10    dollars on foods prepared outside their homes, while by 2006, they spent almost half (48%) of

11    their food dollars eating out.[26]

---

[21]Institute of Medicine of the National Academies. *Industry Can Play A Role In Preventing Childhood Obesity. Fact Sheet 2004*. Drawn from Preventing Childhood Obesity, Health in the Balance 2005. Accessed at  www.iom.edu  on February 2, 2008.

[22] U.S. Department of Health and Human Services. *The Surgeon General's Call To Action To Prevent And Decrease Overweight And Obesity*. Rockville, MD: U.S. Department of Health and Human Services, Public Health Service, Office of the Surgeon General.

[23] President's Cancer Panel. *Promoting Healthy Lifestyles. Policy, Program and Personal and Recommendations for Reducing Cancer Risk. 2006-2007.*  Annual Report. U. S. Department of Health, National Institutes of Health, National Cancer Institute. Bethesda, Maryland, 2007.

[24] St-Onge MP, Keller KL, Heymsfield SB.  *Changes In Childhood Food Consumption Patterns: A Cause For Concern In Light Of Increasing Body Weights*.  American Journal of Clinical Nutrition 2003; 78:1068-1073

[25] French SA, Harnack L, Jeffery RW.  *Fast Food Restaurant Use Among Women In The Pound Of Prevention Study: Dietary, Behavioral And Demographic Correlates*.  International Journal of Obesity *2000*.  24:1353-1359.

[26]  FDA Keystone Report, supra, note 20, at 122.

12

1    Children eat almost twice as many calories when they eat out than when they eat

2    at home.[27] This trend has been facilitated by the increasing number of chain restaurants, which

3    serve food that is easily available, inexpensive and high in calories. Nationally, restaurant chains

4    – both fast food and casual dining chains – comprise a growing share of customer traffic.

5    Between 2005 and 2009, the number of fast food establishments is projected to increase from

6    266,300 to 287,437 establishments.[28]

7    Moreover, studies have documented patterns of increasing portion sizes,

8    particularly at fast-chain restaurants, since the 1970s, in a pattern that parallels the epidemic of

9    obesity.[29,30,31,32,33] There is abundant data to show that people who eat at fast food establishments

10   consume more calories.  Two important analyses draw on the Continuing Surveys of Food

11   Intakes conducted in the mid 1990s.  The first, a 1994-1996 survey of 17,370 adults and children,

12   found that adults who ate at fast food restaurants consumed 205 more calories per day than those

---

[27] Zoumas-Morse C. et al., *Children's Patterns of Macronutrient Intake and Associations with Restaurant and Home Eating*., Journal of the American Dietetic Association 2001. 101:923-925.
[28] C. Barnes & Co. 2008 Barnes reports: U.S. Fast Foods Restaurants Industry (NAICS 72221).

[29] Nielsen, S. J., and B. M. Popkin. *Patterns And Trends In Food Portion Sizes*, 1977-1998. JAMA 2003; 289(4):450-453.

[30] Young, L. R. and M. Nestle. *The Contribution of Expanding Portion Sizes to the US Obesity Epidemic*, American Journal of Public Health 2002; 92(2):246-249.

[31] Guthrie, J. F., B. H. Lin, and E. Frazao. *Role Of Food Prepared Away From Home In The American Diet, 1977-78 Versus 1994-96: Changes And Consequences.* Journal of Nutrition Education and Behavior 2002; 34(3):140-150.

[32] Ello-Martin, J. A., J. H. Ledikwe, and B. J. Rolls. *The Influence of Food Portion Size and Energy Density on Energy Intake: Implications for Weight Management.* The American Journal of Clinical Nutrition 2005; 82(1 Suppl.):236S-241S.

[33] Young L.R. and Nestle M. *Portion Sizes and Obesity: Responses of Fast-Food Companies.* Journal of Public Health Policy 2007; 28: 238–248.

13

1   who did not, and children ate 155 more calories.[34]   In the second survey, of more than 9,000

2   adults, mean energy intake on days when fast food was consumed was 206 calories higher than

3   on other days.[35]   In the second survey, fast food contributed more than one third of consumers'

4   daily calorie intake.[36]   Similarly, in a study of nearly 900 women, called Pound of Prevention,

5   increased frequency of eating at fast food restaurants was associated with higher total energy

6   intake.[37]   This association has also been shown among adolescents and children.  A study of

7   4,746 students age 11-18 years found that regular fast food consumption was associated with 800

8   extra calories per week in boys and 660 extra calories per week in girls.[38]   Such a calorie excess

9   could translate into a weight gain of 10 pounds or more per year.  An increase of 129 calories per

10  day among high- versus low-frequency consumers of fast food was also reported in a large

11  national cohort of adolescent girls.[39]

---

[34] Paeratakul S, Perdinand D, Champagne C, Ryan D, Bray G.  *Fast-Food Consumption Among US Adults And Children: Dietary And Nutrient Intake Profile.*  Journal of American Dietetic Association 2003; 103(10):1332-1338.

[35] Bowman S, Vinyard B.  *Fast Food Consumption Of US Adults: Impact On Energy And Nutrient Intakes And Overweight Status.*  Journal of the American College of Nutrition 2004; 23(2):163-168.

[36] Bowman S, Vinyard B.  *Fast Food Consumption Of US Adults: Impact On Energy And Nutrient Intakes And Overweight Status.*  Journal of the American College of Nutrition 2004; 23(2):163-168.

[37] French SA, Harnack L, Jeffery RW.  *Fast Food Restaurant Use Among Women In The Pound Of Prevention Study: Dietary, Behavioral And Demographic Correlates.*  International Journal of Obesity 2000.  24:1353-1359.

[38] French SA, Story M, Neumark-Sztainer D, Fulkerson JA & Hannan P.  *Fast Food Restaurant Use Among Adolescents:  Associations With Nutrient Intake, Food Choices And Behavioral And Psychosocial Variables.*  International Journal of Obesity, 2001; 25: 1823-33.

[39] Schmidt M, Affenito SG, Striega-Moore R, Khoury PR, Barton B, Crawford P, Kronsberg S, Schreiber G, Obarzanek E, Daniels S.  *Fast-food intake and diet quality in black and white girls:*

1   C.  **People Consistently Underestimate The Number Of Calories Consumed**

2             Consumers consistently underestimate the calorie content of food items and

3   overestimate the healthfulness of restaurant items.[40] As the FDA-commissioned Keystone Report

4   concluded, "[w]ithout nutrition information, consumers typically are unable to assess the caloric

5   content of foods." FDA Keystone Report, _supra_, note 20, at 68, 73. Recent studies found that 9

6   out of 10 people underestimated the calorie content of less-healthy items, and that they did so by

7   an average of more than 600 calories (almost 50% less than the actual calorie content).[41]

8             Even experienced nutrition professionals have difficulty accurately estimating the

9   calorie content of restaurant food. In one study, while these professionals could accurately

10   describe the calories in a cup of milk, they generally underestimated calories in restaurant food

11   by 200 to 600 calories. If not even experienced professionals in the field of nutrition are able to

12   accurately estimate the calorie content of restaurant foods, consumers are even less likely to do

13   so.[42]

14   D.  **Current Nutrition Information Practices Are Woefully Inadequate**

15             The current nutrition information practices of chain restaurants do not effectively

16   transmit calorie information to consumers. Some chains fail to provide any nutrition information

---

the National Heart, Lung, and Blood Institute Growth and Health Study._ Archives of Pediatrics & Adolescent Medicine 2005; 159(7):626-631.

[40]Burton S, Creyer EH. _What Consumers Don't Know Can Hurt Them: Consumer Evaluations And Disease Risk Perceptions Of Restaurant Menu Items._ The Journal of Consumer Affairs. 2004; 38(1):121-145.

[41]Burton S, Creyer EH. et al. _Attacking The Obesity Epidemic: The Potential Health Benefits Of Providing Nutrition Information In Restaurants._ Am J Public Health. 2006; 96(9):1669-1675.

[42]J. Backstrand, et al., _Fat Chance_ (Washington, DC: Center for Science in the Public Interest, 1997).

BRIEF OF AMICI CURIAE CITY OF NEW YORK, et al.,
IN SUPPORT OF DEFENDANT SAN FRANCISCO
Case No. CV-08-3247CW

1    to consumers.    As described in the declarations submitted by the California Restaurant

2    Association, chain restaurants do not typically display nutritional information where and when

3    consumers make their choices and purchases. Such information is typically displayed only where

4    it is hard to find, difficult to read, or accessible only after a purchase is made. Thus, the provided

5    information has little or no impact on choice. While a number of chain restaurants offer nutrition

6    information on their websites, "[l]ooking up nutritional information on a restaurant's food

7    offerings on line before visiting the restaurants requires, at the very least, Internet access and

8    advance planning."  Rebecca S. Fribush, *Putting Calorie and Fat Counts on the Table: Should*

9    *Mandatory Nutritional Disclosure Laws Apply to Restaurant Foods?*, 73 Geo. Wash. L. Rev.

10   377, 385 (2005).  Similarly, while some chain restaurants have nutritional information posted on

11   materials like napkins or tray liners, such items are "not likely to be distributed to consumers

12   until after they have already made their purchasing decisions."  *Id.; see also*, *See* Michael M.

13   McCann, *Economic Efficiency and Consumer Choice Theory in Nutritional Labeling*, 2004 Wis.

14   L. Rev. 1161, 1198 (2004).

15   E.    **Consumers Want Calorie Information And Will Use It To Make More**
16         **Informed Choices.**

17             Since 1994, the  NLEA has made nutrition information available to consumers on

18   packaged foods purchased in retail stores.  This information is widely used, with three quarters

19   of American adults reporting that they examine food labels,[43] the calorie section is the most

20   frequently consulted part of the Nutrition Facts panel on packaged foods, with 73% of consumers

---

[43] US Department of Health and Human Services (US DHHS), Centers for Disease Control and Prevention, *National Center for Health Statistics. Healthy People 2000 Final Review. 2001.*

BRIEF OF AMICI CURIAE CITY OF NEW YORK, et al.,
IN SUPPORT OF DEFENDANT SAN FRANCISCO
Case No. CV-08-3247CW

1  reporting that they look at calorie content.[44]  Nearly  half (48%) of those who consult the

2  nutrition information on packaged foods report changing their food purchasing habits as a result

3  of reviewing this information.[45]

4          Similarly, consumers are interested in knowing the calorie content of restaurant

5  foods and will use it to make more informed choices. Six nationally representative polls have

6  found that 62% to 87% of Americans support requiring restaurants to list nutrition

7  information.[46,47] In studies where calorie information is provided, consumers choose high-calorie

8  items 24% to 37% less often.[48]  A NYC Department of Health  exit interview and receipt study

9  conducted in May and June 2007 demonstrated that patrons of Subway who saw calorie

10 information at the point of purchase chose items with fewer calories.[49]  At the time of the study,

11 Subway – NYC's second-largest chain, with 315 restaurants – posted nutritional information for

12 some of its products on a sticker placed on a display case near the cash register – a manner far

---

[44]  International Food Information Council (IFIC) Foundation. *Food & Health Survey: Consumer Attitudes Toward Food, Nutrition & Health.* Washington, DC: 2007.

[45] Levy AS. Derby BM. *The Impact Of NLEA On Consumers: Recent Findings From FDA's Food Label And Nutrition Tracking System.* Washington DC: Center for Food Safety and Applied Nutrition. Food and Drug Administration. 1996.
[46] Center for Science in the Public Interest. *Anyone's Guess: The Need For Nutrition Labeling At Fast-Food And Other Chain Restaurants.* Washington, DC: Center for Science in the Public Interest, 2003.

[47] Harvard Forums on Health. *Obesity as a Public Health Issue: A Look at Solutions. National Poll by Lake, Snell, Perry & Associates. June 2003.*

[48] Burton S, Creyer EH, Kees J, Huggins K. *Attacking The Obesity Epidemic: The Potential Health Benefits Of Providing Nutrition Information In Restaurants.* Am J Public Health. 2006; 96:1669-1675.

[49] Bassett, M. *Purchasing Behavior and Calorie Information at Fast-Food Chains in New York City, 2007.* American Journal of Public Health 2008, Vol. 98, No. 8, pp. 1-3.

17

1  less prominent than that mandated by NYC Health Code §81.50.  Nevertheless, among the 1,830

2  Subway patrons sampled at 47 randomly selected Subway locations, nearly one third (30.8%)

3  reported seeing the calorie information.  Further, patrons who saw calorie information purchased

4  items containing 52 fewer calories than patrons who did not see it. Furthermore, patrons who

5  acknowledged that calorie information had affected their selection were correct – they chose

6  items with 99 fewer calories, a statistically significant finding.  That their self-report of use of

7  calorie information matched the data from their receipts that documented lower-calorie choices is

8  consistent with findings that when consumers say they will change choices based on calorie

9  information, they often actually do so. These findings strengthen earlier evidence[50] on changes in

10  purchase intent when people see calorie information by actually documenting changes in what

11  people buy after seeing calorie information.

12      Additionally, a 2005 study of college students found that providing nutrition

13  information at the point of sale in campus dining facilities had a positive influence on their food

14  purchasing behavior [51]  Similarly, another study found a significant decrease in the number of

15  calories that people purchase when signs indicating the calorie content of available foods were

16  posted in a cafeteria setting.[52]

---

[50] Burton S, Creyer EH, Kees J, Huggins K. *Attacking The Obesity Epidemic: The Potential Health Benefits Of Providing Nutrition Information In Restaurants*. Am J Public Health. 2006; 96:1669-1675.

[51] Martha T. Conklin, et al., *College Students' Use of Point of Selection Nutrition Information*, 2 TOPICS IN CLINICAL NUTRITION 20, 97, 97-108 (2005).

[52] R. Milich, et al*., Effects of Visual Presentation of Caloric Values on Food Buying by Normal and Obese Persons*, 42 PERCEPTUAL AND MOTOR SKILLS 155, 155-162 (1976).

18

1    Nutrition information at point of sale in restaurants can have an impact even if not

2    all patrons make use of the information. The DeMuth declaration[53] submitted by the California

3    Restaurant Association cites Krukowski's report[54] that 44-57% of students in a study said that

4    they were not likely to use food caloric information as an argument against calorie posting.  Yet,

5    conversely 43-56% of patrons in that same study stated that they *would* use nutrition information

6    if it were available, suggesting that calorie posting will have a substantial effect on public health.

7    As set forth in the declaration of Mary Bassett, Deputy Commissioner, Health

8    Promotion and Disease Prevention of the NYC Department of Health, dated July 30, 2008

9    ("Bassett Declaration"), there has been a positive consumer response to the implementation of

10    section 81.50.

11    F.    **Making Calorie Information Readily Accessible To Diners Will Likely Result**
12    **In The Development Of Healthier Menu Offerings**

13    In addition to providing consumers with the necessary information to make

14    healthier choices, calorie posting will motivate the food service industry to improve its menu

15    offerings.  According to the FDA-sponsored Keystone Forum, "A key benefit of mandatory

16    nutrition labeling on packaged foods has been the reformulation of existing products and the

17    introduction of new, nutritionally improved products. Between 1991 (before the implementation

18    of the NLEA) and 1995 (after implementation) the number of fat-modified cheeses has tripled,

19    and market share for fat-modified cookies increased from zero percent of the market to 15%. In a

---

[53] The DeMuth declaration is annexed as Exhibit B to the California Restaurant Association's Motion.

[54] Krukowski RA, Harvey-Berino J, Kolodinsky J, Narsana RT, Desisto TP. *Consumers May Not Use Or Understand Calorie Labeling In Restaurants*. J Am Diet Assoc 2006; 106(6):917-20.

19

1    similar fashion, nutrition labeling on menus and menu boards may spur nutritional improvements

2    in restaurant foods*."* Keystone Report, *supra*, note 20, at 73**.**

3          As discussed in the Bassett Declaration, since section 81.50 has been

4    implemented, many restaurants have reformulated some of their menu items to lower calorie

5    counts.

6    G.  **In Sum, Nutrition Labeling Legislation Is Sound Public Policy .**

7          As discussed above, there is a consensus among health experts who have

8    addressed the obesity crisis, including the FDA, that restaurant nutrition disclosure legislation is

9    a sound and reasonable strategy to combat the problem.  Thus, this Court should not invalidate

10   San Francisco Ordinance 40-08.

11                              **POINT II**

12                              **CONTRARY    TO    THE    CALIFORNIA**
13                              **RESTAURANT                ASSOCIATION'S**
14                              **ARGUMENT, THE POSITION TAKEN BY**
15                              **THE CITY OF NEW YORK IN THE  NYSRA**
16                              **II APPEAL WAS FULLY CONSISTENT WITH**
17                              **THE   REASONING   OF   THE   DISTRICT**
18                              **COURT IN NYSRA II AND WITH THE**
19                              **POSITION TAKEN BY THE FDA.**

20          In an attempt to undermine the well-reasoned decision of the District Court for the

21   Southern District of New York in NYSRA II, and the FDA's position that state nutrition

22   disclosure legislation of restaurant foods is not preempted, the California Restaurant Association

23   argues that on appeal, the City "effectively abandoned" the District Court's reasoning.

24   Additionally, it argues that the City's position is different from that of the FDA's.  (Cal. Rest.

25   Assoc. Memorandum of Points, at page 10) As discussed below, this is a complete

26   mischaracterization of the City's position.

                                      20

1          Moreover, the California Restaurant Association's argument is an attempt to

2    distract this Court from the dispositive issue herein- whether Congress in enacting the NLEA

3    intended to take away the states' historical power to regulate restaurants.  Congress explicitly

4    indicated that the preemption provisions in the NLEA are to be read narrowly. The NLEA

5    specifically provides that it "shall not be construed to preempt any provision of state law, unless

6    such provision is expressly preempted under section 403A [21 U.S.C. §343-1(a)] of the Federal

7    Food, Drug, and Cosmetic Act." Pub. L. No. 101-535, §6(c), 104 Stat. 2535, 2364.  Thus, in

8    order to find preemption, the Court would have to find that the preemption of state menu labeling

9    legislation was expressly required by the statute.

10          The basic nutrition labeling authority is contained in 21 U.S.C. § 343(q), where

11    Congress directed the FDA to impose mandatory nutrition labeling requirements on most food.

12    Nevertheless, in 21 U.S.C. § 343(q)(5)(A)(i) the statute explicitly exempted restaurants from

13    those labeling requirements.  In the applicable preemption section of the statute, section 343-

14    1(a)(4), Congress included parallel provisions.  Thus in the first portion of section 343-1(a)(4),

15    the statute preempts the states from establishing any requirement "that is not identical" to a

16    requirement under (q), but in the second portion of that same provision, it states that the

17    preemption shall not apply to "a requirement for nutrition labeling of food which is exempt

18    under subclause (i) of section [343](q)(5)(A)."   Subclause (i) exempts restaurants from the

19    federal nutrition labeling requirements.

20          Thus, the statute explicitly states that the preemption provision does not apply to

21    nutrition information regarding restaurants.   The FDA, the expert agency charged with

22    interpreting the NLEA, has adopted this same interpretation of the statute.   The FDA's

23    interpretation is entitled to deference because it is completely consistent with the statute.  *See,*

21

1    *e.g., Chervon USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) (the Court

2    will uphold the agency's interpretation if it is based on a permissible construction of the statute);

3    *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (agency interpretations "constitute a body of

4    experience and informed judgment to which courts and litigants may properly resort for

5    guidance").

6            The California Restaurant Association's argument that the FDA's position is not

7    entitled to deference because it is inconsistent with section 101.13(b)(1) of the FDA's regulations

8    is meritless.  The FDA does not interpret the cited regulation as broadly as plaintiff does.  <u>See</u>

9    *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (when an agency is interpreting its own regulation, its

10   interpretation is "controlling unless plainly erroneous or inconsistent with the regulation").

11   Moreover, if the FDA adopted such a broad interpretation of the regulation, it would be

12   inconsistent with the statute and would not be entitled to deference.  <u>See</u>, *Desiano v. Warner-

13   Lambert & Co.,* 467 F.3d 85, at 97, fn. 9 (2d Cir. 2007), *aff'd*, 128 S. Ct. 1168 (2008) (equally

14   divided court) ("whatever deference would be owed to an agency's view in contexts where a

15   presumption against federal preemption does apply, an agency cannot supply, on Congress's

16   behalf, the clear legislative statement of intent required to overcome the presumption against

17   preemption").

18           In its brief filed in the Second Circuit, the FDA indicated that the

19   mandatory/voluntary distinction was not dispositive, but rather was one prong of the inquiry in

20   determining whether the legislation involved 343(r) claims or 343(q) nutrition information..  The

21   second inquiry looked at the type of information which was required to be disclosed.  (FDA

22   brief, annexed to Declaration of Tara Steeley as Exhibit "2", at pp. 20-21). This is the FDA's sole

23   "disagreement" with the District Court opinion.

                                          22

1    The District Court, however, also recognized that the mandatory/voluntary

2    distinction was not dispositive.  Indeed, the determination whether the legislation involved 343(r)

3    claims or 343(q) nutrition information is a two-part inquiry.  Whether the disclosure is mandated

4    is only one prong of the inquiry; the other prong is whether the information is 343(q) type

5    information. The preemption provision, 343-1(a)(5), prevents a state or local government from

6    mandating that restaurant include § 343(r) content claims (i.e. "low calorie").  In contrast, it is

7    clear that under the NLEA, local governments can mandate § 343(q) type information such as the

8    number of calories contained in a particular food item.  The District Court in NYSRA II stated:

9        There is a world of difference … between the
10       qualitative statement "low in fat" and the
11       quantitative statement "100 calories."  The latter is
12       clearly an unadorned statement of fact that is
13       contemplated by § 343(q) to be disclosed on a food
14       label.  And in the absence of federal regulation, it is
15       precisely this type of disclosure that states may
16       mandate.  On the other hand, the statement "low in
17       fat" characterizes the level of a nutrient and would
18       be subject to regulation under § 343(r) when
19       voluntarily made.  Even if mandated, it would not
20       escape the reach of § 343(r) for the added reason
21       that only "statement of the type required by
22       paragraph (q)" is exempt from regulation under
23       subsection (r).  21 U.S.C. § 343(r).  "Low in fat is
24       not such a statement.

25   2008 WL 1752455, *5(emphasis added).

26   The City adopted the District Court's reasoning in its brief in the Second Circuit,

27   quoting the above reasoning.  Thus, contrary to the California Restaurant Association's assertion,

28   although there may be nuances in the positions taken by the City and the FDA, we are in

29   agreement that two factors are necessary to the analysis, specifically, (1) whether the disclosure

30   is mandated and (2) what type of information is mandated to be disclosed?

23

1

2                              **CONCLUSION**

3              For the reasons stated above and in the defendant's brief, this Court should deny

4   plaintiff's motion for declaratory and preliminary injunctive relief.

5   Dated:  July 31, 2008

6                                   Respectfully submitted,
7
8                                   MICHAEL A. CARDOZO,
9                                   Corporation Counsel of the City of New York.,
10                                  Attorney for Amici Curiae, The City of New York
11
12                                  Gabriel Taussig,
13                                    Chief, Administrative Law Division,
14                                  Fay Ng,
15                                  Scott Pasternack,
16                                    Assistant Corporation Counsels
17
18                                  Thomas Merrill,
19                                  General Counsel,
20                                  N.Y.C. Dept. Of Health
21                                    And Mental Hygiene
22
23
24                                  By:  \s\ (Scott Paternack)------
25                                           Scott Pasternack

24

1

Mr. Devala Janardan
Associate Counsel
International Municipal Lawyers Association
(202) 466-5424, ext.112
djanardan@imla.org

Carolyn Coleman
Director, Federal Relations
National League of Cities
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 626-3023

Leon Rodriguez
County Attorney, Montgomery County
101 Monroe Street, 3d Floor
Rockville, MD 20850
(240) 777-6710

Donna L. Brown, JD, MPH
Government Affairs Counsel
Senior Advisor for Public Affairs
National Association of County & City Health
Officials
1100 17th Street, NW
Suite 200
Washington, DC 20036
 202-507-4197
www.naccho.org

Glenn M. Levy
Deputy County Counsel
San Mateo County Counsel's Office
400 County Center, Sixth Floor
Redwood City, California 94063
TEL 650-363-1965
glevy@co.sanmateo.ca.us

Marnie L. Glaeberman, JD, MPH
Director of Government Relations and
Partnerships
National Association of Local Boards of
Health (NALBOH)
1300 L Street NW, Suite 800
Washington, DC 20005
202-218-4413  fax 202-218-4409
marnie@nalboh.org

2
3

25

1   Scott A. Kronland (SBN 171693)
    Barbara J. Chisholm (SBN 224656)
2   ALTSHULER BERZON LLP
    177 Post Street, Suite 300
3   San Francisco, CA 94108
    Telephone: (415) 421-7151
4   Facsimile: (415) 360-8064
    E-mail: skronland@altber.com
5   E-mail: bchisholm@altber.com

6
7   Robert Post (SBN 111917)
    David Boies Professor of Law
8   YALE LAW SCHOOL
    P.O. Box 208215
9   New Haven, CT 06520
    Telephone: (203) 432-4946
10  Facsimile: (203) 432-1040
    Email: Robert.Post@yale.edu
11

12  *Attorneys for* Amici Curiae *Robert Post,*
    *Jennifer L. Pomeranz, and Kelly D. Brownell*
13

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 15  **CALIFORNIA RESTAURANT** | )   **Case No. CV-08-3247CW** |
| 16  **ASSOCIATION,** | ) |
| | )   **BRIEF OF PROFESSOR ROBERT** |
| 17           **Plaintiff,** | )   **POST OF YALE UNIVERSITY LAW** |
| | )   **SCHOOL, AND JENNIFER L.** |
| 18  v. | )   **POMERANZ AND KELLY D.** |
| | )   **BROWNELL OF THE RUDD** |
| 19 | )   **CENTER FOR FOOD POLICY AND** |
| 20  **THE CITY AND COUNTY OF SAN** | )   **OBESITY AT YALE UNIVERSITY AS** |
|     **FRANCISCO and THE SAN FRANCISCO** | )   *AMICI CURIAE* **IN SUPPORT OF** |
| 21  **DEPARTMENT OF PUBLIC HEALTH,** | )   **DEFENDANTS AND IN OPPOSITION** |
| | )   **TO PLAINTIFF'S MOTION FOR** |
| 22           **Defendants.** | )   **DECLARATORY RELIEF AND** |
| | )   **PRELIMINARY INJUNCTION** |
| 23 | ) |
| 24 | )   **Date: September 4, 2008** |
| | )   **Time: 9 a.m.** |
| 25 | )   **Judge: Claudia Wilken** |
| 26 | )   **Location: Courtroom 2** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………….....ii

STATEMENT OF INTEREST……………………………………………………….1

BACKGROUND………………………………………………………………….2

ARGUMENT………………………………………………………………………...4

I.    Ordinance 40-08 Requires the Disclosure of Factual and Uncontroversial Commercial Information……………………………………………………………….4

II.   The First Amendment Standard for Commercial Disclosure Requirements of Factual and Uncontroversial Commercial Information is the Reasonable Relationship Test, Not Intermediate Scrutiny Under *Central Hudson*……………………………………………9

III.  Ordinance 40-08 Meets the Reasonable Relationship Test……………………….....15

      A. Ordinance 40-08 Reduces Consumer Confusion……………………………….15

      B. Ordinance 40-08 Improves Public Health by Reducing Obesity through Promoting Informed Consumer Decision-Making………………………………………………16

IV.   The Holding of *United Foods* is Inapplicable to Ordinance 40-08……………………...19

V.    The Reasonable Relationship Test Also Applies Under Article I of the California Constitution……………………………………………….………………………...20

CONCLUSION………………………………………………………………………...23

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3

*Board of Trustees v. Fox*,
4           492 U.S. 469 (1989)…………………………………………………….. 17

5   *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
6           447 U.S. 557 (1980)…………………………………………………… 9, 10, 21

7   *Environmental Defense Center v. EPA*,
            344 F.3d 832 (9th Cir. 2003)……………………………….……………… *passim*
8
    *First National Bank v. Bellotti*,
9           435 U.S. 765 (1978)…………………………………………………… 10

10  *In re Matter of Policies and Rules Concerning Interstate 900 Telecommunications Services*,
11          6 F.C.C. Rcd. 6166 (Sept. 26, 1991)…………………………………………….. 8

12  *Johanns v. Livestock Marketing Association*,
13          544 U.S. 550 (2005)………………………………………….…………………... 1

14  *Lochner v. New York*,
            198 U.S. 45 (1905)…………………………………………………… 17
15
    *Meese v. Keene*,
16          481 U.S. 465 (1987)……………………………...……………………… 5

17  *National Electrical Manufacturers Association v. Sorrell*,
18          272 F.3d 104 (2d Cir. 2001)..…………………………………………… *passim*

19  *Pacific Gas & Electric Company v. Public Utilities Commission of California*,
20          475 U.S. 1 (1986)………...…………………………………………… 5

21  *Pharmaceutical Care Management Association v. Rowe*,
            429 F.3d 294 (1st Cir. 2005)…………………………………………… 14
22
    *Pruneyard Shopping Center v. Robins*,
23          447 U.S. 74 (1980)…………………………………………………… 5, 13

24  *Rubin v. Coors Brewing Co.*,
25          514 U.S. 476 (1995)…………………………………………………… 6

26  *United States Department of Agriculture v. United Foods*,
            533 U.S. 405 (2001) …………………………………………...…………….. 19
27
    *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
28          425 U.S. 748 (1976)……………………………………...………… 9, 10

*West Virginia State Board of Ed. v. Barnette*,
    319 U.S. 624 (1943)...……………………………………………………… 13

*Wooley v. Maynard*,
    430 U.S. 705 (1977)……………………………………………………………… 5

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*,
    471 U.S. 626 (1985)……..……………………………………………… *passim*

**STATE CASES**

*Baba v. Board of Supervisors*,
    124 Cal. App. 4th 504 (2004)……………………………...……...…….....…… 21

*Environmental Law Foundation v. Laidlaw Transit Services*,
    Case No. 451832, 2008 WL 2157672 (Cal. Super. Jan. 8, 2008)……..…………….…... 22

*Gerawan Farming, Inc. v. Lyons*,
    24 Cal. 4th 468 (2000)…………………………………………………..…… 20

*Gerawan Farming, Inc. v. Kawamura*,
    33 Cal. 4th 1 (2004)…………………………...………………………...…… 21

*People v. Anderson*,
    235 Cal. App. 3d 586 (1991)………………………………...…..……..... 21, 23

*People v. Teresinski*,
    30 Cal. 3d 822 (1982)……………………..…………………………...……..…….. 21

*Perlman v. People*,
    99 Cal. App. 3d 568 (1979)...…………………………………………...…… 21

*U.D. Registry, Inc. v. State of California*,
    144 Cal. App. 4th 405 (2006) ……………………………………...……….... 21

**FEDERAL STATUTES AND REGULATIONS**

21 C.F.R. § 701.3…………………………………………....……………………………. 7

15 U.S.C. § 68, *et seq.* ………………………………………………………………. 6

15 U.S.C. §§ 69-69j…………………………………………………....……………………. 7

15 U.S.C. § 70, *et seq.* ...……………………………………………....………………. 6

15 U.S.C. §§ 1333-1339....………………………………....………………………….. 13

15 U.S.C. §§ 1667-1667f...…………………………....………………………….... 7

21 U.S.C. § 343…………...……………………..………………...………………….....… 7

27 U.S.C. § 205(e)(2) …………...………………………………...………………………... 7

**STATE STATUTES AND MUNICIPAL ORDINANCES**

Cal. Bus. & Prof. Code §§ 1648.10-1648.20…………………………...…………………….... 13

Cal. Civ. Code § 1916.5(a)(6)..…………………………………………………………….... 7

Cal. Corp. Code § 12310(b)………....…………………………………………………….... 7

Cal. Fin. Code § 22317.2…………………...……………………………………………….. 21

Cal. Health & Safety Code § 110423 …………………………………………………….…21

Cal. Health & Safety Code § 111170.……………………………………………….…. 8, 21

Cal. Health & Safety Code § 25249.6.……………………………………………………... 21

Cal. Health & Safety Code § 25250.25……………………………………………………....21

Cal. Pub. Res. Code § 15013(b)..….………………………………………………………... 21

San Francisco Health Code § 468.…………....………………………………………..…… 2

San Francisco Health Code §§ 468.1-468.3(f)………...……………………………….. *passim*

New York City Health Code § 81.50 (Jan. 22, 2008)………...……………………….……… 3

**MISCELLANEOUS**

AMA House of Delegates, *Nutrition Labeling and Nutritionally Improved Menu Offerings in Fast-Food and Other Chain Restaurants*, Resolution: 419 (A-07) ……………………………..18

A.S. Levy & B.M. Derby, Center for Food Safety and Applied Nutrition, Food and Drug Administration, *The Impact of NLEA on Consumers: Recent Findings from FDA's Food Label and Nutrition Tracking System* (1996)…..………...……………………………………….… 3

Centers for Disease Control and Prevention, National Center for Health Statistics, U.S. Dept. of Health and Human Servs., *Healthy People 2000 Final Review* (2001). …..……...…………….. 3

H.R. Rep. No. 538, 101st Cong., 2d Sess. 1990, *reprinted in* 1990 U.S.C.C.A.N. 3336 ……….16

J. Backstrand, M.G. Wootan, L.R. Young & J. Hurley, *Fat Chance*, Washington, DC: Center for Science in the Public Interest (1997)..….…….…...……………….………………………….. 3

J.N. Variyam & J. Cawley, *Nutrition Labels and Obesity,* National Bureau of Economic Research, working paper 11956 (Jan. 2006)…..…….…………………….…………….. 17

M.G. Wootan & M. Osbord, *Availability of nutrition information from chain restaurants in the United States*, 30(2) American Journal of Preventative Medicine 266 (2006)…….………..…… 18

M.G. Wootan, M. Osborn & C.J. Malloy, *Availability of point-of-purchase nutrition information at a fast food restaurant*, 43 American Journal of Preventative Medicine 458 (2006)………..... 18

Peter S. Murano, Understanding Food Science and Technology (Wadsworth/Thomson Learning 2003)…………………………..………..……………………………...………………….. 6

Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics. Why Markets Fail: Incomplete Information* (Prentice Hall 1998)……......………..…………………………………………..8

Robert Post, *The Constitutional Status of Commercial Speech*, 48 U.C.L.A. L. Rev. 1 (2000)……………………………………..…..……………………………………….. 11

S. Burton, E.H. Creyer, J. Kees & K. Huggins, *Attacking the obesity epidemic: the potential health benefits of providing nutrition information in restaurants*, 96 Am. J. Public Health 1669 (2006)…..………..………………………….……………………………………….. 3

S. Saul, *Conflict on the Menu*, N.Y. Times, Feb. 16, 2008…..………..……………………..… 18

The Institute of Medicine, *Preventing childhood obesity health in the balance*, National Academies Press, Washington DC (2005)...………..…………………………………….. 18

Professor Robert Post of Yale University Law School, and Jennifer L. Pomeranz and Kelly D. Brownell of the Rudd Center for Food Policy and Obesity at Yale University ("Rudd Center") submit this brief in support of Defendants City and County of San Francisco and the San Francisco Department of Public Health ("San Francisco") and in opposition to the Motion for Declaratory Relief and a Preliminary Injunction filed by Plaintiff California Restaurant Association ("CRA").

### STATEMENT OF INTEREST

Robert Post, J.D., Ph.D., is the David Boies Professor of Law at Yale University Law School. He is one of the nation's preeminent First Amendment scholars and has contributed and edited numerous books and authored over 80 law review articles, including: *Transparent and Efficient Markets: Compelled Commercial Speech and Coerced Commercial Association in United Foods, Zauderer, and Abood*, 40 Valparaiso Univ. Law Rev. 555 (2006); *Compelled Subsidization of Speech: Johanns v. Livestock Marketing Association*, 2005 Supreme Court Rev. 195; and *The Constitutional Status of Commercial Speech*, 48 UCLA Law Rev. 1 (2000). Amicus Post is a key advisor to the Rudd Center.

Jennifer L. Pomeranz, J.D., M.P.H., is the Director of Legal Initiatives at the Rudd Center and has worked extensively on implementing, defending, and supporting menu labeling legislation across the country.

Kelly D. Brownell, Ph.D., is the Director of the Rudd Center and is a professor in the Department of Psychology at Yale University, where he also serves as Professor of Epidemiology and Public Health. Amicus Brownell has published 14 books and more than 300 scientific articles and chapters.

The mission of the Rudd Center is to improve the world's diet, prevent obesity, and reduce weight stigma by connecting sound science with public policy. The Rudd Center strives to improve laws, practices, and policies related to nutrition and obesity. It seeks to inform and empower the public while encouraging global changes to allow individuals to maximize their own health. Based on the best scientific evidence available, the Rudd Center supports menu labeling legislations in cities and states across the country as an effective method of addressing

1  the current epidemic of obesity.  San Francisco's adoption of Ordinance 40-08 amending San

2  Francisco Health Code Sections 468 through 468.8 (March 24, 2008), Menu Labeling at Chain

3  Restaurants ("Ordinance 40-08"), directly furthers the Rudd Center's mission.

4      Amici Post, Pomeranz and Brownell (collectively, "Amici") submit this brief in support

5  of San Francisco and against Plaintiff's motion.  Amici address the First Amendment issues

6  presented by the case.

7                              **BACKGROUND**

8      In San Francisco, 43% of the adults and 24% of school-age children are overweight or

9  obese.  See San Francisco Health Code ("Health Code") § 468.1.  The leading causes of death

10  and disability in San Francisco are due to diseases highly correlated with obesity:  heart disease,

11  diabetes, hypertension, and cancer.  *Id.*  The San Francisco Department of Public Health

12  estimates that the obesity epidemic costs San Francisco $192 million a year in medical expenses,

13  lost productivity and workers' compensation.  *Id.*  The estimated cost to the Department for

14  diabetes alone was $25 million in the year 2005.  *Id.*

15      In an effort to address these public health issues, San Francisco adopted Ordinance 40-08

16  in order to provide consumers with information about the nutritional components of the food

17  "prepared, purchased and eaten outside the home" to enable them to "make healthier choices."

18  Health Code §§ 468, 468.1.  Through this regulation, San Francisco requires that chain

19  restaurants disclose the total number of calories of menu items on menu boards and food tags (*id.*

20  § 468.3(c) and (d)), and the total number of calories, saturated fat, carbohydrates and sodium on

21  menu boards.  *Id.* § 468.3(b).

22      Ordinance 40-08 advances San Francisco's interest in reducing obesity by preventing

23  consumer confusion and promoting informed consumer decision-making.  Sound scientific

24  evidence strongly supports this rationale.  Studies have found that 9 out of 10 people

25  underestimate the calorie content of less-healthy items by an average of more than 600 calories

26

27

28

1   (almost 50% less than the actual calorie content).[1]  One survey performed at the American

2   Dietetic Association's annual meeting shows that even professional nutritionists underestimate

3   the calorie content of restaurant foods by 220 to 680 calories.[2]  Studies show that consumers

4   routinely consult food labels when available,[3] and that as a result they change their food

5   purchasing habits.[4]  In one study, consumers presented with calorie content on the menu chose

6   high-calorie items one-third less frequently.[5]  Without this nutritional information, consumers

7   have no way of choosing items that fit their nutritional needs.  Polling data confirms that

8   consumers overwhelmingly want this information.  *See* Health Code § 468.1.

9           The consensus that consumers are unable to estimate the nutritional composition of

10  prepared foods and beverages, and that they would use the information about this composition to

11  make choices better suited for their nutritional needs, prompted New York City to enact a menu

12  label law earlier this year that is very similar to Ordinance 40-08.  Under New York City's

13  ordinance, covered food service establishments are required to disclose the calorie content of

14  their menu items on menu boards and food tags.  *See* New York City Health Code § 81.50 (Jan.

15  22, 2008).  The New York State Restaurant Association ("NYSRA") challenged the New York

16  City ordinance arguing the same federal deficiencies as CRA argues here.  Judge Howell of the

17  Southern District of New York found in favor of New York City on all counts.  *See New York*

18  *State Rest. Ass'n v. New York City Board of Health, et al.*, Case No: 1:08-cv-1000 (RJH), Mem.

19  Op. & Order of the U.S. District Court for the Southern District of New York (April 16, 2008)

20

21  ---

22  [1]  S. Burton, E.H. Creyer, J. Kees & K. Huggins, *Attacking the obesity epidemic: the potential
    health benefits of providing nutrition information in restaurants*, 96 Am. J. Public Health 1669-
23  75 (2006).
    [2]  J. Backstrand, M.G. Wootan, L.R. Young & J. Hurley, *Fat Chance*, Washington, DC: Center
24  for Science in the Public Interest (1997).
    [3]  Centers for Disease Control and Prevention, National Center for Health Statistics, U.S. Dept.
25  of Health and Human Servs., *Healthy People 2000 Final Review* (2001).
    [4]  A.S. Levy & B.M. Derby, Center for Food Safety and Applied Nutrition, Food and Drug
26  Administration, *The Impact of NLEA on Consumers: Recent Findings from FDA's Food Label
    and Nutrition Tracking System* (1996).
27  [5]  Burton, *supra* note 1.

28

---

1    ("SDNY Opinion and Order").  Specifically, the court found that the federal Nutrition and

2    Labeling and Education Act of 1990 ("NLEA") does not preempt locales' ability to enact menu

3    labeling laws, and "that the required disclosure of calorie information is reasonably related to the

4    government's interest in providing consumers with accurate nutritional information and therefore

5    does not unduly infringe on the First Amendment rights of NYSRA members."  *Id*. at 2-3.

6    NYSRA appealed this decision to the Second Circuit and simultaneously sought a stay of

7    enforcement.  The District Court rejected the stay and the Second Circuit later denied NYSRA's

8    application to extend the period during which no fine will be imposed on covered establishments

9    that violate the ordinance.  A decision on the appeal is pending.

10            San Francisco's disclosure requirement implements sound public policy reflecting

11    information the public health community has known for years.  The regulation requires that

12    nutritional information be disclosed in the most effective possible way – at the point of purchase.

13    Similar disclosure requirements are common in federal and state regulatory programs designed to

14    promote consumer information and prevent potential consumer confusion.  Plaintiff argues that

15    Ordinance 40-08 compels speech in violation of the First Amendment of the United States

16    Constitution and Article I of the California Constitution.  *See* Mem. of Law in Support of Pl.'s

17    Mot. for Declaratory Relief & a Prelim. Injunction ("CRA Br.") at 22-34.  If Plaintiff's argument

18    is accepted, innumerable federal and state regulations requiring commercial actors to disclose

19    uncontroversial factual information will be rendered constitutionally suspect.  The regulatory

20    structure of consumer protection in California and the United States, which relies heavily on

21    promoting information transparency to encourage informed consumer decision-making, will be

22    jeopardized.  The government's ability to address the obesity epidemic through regulations

23    promoting informed consumer choice and personal responsibility would be derailed.

24                                  **ARGUMENT**

25    **I.     Ordinance 40-08 Requires the Disclosure of Factual and Uncontroversial
              Commercial Information**

26

27            Ordinance 40-08 requires that "chain restaurants" post the total number of calories,

28    saturated fat, carbohydrates, and sodium of each product "next to or beneath each Menu Item" on

1    the menu. Health Code § 468.3(a), (b). The ordinance also requires that federally recommended

2    daily limits of calories, saturated fat and sodium also be clearly posted on the menu. *Id.* The

3    ordinance mandates that chain restaurants using a menu board post the total number of calories

4    "next to or beneath each Menu Item on the Menu Board" (*id.* § 468.3(c)), and that restaurants

5    using food tags post the total number of calories "on the Food Tag." *Id.* § 468.3(d). The

6    ordinance expressly allows food service establishments to provide additional nutritional

7    information. *See id.* § 468.3(a). Restaurants are also free to post disclaimers indicating "that

8    there may be minimal variations in nutritional content values across servings based on slight

9    variations in serving size and quantities of ingredients, and based on special ordering." *Id.* §

10   468.3(f).

11          Ordinance 40-08 does not require restaurants to state an opinion or belief. *Cf. Wooley v.

12   Maynard*, 430 U.S. 705 (1977). It does not require them to subsidize advertisements. *Cf. United

13   States Dept. of Agriculture v. United Foods*, 533 U.S. 405 (2001). It does not require them to

14   disclose controversial facts. *Cf. Zauderer v. Office of Disciplinary Counsel of the Supreme

15   Court of Ohio*, 471 U.S. 626 (1985). It does not force any CRA member to take a position in any

16   ongoing debate. *Cf. Pacific Gas & Electric Co. v. Public Utilities Comm. of Cal.*, 475 U.S. 1, 14

17   (1986). The ordinance does not prevent restaurants from announcing that they are disclosing

18   calorie content under legal compulsion or from disclosing any additional data they deem

19   necessary. *See Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 87 (1980); *see also Meese v.

20   Keene*, 481 U.S. 465, 481 (1987); *Environmental Defense Center v. EPA*, 344 F.3d 832, 850 (9th

21   Cir. 2003). Ordinance 40-08 does not preclude food service establishments from expressing

22   whatever additional information or opinions they wish. Plaintiff is simply incorrect that

23   Ordinance 40-08 compels restaurants to voice a "message" or "government viewpoints." CRA

24   Br. at 23-24.

25          The San Francisco ordinance compels the disclosure only of "purely factual and

26   uncontroversial" commercial information – the nutritional contents of restaurant menu items.

27   *Zauderer*, 471 U.S. at 651. It requires the disclosure of the total number of calories. Health

28   Code § 468.3(a)(1). A calorie is the "[a]mount of heat needed to raise the temperature of 1 gram

---

1    of water by 1 degree Celsius." Peter S. Murano, Understanding Food Science and Technology

2    G-3 (Wadsworth/Thomson Learning 2003). It requires the disclosure of the total amount of

3    saturated fat. Health Code § 468.3(a)(2). Saturated fat is a "[f]atty acid chain that does not

4    contain any carbon-to-carbon double bonds." Murano, *supra* at G-16. It requires the disclosure

5    of the total amount of carbohydrates. Health Code § 468.3(a)(3). Carbohydrates "are composed

6    of the elements carbon (C), hydrogen (H), and oxygen (O)" and can be classified as

7    monosaccharides, disaccharides, or polysaccharides. Murano, *supra* at 66-67. And the

8    ordinance requires the disclosure of the total amount of sodium. Health Code § 468.3(a)(4).

9    Sodium is a mineral, which is an inorganic substance listed on the periodic table of elements.

10   Murano, *supra* at 75, 77. This is the same factual information that the NLEA requires food

11   producers to disclose. *See* 21 U.S.C. § 343. If CRA is correct that compelled disclosures

12   required by Ordinance 40-08 violate the First Amendment, so also does the NLEA. Yet in this

13   Court CRA takes the position that the NLEA is constitutional and that it preempts Ordinance 40-

14   08. *See* CRA Br. at 9-21.

15       Ordinance 40-08 is a commercial disclosure regulation indistinguishable from thousands

16   of analogous regulations routinely applied to transactions in the commercial marketplace to

17   provide consumers with information. Courts uniformly have held that the compelled disclosure

18   of uncontroversial factual information in the context of the sale and purchase of goods is

19   compelled commercial speech. *See*, *e.g.*, *Rubin v. Coors Brewing Co*., 514 U.S. 476, 483 (1995);

20   *Environmental Defense Center v. EPA*, 344 F.3d 832, 851, n.27 (9th Cir. 2003); *National*

21   *Electrical Manufacturers Ass'n v. Sorrell* ("*Sorrell*"), 272 F.3d 104, 113 (2d Cir. 2001);

22   *Environmental Law Foundation v. Laidlaw Transit Servs.*, Case No. 451832, 2008 WL 2157672

23   (Cal. Super. Jan. 8, 2008). "Innumerable federal and state regulatory programs require the

24   disclosure of product and other commercial information." *Sorrell*, 272 F.3d at 116.

25       Federal law, for example, requires that textile and wool products be labeled with their

26   fiber content, country of origin, and the identity of the business responsible for marketing or

27   handling the item. *See* Textile Fiber Products Identification Act, 15 U.S.C. § 70, *et seq.*; Wool

28   Products Labeling Act of 1939, 15 U.S.C. § 68, *et seq.* It requires that articles of apparel made

1    of fur be labeled, and that invoices and advertising for furs and fur products specify the true

2    English name of the animal from which the fur was taken, and whether the fur is dyed or

3    previously used.  *See* Fur Products Labeling Act, 15 U.S.C. §§ 69-69j.  It requires that for

4    personal property leases that exceed 4 months and that are made to consumers for personal use, a

5    written disclosure of lease costs, taxes, fees and terms be disclosed; and it also requires certain

6    disclosures be made in the lease advertising.  *See* Consumer Leasing Act, 15 U.S.C. §§ 1667-

7    1667f, as amended.  It requires that cosmetic products display an information panel which lists

8    ingredients.  *See* 21 C.F.R. § 701.3.  It requires that packaged food and beverages disclose their

9    ingredients (21 U.S.C. § 343(i)), the net weight of their contents (21 U.S.C. § 343(e)), and their

10   percentage of alcohol by volume (27 U.S.C. § 205(e)(2)).  Foods regulated by the Food and Drug

11   Administration ("FDA") must be labeled with all ingredients that are derived from the eight most

12   common food allergens (milk, eggs, fish, crustacean shellfish, tree nuts, peanuts, wheat,

13   soybeans).  *See* Food Allergen Labeling and Consumer Protection Act of 2004, Title II of Public

14   Law 108-282 (Aug. 2, 2004).

15       California law requires lenders who give variable interest loans to provide consumers

16   with a statement "consisting of the following language:  NOTICE TO BORROWER:  THIS

17   DOCUMENT CONTAINS PROVISIONS FOR A VARIABLE INTEREST RATE."  Cal. Civ.

18   Code § 1916.5(a)(6).  It requires that cooperative corporations formed under California

19   Corporations Code include the following statement in their articles of incorporation:  "This

20   corporation is a cooperative corporation organized under the Consumer Cooperative Corporation

21   Law.  The purpose of this corporation is to engage in any lawful act or activity for which a

22   corporation may be organized under such law."  Cal. Corp. Code § 12310(b).  It requires that

23   products with removable or rechargeable batteries be conspicuously labeled with the following

24   statements:  "NICKEL-CADMIUM BATTERY. MUST BE RECYCLED OR DISPOSED OF

25   PROPERLY." or "SEALED LEAD BATTERY. MUST BE RECYCLED OR DISPOSED OF

26   PROPERLY."  Cal. Pub. Res. Code § 15013(b).  It requires that "[e]ach container of bottled

27   water sold in this state, each water-vending machine, and each container provided by retail water

28   facilities located in this state shall be clearly labeled" to include the source of the bottled water, a

1    description of the treatment process or, if none, a statement to that effect, and the name and

2    contact information for the bottler, brand owner, or facility operator.  Cal. Health & Safety Code

3    § 111170.

4        Contrary to CRA's assertions (CRA Br. at 32), the government may require the

5    disclosure of noncontroversial, factual information in the context of commercial speech for many

6    reasons other than protecting consumers from deception or warning consumers about "inherently

7    dangerous" products.  Such disclosures are routinely required to protect public health and to

8    serve the general welfare.  Consumer protection law is based on the belief that the disclosure of

9    factual and uncontroversial information will promote knowledgeable consumer decision-making.

10   *See*, *e.g.*, 15 U.S.C. § 1451 (Congressional declaration of the policy for the Fair Packaging and

11   Labeling Act: "Informed consumers are essential to the fair and efficient functioning of a free

12   market economy.  Packages and their labels should enable consumers to obtain accurate

13   information as to the quantity of the contents and should facilitate value comparisons.").

14       Compelled disclosures also frequently reduce information costs and thereby increase

15   market efficiency.  *See* Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics. Why Markets*

16   *Fail: Incomplete Information* 612 (Prentice Hall 1998).  They reduce potential consumer

17   confusion.  *See*, *e.g.*, *In re Matter of Policies and Rules Concerning Interstate 900*

18   *Telecommunications Services*, 6 FCC Rcd. 6166, 6168 (Sept. 26, 1991) ("The preamble

19   [requirement] is designed to prevent deception and confusion by providing the consumer 'purely

20   factual and uncontroversial information about the terms under which [the] services will be

21   available,' thereby enabling the consumer to make an informed purchasing decision.").  They

22   enable consumers to make decisions that will best serve their own best interests, including their

23   own interests in health and safety. *See* 137 Cong. Rec. E 1165 (April 9, 1991) (Rep. John

24   Moakley:  NLEA authorizes the FDA to regulate food labels "to help consumers choose

25   healthful foods in the context of a total daily diet without the confusing and all-too-often

26   misleading information currently on many food labels.").

27       If CRA's constitutional arguments were accepted, none of these regulations would be

28   constitutionally permissible.

## II. The First Amendment Standard for Commercial Disclosure Requirements of Factual and Uncontroversial Commercial Information is the Reasonable Relationship Test, Not Intermediate Scrutiny Under *Central Hudson*

Courts uniformly have held that the compelled disclosure of factual and uncontroversial commercial information is constitutional under the First Amendment if it is reasonably related to an appropriate state interest. Although the general standard for restrictions on commercial speech is the test set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980), regulations that compel "purely factual and uncontroversial" commercial speech are "acceptable less restrictive alternatives to actual suppression of speech" and thus subject to more lenient review. *Zauderer*, 471 U.S. at 651, n.14.

The asymmetry between the constitutional test applied to restrictions on commercial speech and the constitutional test applied to compelled disclosure of factual and uncontroversial commercial information follows directly from the justification announced by the Supreme Court for First Amendment protection of commercial speech. The Court explained:

> Advertising . . . is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price. So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable. . . . And if it is indispensable to the proper allocation of resources in a free enterprise system, it is also indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered. Therefore, even if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a democracy, we could not say that the free flow of information does not serve that goal.

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976).

The Court explained that commercial speech merits constitutional protection because it conveys information necessary for "public decisionmaking," and it has repeatedly reaffirmed this conclusion: "The First Amendment's concern for commercial speech is based on the informational function of advertising." *Central Hudson*, 447 U.S. at 563. "A commercial advertisement is constitutionally protected not so much because it pertains to the seller's business as because it furthers the societal interest in the 'free flow of commercial information.'"

1     *First National Bank v. Bellotti*, 435 U.S. 765, 783 (1978) (quoting *Virginia State Board of*

2     *Pharmacy*, 425 U.S. at 764).

3          Restrictions on commercial speech *interrupt* the flow of commercial information to the

4     public and thus interfere with the constitutional value of commercial speech. They are therefore

5     subject to the intermediate scrutiny of the *Central Hudson* test. By contrast, legislation that

6     requires commercial vendors to disclose factual and uncontroversial information increases the

7     flow of commercial information to consumers and thus serves the same constitutional purpose as

8     does the constitutional protection extended to commercial speech. Moreover, CRA does not

9     argue, nor could it argue, that Ordinance 40-08 restricts the ability of its members to speak.

10    Because 40-08 does not suppress expression, it is not encompassed within the rationale of

11    *Central Hudson* and its progeny.

12         The Supreme Court in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court*

13    *of Ohio*, explicitly held that compelled disclosure of factual and uncontroversial commercial

14    information is constitutional if it bears a reasonable relationship to an appropriate state interest.

15    471 U.S. at 651. In *Zauderer*, the Court considered a state requirement that attorney

16    advertisements for contingent-fee representation must disclose "whether percentages are

17    computed before or after deduction of court costs and expenses." *Id.* at 633. The Ohio Office of

18    Disciplinary Counsel filed a complaint against an attorney named Philip Q. Zauderer for not

19    complying with this disclosure requirement.

20         Zauderer argued that the Ohio disclosure requirement violated his First Amendment right

21    not to speak. The Court disagreed:

22
23
24
> The State has attempted only to prescribe what shall be orthodox in commercial advertising, and its prescription has taken the form of a requirement that plaintiff include in his advertising purely factual and uncontroversial information about the terms under which his services will be available.

25    *Id.* at 651. The Court explained that "the extension of First Amendment protection to

26    commercial speech is justified principally by the value to consumers of the information such

27    speech provides," and that therefore "plaintiff's constitutionally protected interest in *not*

28    providing any particular factual information in his advertising is minimal." *Zauderer*, 471 U.S.

---

1  at 651 (emphasis in the original) (citing *Virginia State Pharmacy Board*, 425 U.S. 748).  Noting

2  the "material differences between disclosure requirements and outright prohibitions on speech"

3  (471 U.S. at 650), *Zauderer* unambiguously held that "the First Amendment interests implicated

4  by disclosure requirements are substantially weaker than those at stake when speech is actually

5  suppressed."  *Id.* at 651 n.14.

6      *Zauderer* thus stands for the general rule that "an advertiser's rights are adequately

7  protected as long as disclosure requirements are reasonably related to" a governmental interest.

8  *Id.* at 651.  In *Zauderer*, Ohio sought to require disclosure of factual and noncontroversial

9  commercial information about contingency fee agreements in order to prevent potential

10  consumer deception.  But nothing in the Court's reasoning limited the application of the

11  "reasonable relationship" test to the particular state interest of preventing consumer deception.

12  Instead, the Court's analysis rested on the understanding that the constitutional values served by

13  the commercial speech doctrine dictate that the constitutional review of "disclosure

14  requirements" be different than that of "outright prohibitions on speech."  *See* Robert Post, *The*

15  *Constitutional Status of Commercial Speech*, 48 U.C.L.A. L. Rev. 1, 26-28 (2000).

16      This is the interpretation of *Zauderer* adopted by all Circuit Courts that have considered

17  the question.  Plaintiff incorrectly asserts that the Second Circuit "dramatically extended

18  *Zauderer*" in *National Electrical Manufacturers Association v. Sorrell*, 272 F.3d 104 (2d Cir.

19  2001), and thus that the Southern District of New York should not have applied the reasonable

20  basis test in *NYSRA v. New York City*.  CRA Br. at 29-30.  But *Sorrell* properly understood and

21  applied the essential logic of *Zauderer*.

22      In *Sorrell*, the Second Circuit considered a First Amendment challenge by the National

23  Electrical Manufacturers Association to a Vermont statute requiring "manufacturers of some

24  mercury-containing products to label their products and packaging to inform consumers that the

25  products contain mercury and, on disposal, should be recycled or disposed of as hazardous

26  waste."  272 F.3d at 107.  The Second Circuit held that the compelled disclosure of factual and

27  uncontroversial commercial information is constitutional if there is "a rational connection

28  between the purpose of" the disclosure requirement and "the means employed to realize that

purpose." *Id*. at 115.  The court reasoned that "*Zauderer*, not *Central Hudson Gas & Electric Corp*. . . . describes the relationship between means and ends demanded by the First Amendment in compelled commercial disclosure cases." *Id*. (internal citations omitted).

The Second Circuit explained that the reasonable relationship test was the appropriate standard of review for compelled disclosure of factual and uncontroversial commercial information because such disclosure:

> does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests.  Such disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the "marketplace of ideas."  Protection of the robust and free flow of accurate information is the principal First Amendment justification for protecting commercial speech, and requiring disclosure of truthful information promotes that goal.

*Id*. at 114.

In applying the "reasonable-relationship rule" of *Zauderer* to determine whether the Vermont statute was constitutional, the Second Circuit identified the state interest served by the statute as "protecting human health and the environment from mercury poisoning." *Id*. at 115.  Vermont expected that by "increasing consumer awareness of the presence of mercury in a variety of products," it could "reduce the amount of mercury released into the environment." *Id*.  This goal has nothing to do with preventing consumer deception, and instead is based on the expectation that better informing "consumers about the products they purchase" will lead to more intelligent decision-making that will serve to protect human health. *Id*.[6]

---

[6]  California's Proposition 65 has a similar requirement which requires disclosure of the presence of toxic chemicals including mercury.  *See* Proposition 65, California's Safe Drinking Water and Toxic Enforcement Act of 1986, Cal. Health & Saf. Code §§ 25249.5-25249.13.  Through this provision, dentists are required to disclose information about mercury content and toxicity for dental materials.  Cal. Bus. & Prof. Code §§ 1648.10-1648.20.  One of the declared purposes of Proposition 65 is for the people of California "[t]o be informed about exposures to chemicals that cause cancer, birth defects, or other reproductive harm."  Cal. Health & Saf. Code, Div. 20, Ch. 6.6 Note § 1(b) (approved Nov. 4, 1986).  Like the requirement in *Sorrell*, California's Proposition 65 was enacted to further the health and safety of the population through increased information.

1       The Ninth Circuit specifically relied on *Sorrell* to conclude that government can compel

2  the disclosure of noncontroversial, factual, commercial information.  In *Environmental Defense*

3  *Center v. EPA*, the Ninth Circuit responded to challenges to certain regulations promulgated by

4  the Environmental Protection Agency ("EPA") under sections of the Clean Water Act dealing

5  with pollution from stormwater runoff.  344 F.3d 832 (9th Cir. 2003).  One such regulation

6  compelled municipalities ("MS4s") to "distribute educational materials to the community" about

7  the impact of stormwater discharges and to "inform public employees, businesses, and the

8  general public of hazards associated with illegal discharges and improper disposal of waste."  *Id*.

9  at 848.  The purpose of the disclosure requirement was to inform the public how to dispose of

10  toxins, not to prevent consumer deception.  The regulation was enacted with the expectation that

11  better informed consumers will lead to better informed decision-making to protect public health.

12  The Ninth Circuit specifically invoked *Sorrell* to liken the disclosure requirement at issue to

13  other similar labeling requirements:

> In deciding [a] similar question, . . . the Second Circuit held that "mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001). . . .  We think the policy considerations underlying the commercial speech treatment of labeling requirements, *see, e.g.*, the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1333-39, apply similarly in [this] context.

19  344 F.3d 832, 851 n.27 (9th Cir. 2003).  The Ninth Circuit thus held that the requirement ought

20  not to be subject to elevated First Amendment scrutiny:

> As in *Zauderer v. Office of Disciplinary Counsel of the Sup*. Ct. of Ohio, 471 U.S. 626 (1985), where the Supreme Court upheld certain disclosure requirements in attorney advertising, "[t]he interests at stake in this case are not of the same order as those discussed in *Wooley* . . . and *Barnette* . . . ." *Id.* at 651.  EPA has not attempted to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  *West Virginia State Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).

> Informing the public about safe toxin disposal is non-ideological; it involves no "compelled recitation of a message" and no "affirmation of belief."  *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 88 (1980). . . .  It does not prohibit the MS4 from stating its own views about the proper means of managing toxic materials, or even about the Phase II Rule itself.  Nor is the MS4 prevented from identifying its dissemination of public

1    information as required by federal law, or from making available federally produced
2    informational materials on the subject and identifying them as such.

3    *Id*. at 849-50.

4        The First Circuit has likewise agreed with this interpretation of *Zauderer*.  In
5    *Pharmaceutical Care Management Association v. Rowe*, 429 F.3d 294 (1st Cir. 2005), the First
6    Circuit considered a challenge to a Maine statute requiring that pharmacy benefit managers
7    ("PBMs"), who act as intermediaries between pharmaceutical manufacturers and health benefit
8    providers, disclose to providers conflicts of interest and certain financial arrangements with third
9    parties.  429 F.3d at 299 (Op. of Torruella, J.).  The purpose of these disclosure requirements was
10   to place "Maine health benefit providers in a better position to determine whether PBMs are
11   acting against their interests, and correspondingly, to help control prescription drug costs and
12   increase access to prescription drugs."  *Id*. at 298-99.  The First Circuit applied *Zauderer* to
13   dismiss a First Amendment challenge to the statute:

14       [The] First Amendment claim is completely without merit.  So-called "compelled
15       speech" may under modern Supreme Court jurisprudence raise a serious First
         Amendment concern where it effects a forced association between the speaker and a
16       particular viewpoint. . . .

17       What is at stake here, by contrast, is simply routine disclosure of economically
         significant information designed to forward ordinary regulatory purposes-in this case,
18       protecting covered entities from questionable PBM business practices.  There are literally
         thousands of similar regulations on the books-such as product labeling laws,
19       environmental spill reporting, accident reports by common carriers, SEC reporting as to
         corporate losses and (most obviously) the requirement to file tax returns to government
20       units who use the information to the obvious disadvantage of the taxpayer.

21
         The idea that these thousands of routine regulations require an extensive First
22       Amendment analysis is mistaken.  *Zauderer v. Office of Disciplinary Counsel,* 471 U.S.
         626 (1985), makes clear "that an advertiser's rights are adequately protected as long as
23       disclosure requirements are reasonably related to the State's interest in preventing
         deception of consumers."  *Id*. at 651.  This is a test akin to the general rational basis test
24       governing all government regulations under the Due Process Clause.  The test is so
         obviously met in this case as to make elaboration pointless.
25

26
27   *Id*. at 316 (Op. of Boudin, C.J.); *see also id*. at 297-98 (*per curiam* holding that the joint
     concurring opinion of Chief Justice Boudin and Judge Dyk represents the opinion of the court
28   with respect to the First Amendment issues).

1    **III.    Ordinance 40-08 Meets the Reasonable Relationship Test**

2         San Francisco's ordinance meets the reasonable relationship test of *Zauderer*.  San

3    Francisco enacted Ordinance 40-08 (1) to reduce consumer confusion and deception; and (2) to

4    promote informed consumer decision-making so as to reduce obesity and the diseases associated

5    therewith.  The ordinance is reasonably related to these governmental interests.

6         **A.    Ordinance 40-08 Reduces Consumer Confusion**

7         San Francisco relied on studies and polls to conclude that "[w]ithout nutrition

8    information, consumers consistently underestimate the nutritional content of restaurant foods."

9    Health Code § 468.1.  It also found that, "the fact that chain restaurants' serving sizes are so

10   varied and large, and their prices are so low, can mislead and even deceive the public regarding

11   the amount of an actual serving size and how many calories a portion contains."  *Id*.  In enacting

12   Ordinance 40-08, San Francisco sought to correct the information disparity that currently harms

13   consumers.

14        CRA concedes that the reasonable relationship test of *Zauderer* applies to regulations that

15   compel disclosure of factual and uncontroversial commercial information in order to prevent

16   potential consumer deception.  CRA Br. at 29-30.  Ordinance 40-08 was enacted in part in order

17   to serve this purpose.  Thus, on this basis alone, Ordinance 40-08 should easily be upheld against

18   CRA's First Amendment challenge.

19        In enacting Ordinance 40-08, San Francisco relied on independent studies and found that

20   when "nutritional information is provided, consumers use it to make healthier choices."  Health

21   Code § 468.1.

22        This premise that providing consumers with factual and uncontroversial commercial

23   information will inform consumer decision-making and reduce the likelihood of consumer

24   deception, is the same premise that underlies federal legislation like the NLEA.  Congress

25   specifically recognized the elimination of consumer confusion as one of the purposes behind

26   enacting the NLEA:

27        The purpose of those amendments, known collectively as the NLEA, was: (1) To make
           available nutrition information that can assist consumers in selecting foods that can lead
28         to healthier diets, (2) *to eliminate consumer confusion* by establishing definitions for
           nutrient content claims that are consistent with the terms defined by the Secretary [of

Health and Human Services], and (3) to encourage product innovation through the development and marketing of nutritionally improved foods.

H.R. Rep. No. 538, 101st Cong., 2d Sess. 8-10, *reprinted* in 1990 U.S.C.C.A.N. 3336, 3337-38 (emphasis added).  If this purpose suffices to establish the constitutionality of the compelled disclosure required by the NLEA, it equally suffices to establish the constitutionality of the disclosure required by Ordinance 40-08.

Empirical studies suggest that almost half of Americans report that nutrition information provided on food labels has caused them to change their mind about purchasing particular products.  Health Code § 468.1.  Because there is no reason to suppose that the nutrition information which Ordinance 40-08 requires to be disclosed will be any less effective in reducing the likelihood of consumer confusion and deception than the same information which the NLEA requires to be disclosed, it follows that Ordinance 40-08 is reasonably related to a proper state interest and that it therefore passes the test of *Zauderer*.  This is true regardless of whether Ordinance 40-08 also serves the additional state interest of combating the current epidemic of obesity.

**B.      Ordinance 40-08 Improves Public Health by Reducing Obesity through Promoting Informed Consumer Decision-Making**

Ordinance 40-08 seeks to promote public health by providing consumers with more complete information about the nutritional content of the food that they eat.  San Francisco specifically found that:

> Consumers must have basic nutritional information readily available in order to make informed choices about the Food that they, and their children and dependants, eat.  These sections require Chain Restaurants to provide consumers with specific nutritional information . . . so that consumers may be better able to make nutritional choices consistent with their health needs.  Furthermore, ensuring informed food choices supports societal public health goals of preventing obesity, diabetes, and other avoidable nutrition-related diseases.

Health Code § 468.  Based on scientific studies, San Francisco concluded that the "increase in per capita restaurants accounts for 65% of the increase in the percentage of those who are obese."  Health Code § 468.1.  This is because restaurant foods are often served in large portions

and generally contain an excess of calories, saturated fat, trans-fat and sodium. *Id.* San Francisco concluded, and studies confirm, that there is "a positive association between eating out and higher caloric intakes and higher body weights." *Id.*

San Francisco's findings are supported by independent scientific research demonstrating that consumers routinely consult food labels and make positive changes to their food purchasing habits. Health Code § 468.1. In one study, consumers presented with calorie information on a restaurant menu chose high-calorie items one-third less frequently. *Id.* Economists from the National Bureau of Economic Research have estimated that the information required by the NLEA to be set forth in food labels has produced a decrease in body weight that over a 20-year period has generated a total monetary benefit of about $63-166 billion (in 1991 dollars). *See* J.N. Variyam & J. Cawley, *Nutrition Labels and Obesity*, National Bureau of Economic Research, working paper 11956 (Jan. 2006). This benefit flowed from the fact that two-thirds of adults at least sometimes read nutrition information about calories, fat, or cholesterol listed on a label when they buy a food item for the first time.

This record suffices to establish the rationality of Ordinance 40-08 under the reasonableness test of *Zauderer*. In its brief, Plaintiff states that Ordinance 40-08 may not in fact succeed in reducing obesity. CRA Br. at 4-5. This argument may have been significant in the constitutional universe of *Lochner v. New York*, 198 U.S. 45 (1905), but in the 21st century, it is well established that courts cannot strike down government regulations merely because the regulations may not achieve their goals, and that to do so would ultimately result in no government legislation at all. Under modern constitutional standards like those contained in *Zauderer*, 471 U.S. at 652-53, and even in *Central Hudson*, 447 U.S. at 570, it is sufficient for the state to advance regulations supported by rational and relevant evidence. *See also Board of Trustees v. Fox*, 492 U.S. 469, 480 (1989). Ordinance 40-08 easily passes this test. [7]

---

[7] It is noteworthy that the "evidence" on which Plaintiff relies to support its argument that Health Code 40-08 does not advance San Francisco's interest in preventing obesity is the Declaration of David B. Allison, which was submitted in the *NYSRA v. NYC* matter. *See* CRA (continued…)

Ordinance 40-08 is consistent with the recommendation of leading public health authorities.  There is virtual unanimity that requiring the effective communication of factual nutritional information for food consumed away from home is necessary if consumers are to make informed decisions.  *See* Health Code § 468.1.  Ordinance 40-08 provides this information to consumers in a manner that public health professionals regard as most effective in promoting informed consumer decision-making – at the point of purchase.[8]  Requiring nutritional disclosure at the point of purchase ensures that consumers can utilize this information prior to purchase and during decision-making.  San Francisco found that current methods used by restaurants to communicate nutrition information to customers are inadequate.  See Health Code § 468.1.  This conclusion is supported by independent studies.[9]

Ordinance 40-08 is reasonably related to the San Francisco's interest in reducing obesity by promoting informed consumer decision-making.  It is accordingly constitutional under the test of *Zauderer* regardless of whether it also serves the additional interest of reducing potential consumer confusion.

---

Br. at 25-26.  As reported in the New York Times, Dr. Allison resigned from his position as incoming president of the Obesity Society in response to "criticism from some of the group's members after he wrote an affidavit as a paid consultant on behalf of the restaurant industry."  S. Saul, *Conflict on the Menu*, N.Y. Times, Feb. 16, 2008, Sec. C-1.  As the New York Times reported it: "Because Dr. Allison's position ran counter to the conventional thinking in his field, some critics contended that it illustrated the way industry money can influence scientific and medical debate."  *Id.*

[8]  *See* The Institute of Medicine, *Preventing childhood obesity health in the balance*, National Academies Press, Washington, DC (2005) at 165-66 (Recommending that "[f]ull-service and fast food restaurants should expand healthier food options and provide calorie content and general nutrition information at point of purchase."); AMA House of Delegates, *Nutrition Labeling and Nutritionally Improved Menu Offerings in Fast-Food and Other Chain Restaurants*, Resolution: 419 (A-07) at 2 ("Our American Medical Association support federal, state, and local policies to require fast-food and other chain restaurants . . . to provide consumers with nutrition information on menus and menu boards.").

[9]  *See*, *e.g.*, M.G. Wootan & M. Osbord, *Availability of nutrition information from chain restaurants in the United States*, 30(2) Am. J. of Preventative Med. 266-68 (2006); M.G. Wootan, M. Osborn & C.J. Malloy, *Availability of point-of-purchase nutrition information at a fast-food restaurant*, 43 Am. J. of Preventative Med. 458-59 (2006).

**IV.    The Holding of _United Foods_ is Inapplicable to Ordinance 40-08**

Plaintiff characterizes Ordinance 40-08 as forcing "a private party to convey the government's message as if it were the private party's message when the private party wishes to convey a different message or no message at all."  CRA Br. at 28.  It similarly argues that enforcement of Ordinance 40-08 will lead "consumers to mistakenly assume that the posting of calories conveys the restaurants' own point of view," in violation of _United States Department of Agriculture v. United Foods_, 533 U.S. 405 (2001).  _Id._  This is simply an untenable characterization of the ordinance.

Mandated disclosures of factual and uncontroversial commercial information are routine and they are always understood as requiring simply the publication of relevant factual information.  If Plaintiff were correct that requiring disclosure of factual information somehow meant that restaurants were required to espouse a particular "point of view" with which the restaurants disagreed, than all compelled factual disclosure such as that mandated by the NLEA would be constitutionally suspect.  Indeed, if Plaintiff's argument were accepted, every such statute would be transformed into compelled ideological speech that is constitutionally suspect.  But no court has interpreted the mandated disclosure of factual and noncontroversial commercial information about a commercial actor's own products and services as requiring it to espouse a particular point of view.

Plaintiff's flawed position rests on a misunderstanding of _United States Department of Agriculture v. United Foods_, 533 U.S. 405 (2001).  _See_ SDNY Opinion and Order at 17 ("NYSRA's reliance on United Foods is misplaced.").  _United Foods_ involved a federal statute authorizing a Mushroom Council to impose mandatory assessments upon handlers of mushrooms for generic advertising.  533 U.S. at 408.  One mushroom handler contended that the "forced subsidy for generic advertising" violated its First Amendment right not to be "charged for a message . . . that mushrooms are worth consuming whether or not they are branded," because it wanted to "convey the message that its brand of mushrooms [were] superior to those grown by other producers."  _Id._ at 411.  The Court held that the First Amendment was implicated because the federal statute required "producers to subsidize speech with which they disagree."  _Id._ at 411.

1    Ordinance 40-08, in contrast to the federal statute in *United Foods*, does not require

2    commercial speakers to subsidize speech with which they disagree.  Ordinance 40-08 requires

3    only the disclosure of factual and uncontroversial commercial information about the nutrition

4    content of their foods and beverages.  There is nothing subjective or ideological about this

5    information.  Ordinance 40-08 does not require restaurants to disclose a point of view about the

6    meaning or significance of the nutritional information; to the contrary, it permits restaurants to

7    say about this requirement whatever they wish to communicate.

8    Plaintiff does not here contend that the disclosures required by Ordinance 40-08 are

9    inaccurate; thus, there is no basis for suggesting that Plaintiff somehow "disagrees" with the

10    content of the information that must be displayed pursuant to Ordinance 40-08.  At most,

11    Plaintiff objects to the requirement that this factual information be disclosed.  But this same

12    objection can be made to all legislation that requires disclosure of factual and noncontroversial

13    commercial information.  This objection has nothing to do with the constitutional concern of

14    *United Foods*, which extended First Amendment protection to commercial speakers who were

15    compelled to subsidize messages that contained content with which they could in fact disagree.

16    *See* 533 U.S. at 411.

17    **V.    The Reasonable Relationship Test Also Applies Under Article I of the California
          Constitution**

18

19    The California Supreme Court has stated that the "free speech clause" of the California

20    Constitution "is at least as broad as the First Amendment's, and its right to freedom of speech is

21    at least as great."  *Gerawan Farming, Inc. v. Lyons* ("*Gerawan I*"), 24 Cal. 4th 468, 490 (2000).

22    The California Supreme Court has held that decisions of the U.S. Supreme Court "are entitled to

23    respectful consideration and ought to be followed unless persuasive reasons are presented for

24    taking a different course."  *People v. Teresinski*, 30 Cal. 3d 822, 836 (1982).  California courts

25    do just that.  Thus, for restrictions on commercial speech, California courts apply the *Central

26    Hudson* test.  *See*, *e.g.*, *U.D. Registry, Inc. v. State of California*, 144 Cal. App. 4th 405, 424-25

27    (2006); *Baba v. Board of Supervisors*, 124 Cal. App. 4th 504, 518-21 (2004).  Similarly, as

28    Plaintiff concedes (CRA Br. at 33), California courts rely on U.S. Supreme Court precedent for

       compelled subsidy of speech cases.  *See Gerawan Farming, Inc. v. Kawamura* ("*Gerawan II*"),

---

1  33 Cal. 4th 1 (2004).  California courts likewise apply the reasonable relationship test to factual

2  commercial disclosure requirements.  *See*, *e.g.*, *People v. Anderson*, 235 Cal. App. 3d 586

3  (1991); *Perlman v. People*, 99 Cal. App. 3d 568 (1979).

4       Plaintiff cites *Gerawan I* for the proposition that "article I's right to freedom of speech,

5  without more, would *not* allow compelling one who engages in commercial speech to say

6  through advertising what he otherwise would not say, when his message is about a lawful

7  product or service and is not otherwise false or misleading."  CRA Br. at 33 (citing 24 Cal. 4th at

8  509).  *Gerawan I*, like *United Foods*, considered the constitutionality of a government regulation

9  that compelled the "funding of generic advertising."  *Gerawan I*, 24 Cal. 4th at 509.  Just as

10  *United Food*s does not state the applicable First Amendment test for the compelled disclosures of

11  noncontroversial, factual commercial information, so also *Gerawan I* does not state the

12  applicable test under the California Constitution for compelled disclosures of noncontroversial,

13  factual commercial information.  Any other conclusion would undermine the well-developed

14  legislative framework that presently protects consumers in California by requiring the disclosure

15  of uncontroversial, factual commercial information.  *See*, *e.g.*, Cal. & Health & Saf. Code §§

16  110423, 111170, 25250.25; Cal. Fin. Code § 22317.2; Cal. Pub. Res. Code § 15013(b).

17       Plaintiff's interpretation of *Gerawan I*, for example, would render constitutionally

18  suspect such foundational regulatory schemes as Proposition 65.  Proposition 65 provides: "No

19  person in the course of doing business shall knowingly and intentionally expose any individual to

20  a chemical known to the state to cause cancer or reproductive toxicity without first giving clear

21  and reasonable warning to such individual."  Cal. Health & Saf. Code § 25249.6 (2007).  It

22  compels the disclosure of this noncontroversial, factual commercial information in order to

23  ensure the citizens of California are "informed about exposures to chemicals that cause cancer,

24  birth defects, or other reproductive harm" in order to "protect themselves."  Cal. Health & Saf.

25  Code Div. 20, Ch. 6.6 Note §1 (2007).  The California Supreme Court has repeatedly affirmed

26  and enforced Proposition 65.  *See*, *e.g.*, *People ex rel. Lungren v. Superior Court*, 14 Cal. 4th 294

27  (1996).

28

As Plaintiff recognizes, few California cases address commercial disclosure requirements (CRA Br. at 29), because few commercial actors challenge the state's authority to compel the disclosure of purely factual commercial information in the context of the purchase and sale of goods and services.  In a case on point, the Superior Court for the City of San Francisco addressed a school bus company's challenge to Proposition 65's requirement that businesses display a "safe harbor warning" advising the public of the presence of toxic substances in the location.  *Environmental Law Foundation v. Laidlaw Transit Services*, 2008 WL 2157672 (Cal. Super. Jan. 8, 2008).  Directly relying on the Second Circuit's reasoning in *Sorrell*, the court rejected CRA's argument that a stricter form of scrutiny is required:

> [T]he warning here falls under case law for labels and warnings, and easily meets the corresponding rational basis standard of scrutiny. "Regulations that compel 'purely factual and uncontroversial' commercial speech are subject to more lenient review than regulations that restrict accurate commercial speech and will be sustained if they are 'reasonably related to the State's interest in preventing deception of consumers.'"

*Id*. at *2 (quoting *Sorrell*, 272 F.3d at 113).  The Superior Court recognized that Proposition 65 mandated the "disclosure of 'accurate, factual, commercial information' . . . for the benefit of the consumers."  *Id*. at *2.  As such, the purpose of the requirement was to ensure that businesses warn people before exposing them to toxins to promote the health and safety of the public, not to prevent consumer deception.  *Id*. at *3.  The Superior Court found that the compelled disclosure of uncontroversial factual commercial information was reasonably related to the state's purpose, and was thus constitutional under the California Constitution.  *See id*.

The California Court of Appeals has also applied the reasonable relationship test of *Zauderer* to uphold the mandated disclosure of noncontroversial commercial facts.  In *People v. Anderson*, defendant objected to being compelled to disclose the name and address of the manufacturer of any video or audiotape he offered for sale, as required by "anti-piracy" legislation under the Penal Code.  235 Cal. App. 3d at 588.  The court found that the speech at issue was commercial speech and the state's interest was a desire to protect the public and the entertainment industry from financial "losses suffered as a result of the 'piracy and bootlegging' of the industry's products."  *Id*. at 590-91.  The court relied on *Zauderer* and found that

1 | California must only show a reasonable relationship between the statute and the state's interest.

2 | *Id*. at 591. Applying *Zauderer*, the court held the compelled disclosure constitutional, reasoning

3 | that a commercial actor's "'constitutionally protected interest in *not* providing any particular

4 | factual information in his advertising is minimal.'" *Id*. (quoting *Zauderer*, 471 U.S. at 651)

5 | (emphasis in original).

6 |      In sum, challenges to the compelled disclosure of noncontroversial factual commercial

7 | information are constitutional under California's Constitution so long as they pass the same

8 | reasonable relationship test that *Zauderer* uses to analyze the question of federal

9 | constitutionality.

10 | **<u>CONCLUSION</u>**

11 |      For the foregoing reasons, we urge the Court to deny Plaintiff's Motion for Declaratory

12 | Relief and Preliminary Injunction, and uphold Ordinance 40-08.

13 |

14 | Dated: July 31, 2008            Respectfully submitted,

15 |                      <u>/s/ Barbara J. Chisholm</u>

16 |                     Scott A. Kronland (SBN 171693)

17 |                     Barbara J. Chisholm (SBN 224656)<br>ALTSHULER BERZON LLP

18 |                     177 Post Street, Suite 300<br>San Francisco, CA 94108

19 |                     Telephone: (415) 421-7151<br>Facsimile: (415) 360-8064

20 |                     E-mail: skronland@altber.com<br>E-mail: bchisholm@altber.com

21 |

22 |                     Robert Post (SBN 111917)

23 |                     David Boies Professor of Law<br>YALE LAW SCHOOL

24 |                     P.O. Box 208215<br>New Haven, CT 06520

25 |                     Telephone: (203) 432-4946<br>Facsimile: (203) 432-1040

26 |                     Email: Robert.Post@yale.edu

27 |                     *Attorneys for* Amici Curiae *Robert Post, Jennifer L.*<br>*Pomeranz, and Kelly D. Brownell*

28 |