Trenton H. Norris (California State Bar No. 164781)
Sarah Esmaili (California State Bar No. 206053)
ARNOLD & PORTER LLP
90 New Montgomery Street, Suite 600
San Francisco, CA  94105
Telephone:  (415) 356-3000
Facsimile:  (415) 356-3099
Email:  trent.norris@aporter.com
Email:  sarah.esmaili@aporter.com

Peter L. Zimroth (*pro hac vice*)
Kent A. Yalowitz (*pro hac vice*)
Nancy G. Milburn (*pro hac vice*)
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY  10022
Telephone:  (212) 715-1000
Facsimile:  (212) 715-1399
Email:  peter.zimroth@aporter.com
Email:  kent.yalowitz@aporter.com
Email:  nancy.milburn@aporter.com

Attorneys for Plaintiff
CALIFORNIA RESTAURANT ASSOCIATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

CALIFORNIA RESTAURANT
ASSOCIATION,

                    Plaintiff,

        v.

THE CITY AND COUNTY OF SAN
FRANCISCO, et al.,

                    Defendants.

CALIFORNIA RESTAURANT
ASSOCIATION,

                    Plaintiff,

        v.

THE COUNTY OF SANTA CLARA, et al.,

                    Defendants.

Case No. CV-08-03247 (CW), and
Case No. CV-08-03685 (CW)

**PLAINTIFF'S REPLY MEMORANDUM
IN FURTHER SUPPORT OF ITS
MOTIONS FOR DECLARATORY
RELIEF AND A PRELIMINARY
INJUNCTION**

Date:    August 28, 2008
Time:    2:00 P.M.
Dept:    Ctrm. 2, 4th Floor
Judge:   The Honorable Claudia Wilken

Complaints filed:  July 3 and July 22, 2008,
                              respectively

1

## **TABLE OF CONTENTS**

2

**Page**

3 INTRODUCTION ................................................................................................ 1

4 FACTS ................................................................................................................. 5

5       1.    A Focus on Calorie Count Is Controversial ........................................ 5

6
      2.    Defendants Have No Evidence that Statements of Calories on Menus Will
7             Reduce Obesity ................................................................................... 6

8 ARGUMENT ..................................................................................................... 11

9 I.    THE ORDINANCES ARE PREEMPTED BY FEDERAL LAW ....................... 11

10     A.   Statements of Nutritional Amount Are "Claims" Governed by
11         Subsection (r) .................................................................................... 12

12     B.   Statements Required by the Ordinances Do Not Fall Within the
        "Carve-Out" ...................................................................................... 13

13         1.    The "Carve-Out" in the Statute and Regulation Covers Only
14             Statements that "Appear as Part of" Comprehensive
            Nutrition Information ............................................................. 13

15
        2.    The FDA's *Amicus* Brief Is Not Entitled to Deference ............... 16
16

17     C.   San Francisco's "Three-Factor Test" Does Not Comport with the NLEA or
        FDA Regulations ............................................................................... 18

18         1.    The "Mandatory" Factor ....................................................... 19
19
        2.    The "Quantitative" Factor ..................................................... 19
20
        3.    The "Location" Factor ........................................................... 20
21
    D.   Santa Clara's "Promotional Statements" Theory Does Not Comport with
22         the NLEA or FDA Regulations ......................................................... 21

23     E.   The "Presumption Against Preemption" ........................................... 22

24     F.   CRA's Theory of the Case Harmonizes the Statute. .......................... 23

25 II.   THE ORDINANCES ARE PREEMPTED BY STATE LAW ........................... 24

26 III.  THE ORDINANCES VIOLATE THE FIRST AMENDMENT ......................... 26

27
    A.   The Ordinances Cannot Pass Muster Under *Central Hudson* ................... 27
28

CASE NOS. CV-08-3247 (CW) and CV-08-3685 (CW); PLAINTIFF'S REPLY MEMORANDUM IN FURTHER
SUPPORT OF ITS MOTIONS FOR DECLARATORY RELIEF AND A PRELIMINARY INJUNCTION

**Page**

1.   The Ordinances Are More Extensive than Necessary to Achieve the Government's Asserted Interest in Curbing Obesity ............................... 27

2.   Defendants Cannot Demonstrate that the Ordinances Directly Advance Their Asserted Interest in Curbing Obesity .................................... 27

B.   Compelled Speech Is Subject to the Same Level of Scrutiny as Government Suppression of Speech ........................................................... 29

C.   "Reasonableness" Review Is the Wrong Standard ....................................... 32

1.   First Amendment Doctrine Robustly Protects Commercial Speech ............. 32

2.   *United Foods* Expressly Rejects the "Reasonableness" Standard ................. 33

D.   The Ordinances Cannot Be Saved with Accusations of Deception ............................ 35

E.   This Case Does Not Threaten Consumer Protection Laws ........................................ 35

IV.   THE ORDINANCES VIOLATE THE CALIFORNIA CONSTITUTION ........................... 36

CONCLUSION ............................................................................................................. 38

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases:**

4

*ARP Pharmacy Services, Inc. v. Gallagher Bassett Services, Inc.*,
    138 Cal. App. 4th 1307 (2006) .................................................................. 37, 38

5

6

*Alaska Trojan Partnership v. Gutierrez*,
    425 F.3d 620 (9th Cir. 2005) ......................................................... 12, 13, 18

7

*Association of Nat'l Advertisers v. Lungren*,
    44 F.3d 726 (9th Cir. 1994) ....................................................................... 28

8

9

*Auer v. Robbins*,
    519 U.S. 452 (1997)................................................................................... 17

10

*Bravo Vending v. City of Rancho Mirage*,
    16 Cal. App. 4th 383 (1993) ...................................................................... 26

11

12

*Carlson v. U.S. Postal Service*,
    504 F.3d 1123 (9th Cir. 2007) ................................................................... 17

13

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980)............................................................................*passim*

14

15

*Chevron U.S.A. Inc. v. NRDC*,
    467 U.S. 837 (1984)................................................................................... 16

16

*Christensen v. Harris County*,
    529 U.S. 576 (2000)................................................................................ 16-18

17

18

*Crown Pac. v. Occupational Safety and Health Review Commission*,
    197 F.3d 1036 (9th Cir. 1999) ................................................................... 17

19

*Downey v. Crabtree*,
    100 F.3d 662 (9th Cir. 1996) ..................................................................... 16

20

21

*Edenfield v. Fane*,
    507 U.S. 761 (1993)...................................................................... 27, 28, 33

22

*Environmental Defense Center, Inc. v. EPA*,
    344 F.3d 832 (9th Cir. 2003) ..................................................................... 34

23

24

*Environmental Law Foundation v. Laidlaw Transit Services*,
    No. 451832, 2008 WL 2157672 (Cal. Super. Jan. 8, 2008) ........................... 37

25

*Florida Bar v. Went For It, Inc.*,
    515 U.S. 618 (1995)................................................................................... 33

26

27

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996)...................................................................... 27, 33

28

CASE NOS. CV-08-3247 (CW) and CV-08-3685 (CW); PLAINTIFF'S REPLY MEMORANDUM IN FURTHER
SUPPORT OF ITS MOTIONS FOR DECLARATORY RELIEF AND A PRELIMINARY INJUNCTION

**Page(s)**

*Garcia-Quintero v. Gonzalez,*
    455 F.3d 1006 (9th Cir. 2006) ........................................................................ 16

*Gerawan Farming, Inc. v. Kawamura,*
    33 Cal. 4th 1 (2004) ............................................................................... 36, 37

*Glickman v. Wileman Brothers & Elliott, Inc.,*
    521 U.S. 457 (1997)......................................................................... 29, 33, 34

*Gonzales v. Oregon,*
    546 U.S. 243 (2006)........................................................................................ 17

*Greater New Orleans Broad. Ass'n v. United States,*
    527 U.S. 173 (1999)........................................................................................ 35

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
    515 U.S. 557 (1995)........................................................................................ 31

*Ibanez v. Florida Dep't of Bus. & Prof. Reg., Bd. of Accountancy,*
    512 U.S. 136 (1994)........................................................................................ 28

*International Dairy Foods Ass'n v. Amestoy,*
    92 F.3d 67 (2d Cir. 1996) ......................................................................... 28, 30

*Johanns v. Livestock Mktg. Ass'n,*
    544 U.S. 550 (2005)................................................................................. 30, 37

*Lorillard Tobacco Co. v. Reilly,*
    533 U.S. 525 (2001)................................................................................. 27, 36

*Marcus v. FTC,*
    354 F.2d 85 (2d Cir. 1965) ............................................................................ 36

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996)........................................................................................ 22

*National Electric Manufacturers Association v. Sorrell,*
    272 F.3d 104 (2d Cir. 2001) .......................................................................... 34

*New York State Restaurant Association v. New York City Board of Health,*
    509 F. Supp. 2d 351 (S.D.N.Y. 2007) ..................................................... 13, 19

*New York State Restaurant Ass'n v. New York City Board of Health,*
    No. 08 Civ. 1000, 2008 WL 1752455 (S.D.N.Y. Apr. 16, 2008).................... 19

*Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California,*
    475 U.S. 1 (1986)........................................................................................... 31

*People v. Anderson,*
    235 Cal. App. 3d 586 (1991) ......................................................................... 37

*Perlman v. People,*
    99 Cal. App. 3d 568 (1979) ........................................................................... 37

**Page(s)**

*Pharmaceutical Care Management Association v. Rowe,*
  429 F.3d 294 (1st Cir. 2005) ............................................................. 35

*PruneYard Shopping Ctr. v. Robins,*
  447 U.S. 74 (1980) ............................................................................. 31

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ........................................................................... 33

*Rigel v. Medtronic, Inc.,*
  128 S. Ct. 999 (2008) ......................................................................... 16

*Riley v. National Federation of the Blind of N.C., Inc.,*
  487 U.S. 781 (1988) ........................................................................... 31

*Rubin v. Coors Brewing Co.,*
  514 U.S. 476 (1995) ..................................................................... 27, 33

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) ........................................................................... 16

*United States v. Haggar Apparel Co.,*
  526 U.S. 380 (1999) ..................................................................... 12, 16

*United States v. LSL Biotechnologies,*
  379 F.3d 672 (9th Cir. 2004) ............................................................. 13

*United States v. Mead Corp.,*
  533 U.S. 218 (2001) ..................................................................... 12, 16

*United States v. Schiff,*
  379 F.3d 621 (9th Cir. 2004) ............................................................. 35

*United States v. United Foods, Inc.,*
  533 U.S. 405 (2001) .................................................................... *passim*

*Valley Broad. Co. v. United States,*
  107 F.3d 1328 (9th Cir. 1997) ........................................................... 35

*Viacom Outdoor, Inc. v. City of Arcata,*
  140 Cal. App. 4th 230 (2006) ............................................................ 24

*West v. American Telephone & Telegraph Co.,*
  311 U.S. 223 (1940) ........................................................................... 38

*West Va. Bd. of Ed. v. Barnette,*
  319 U.S. 624 (1943) ..................................................................... 29, 30

*Wooley v. Maynard,*
  430 U.S. 705 (1977) ........................................................................... 29

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,*
  471 U.S. 626 (1985) ...................................................................... 32-34

**Page(s)**

**Statutes, Rules and Other Administrative Materials:**

Nutrition Labeling & Education Act,
  Pub. L. No. 101-535, 104 Stat. 2353 (1990)..........................................*passim*

15 U.S.C. §§ 68-68*j* ............................................................................ 36

15 U.S.C. § 78*l* ................................................................................... 36

15 U.S.C. § 1333 ................................................................................. 36

15 U.S.C. §§ 1667-1667*f* .................................................................. 36

21 U.S.C. § 321(k) ......................................................................... 14, 15

21 U.S.C. § 321(m) ............................................................................. 15

21 U.S.C. § 343 ................................................................................... 36

21 U.S.C. § 343(q) .......................................................................*passim*

21 U.S.C. § 343(r) ........................................................................*passim*

21 U.S.C. § 343-1(a) ................................................................ 11, 22, 23

21 U.S.C. § 343-1(b) ........................................................................... 18

21 C.F.R. § 100.1 ................................................................................ 18

21 C.F.R. § 101.9 .........................................................................*passim*

21 C.F.R. § 101.10 .......................................................................... 2, 27

21 C.F.R. § 101.13 .......................................................................*passim*

21 C.F.R. § 101.45 .............................................................................. 27

21 C.F.R. § 202.1 ................................................................................ 36

38 Fed. Reg. 2125 (Jan. 19, 1973)............................................... 2, 4, 15

56 Fed. Reg. 60366 (Nov. 27, 1991) ...................................................... 4

56 Fed. Reg. 60421 (Nov. 27, 1991) .................................................... 18

68 Fed. Reg. 41434 (July 11, 2003)...................................................... 36

136 Cong. Rec. H5836 (July 30, 1990) ................................................ 18

136 Cong. Rec. S16607-02 (Oct. 24, 1990) ......................................... 23

H.R. Rep. No. 538, 101st Cong., 2d Sess. 7 (1990),
  *reprinted in* 1990 U.S.C.C.A.N. 3336 ......................................... 13-15, 21

**Page(s)**

Cal. Civ. Code § 1916.5(a)(6) ................................................................. 36

Cal. Corp. Code § 12310(b)...................................................................... 36

Cal. Health & Safety Code § 113703 ....................................................... 24

Cal. Health & Safety Code § 113705 ....................................................... 24

Cal. Health & Safety Code § 114089 ....................................................... 25

Cal. Health & Safety Code § 114089.1 .................................................... 25

Cal. Health & Safety Code § 114090 ....................................................... 25

Cal. Health & Safety Code § 114093 ....................................................... 25

Cal. Health & Safety Code § 114093.1 .................................................... 25

Cal. Health & Safety Code § 25249.6 ....................................................... 36

Cal. Pub. Res. Code § 15013(b) ............................................................... 36

Ordinance 40-08 (amending San Francisco Health Code §§ 468-468.8) ....................... *passim*

Ordinance 195-08 (amending San Francisco Health Code §§ 468.2-468.8) ........................... 4

Ordinance 300.793 (amending Santa Clara County
    Ordinance Code §§ A18-351-366) ................................................... *passim*

Assembly Health Committee Report on SB 144 (July 5, 2005)............................................. 26

Senate Health Committee Report on SB 144 (April 20, 2005) ............................................. 25

**Other**:

Emily Buchanan Buckles*, Food Fights in the Courts:  The Odd Combination of
    Agriculture and First Amendment Rights,* 43 HOUS. L. REV. 415 (2006) ........................ 34

Julia A. Ello-Martin, et al., *Dietary Energy Density in the Treatment of
    Obesity: A Year-Long Trial Comparing 2 Weight-Loss Diets,*
    85 AM. J. CLINICAL NUTRITION 1465 (2007).................................................... 6

Food & Drug Administration, 2005 Model Food Code ........................................ 25

Steve Keane, *The Case of Food Labeling,*
    16 TRANSNAT'L L. & CONTEMP. PROBS. 291 (2006) ....................................... 19

Amy M. Lando & Judith Labiner-Wolfe, *Helping Consumers Make More Healthful
    Food Choices:  Consumer Views on Modifying Food Labels and Providing Point-of-
    Purchase Nutrition Information at Quick-Service Restaurants,*
    39 J. NUTRITION EDUC. & BEHAV. 157 (2007) ........................................... 2, 8

**Page(s)**

Robert H. Lustig, *Childhood Obesity:  Behavioral Observation or Biochemical Drive? Reinterpreting the First Law of Thermodynamics*, 2 NATURE CLINICAL PRAC. ENDOCRINOLOGY & METABOLISM 447 (2006) .................................................................. 6

Kevin C. Maki, et al., *Effects of a Reduced-Glycemic-Load Diet on Body Weight, Body Composition, and Cardiovascular Disease Risk Markers in Overweight and Obese Adults*, 85 AM. J. CLINICAL NUTRITION 724 (2007) ............................................. 6

Robert C. Post, *Transparent & Efficient Markets: Compelled Commercial Speech & Coerced Commercial Associations in* United Foods, Zauderer, *and* Abood, 40 VAL. U. L. REV. 555 (2006) ............................................................ 34

Iris Shai, et al., *Weight Loss with a Low-Carbohydrate, Mediterranean, or Low-Fat Diet*, 359 NEW ENG. J. MED. 229 (2008) ............................................ 5, 6

Stephanie Saul, *Menu Fight Over Calories Leads Doctor to Reject Post*, NEW YORK TIMES, Mar. 4, 2008 ............................................................ 7

L.C. Savage & Rachel K. Johnson, *Labeling in Restaurants: Will It Make a Difference?* 31 NUTRITION BULL. 332 (2006) ................................................... 7, 8

Jayachandran N. Variyam & John Cawley, *Nutrition Labels and Obesity*, NBER Working Paper 11956 (2006) .................................................................. 9

Jayachandran N. Variyam, *Do Nutrition Labels Improve Dietary Outcome?*, 17 HEALTH ECON. 695 (2008) ................................................................ 9

GAIL WOODWARD-LOPEZ, ET AL., OBESITY: DIETARY AND DEVELOPMENTAL INFLUENCES (CRC Press 2006) ............................................................ 6

**INTRODUCTION**

Defendants and their *amici* have attempted to caricature the arguments of the California Restaurant Association ("CRA") and its reasons for bringing these lawsuits. They suggest that CRA's members wish to "hide" calorie information from their customers. Many of defendants' legal arguments—as well as much of their hyperbolic public rhetoric (*see* Press Release of July 7, 2008 (App. Ex. A))—are based on this suggestion.

1.    This suit is not about "hiding" nutrition information (including calories) from customers. In fact, many of the restaurants targeted by San Francisco and Santa Clara have been in the forefront of providing nutrition information in the restaurants and elsewhere to their customers; they began doing so long before local laws like the ones at issue here had ever been proposed. However, CRA objects to these laws because they force restaurants to communicate misleading and confusing messages to their customers.[1]

The San Francisco brief trumpets a vignette reported by MSNBC to illustrate why its ordinance is a good law that should be upheld. S.F. Br. 25-26. As reported, a customer was visiting a restaurant that was required to include statements of calories on its menu by New York City's new regulation. She stated that she was surprised to see that a pecan-crusted chicken salad served with mandarin oranges, dried cranberries, and celery had 1,360 calories while a cheeseburger with fries had 1,290 calories. She is reported to have said that advertising the salad as a healthy option was "like false advertising." "You think [the salad is] better than the burger and fries. It's misleading." *Id.*

We think this vignette illustrates some of what is wrong with the ordinances at issue here. There is no question that the customer viewed the calorie statements as a health message. She is not alone. A survey published in the *Journal of Nutrition Education and Behavior* concluded that many of the participants who were shown calories listed alone on the menu board saw the listing as a

---

[1] By this Court's Order on Management of Related Cases, dated August, 20, 2008, CRA submits this consolidated Reply Memorandum in support of its motions for declaratory relief and a preliminary injunction challenging San Francisco's Ordinance 40-08 (amending San Francisco Health Code §§ 468-468.8) and Santa Clara's Ordinance 300.793 (amending Santa Clara County Ordinance Code §§ A18-351-366).

"shorthand signal about the healthfulness of the item."[2]  For CNBC's interviewee, the "signal" was that the cheeseburger and fries was "better" than the salad, because the salad had more calories.  So, too, a customer might see a diet soda as "better" than 1% low-fat milk or 100% fruit juice, because both the milk and the fruit juice have more calories.  *See* Quirantes Decl. ¶ 15.  Perhaps defendants would agree with the conclusions drawn from these shorthand signals—although we suspect that many nutritionists, including some who work for defendants and their *amici*, would find them controversial.

CRA does not believe that its members should be coerced into delivering these messages—especially when its members want to deliver a different health message.  That message is that if customers want to choose a meal based on its healthfulness, they should consider all the relevant nutrition information (calories, calories from fat, total fat, saturated fat, trans fat, cholesterol, sodium, potassium, total carbohydrates, dietary fiber, sugars, protein, and vitamins)—not just calories (on menu boards), not just calories, saturated fat, carbohydrates and sodium (on chain restaurant menus in San Francisco), nor just calories, saturated fat, trans fat, carbohydrates and sodium (in Santa Clara's unincorporated areas).

For decades before Congress passed the Nutritional Labeling and Education Act ("NLEA"), the FDA took the position that when any nutrition information was provided—such as calorie or fat content—complete nutrition information had to be included.  Otherwise, the FDA reasoned, the statements of calories alone "would be confusing and misleading for lack of completeness and could deceive consumers about the true nutritional value of the food, its overall nutritional contribution to the daily diet, and its nutritional weaknesses as well as strengths."  38 Fed. Reg. 2125, 2125 (Jan. 19, 1973).  Under the NLEA, restaurants that provide nutrition information are given more flexibility in presenting statements about their food, but only if the restaurants comply fully with the NLEA's "claims" regime.  *See* 21 C.F.R. § 101.10.  The local laws at issue in these

---

[2] Amy M. Lando & Judith Labiner-Wolfe, *Helping Consumers Make More Healthful Food Choices:  Consumer Views on Modifying Food Labels and Providing Point-of-Purchase Nutrition Information at Quick-Service Restaurants*, 39 J. NUTRITION EDUC. & BEHAV. 157, 161 (2007) (App. Ex. B) (hereinafter "*Helping Consumers*").

1    cases remove the restaurants' flexibility, requiring, for example, statements of calories on menu

2    boards apart from other nutrition information.

3          The vignette of the cheeseburger and fries supports two of CRA's legal arguments.  *First*,

4    although the number of calories in a particular meal may be a "fact," the separation of calories from

5    other nutrition information and its manner of presentation certainly is not just a "fact."  It conveys a

6    point of view about the *significance* of the fact; it gives a "shorthand signal," a health message.  As

7    San Francisco's vignette illustrates, and as the survey mentioned above concludes, customers

8    certainly perceive it that way.  The cases dealing with purely factual, non-controversial information

9    under the First Amendment are inapposite.

10          *Second*, the separation of calories from the other nutrition information illustrates why a

11    statement of calories on a menu is a "claim" under the NLEA.  When calories (or fat, or sodium) are

12    presented alone, as the most prominent information about the food along with the statement of

13    identity and the price, that presentation says something about the importance of the information

14    about the food.  In these circumstances, the NLEA and the United States Food and Drug

15    Administration's ("FDA") regulations dictate that the statement must be treated as a "claim."  Such

16    claims are permissible, but only if they meet the requirements of the FDA's "claims" regime.

17    ordinances that are not "identical" to that regime are preempted.

18          2.    CRA has brought these lawsuits also because it believes there is a need for

19    uniformity in menu labeling.  The two local laws target national chain restaurants.  Under

20    defendants' theory of preemption, these national chains would be subject to hundreds, perhaps

21    thousands, of different state and local regulatory regimes.  Each jurisdiction could choose which

22    aspects of nutrition it wants to emphasize and could force restaurants to enforce this choice.

23          This lack of uniformity would place a heavy burden on the restaurants.  National chains

24    would face the possibility of having to create and install hundreds or thousands of different menu

25    boards and menus throughout the country.  Even more important, however, the lack of uniformity

26    would be confusing to consumers and would undermine the considerable efforts that have been

27    made pursuant to the NLEA to educate consumers about nutrition.  For example, when consumers

28    look at packaged foods, they see nutrition information in the context of serving size.  The NLEA

- 3 -

mandates the presentation of nutrition information in this way. San Francisco and Santa Clara apparently think that serving size is not important. So when consumers eat in targeted restaurants in San Francisco and Santa Clara, they will not be able to judge the purchase using serving size as a measure even for items intended to be shared, such as family-sized meals—except for pizza-eaters in San Francisco, where there is a pizza exception to the no serving size rule.[3]

Similarly, when consumers look at packaged foods, they never see ranges for the nutrition information. That is because the FDA determined in the course of rulemaking that ranges are more confusing than helpful. *See* 56 Fed. Reg. 60366, 60373 (Nov. 27, 1991). San Francisco and Santa Clara apparently disagree with the FDA. So when consumers eat in a chain restaurant targeted by these ordinances, they will often see ranges like a sign on display in New York City that states, next to "Salad," a calorie range of 155-820. Bassett Decl. Ex. 2 at 7. It is hard to see how such information is helpful to consumers.

And perhaps most important, when consumers look at packaged foods, they see all the nutrition information together, presented in a standardized format. That is because the FDA believes that without full nutrition labeling, consumers could be deceived or misled about the nutritional value of the foods. *See* 38 Fed. Reg. at 2125. Apparently, defendants disagree with this approach. They want consumers (at least those who eat at selected restaurants) to focus only on calories, and not to bother with comprehensive nutrition information. Mixed messages like this undercut attempts to educate consumers about nutrition.

3.     Finally, as more fully explained below (*infra* pp. 22-24), the NLEA does not preclude state or local governments from taking important steps in connection with menu labeling. Specifically, although the NLEA does not itself require restaurants to provide full nutrition labeling in accordance with subsection (q) and its implementing regulations, states *can* require restaurants to do so, by opting to impose such requirements. This regime, however, is an integrated whole, and what the states cannot do is dismember it—adopting some parts while ignoring others.

---

[3] *See* Ordinance 195-08 (amending San Francisco Health Code §§ 468.2-468.8) (Aug. 7, 2008) (App. Ex. Q).

**FACTS**

Two important conclusions can be drawn from the facts of record in this case. *First*, defendants' view that the calorie count of a menu item, by itself, conveys an accurate and beneficial shorthand signal about the healthfulness of the item is neither "factual" nor "uncontroversial." Rather, defendants have taken "a position in an ongoing debate." *Compare* S.F. Br. 27. *Second*, no scientific evidence supports the conclusion that mandating calorie information (or sodium, or fat) on the menus of 372 restaurants in San Francisco[4] and 9 restaurants in Santa Clara[5] will actually be effective in reducing obesity in those localities.

**1.    A Focus on Calorie Count Is Controversial.**

Defendants believe that consumers reading menu boards should be encouraged, for their own good, to focus on one of the many nutritional factors affecting health—the foods' caloric content. CRA members disagree. They believe that sending the signal that calories "count" more than other nutrients is mistaken and counter-productive, compromising the meaningfulness and relevance of their broader health-related messages. *See*, *e.g*., Quirantes Decl. ¶¶ 14-18; DeMuth Decl. ¶¶ 3, 11.

Even when other health aspects of diet are ignored, and only weight gain considered, the notion of spotlighting calories is controversial. Defendants have presented one view, that "calories are *the* nutrition information relevant to obesity." Wootan Decl. ¶ 7; *see* Katz Decl. ¶ 27. But that view is disputed. What is *not* controversial is that calories measure the energy required to burn off food, and that consuming more calories than are burned off by physical activity leads to weight gain. So far, that is simple physics and biology.

But defendants then jump to the conclusion that calorie counting must be the key to a weight-controlling diet. That conclusion is disputed. Some say that, over the long haul, carbohydrate counting, not calorie counting, is the better dietary strategy to avoid obesity. For example, in July 2008, the *New England Journal of Medicine* reported that dieters achieved equal or

---

[4] S.F. Br. 30.

[5] According to the information provided by the Santa Clara Public Health Department, Santa Clara's ordinance applies to only 9 restaurants. *See* App. Ex. C.

better results by restricting carbohydrates rather than total calories.[6]  The carbohydrate-restricted dieters in that study experienced more weight loss *and* lower cholesterol than dieters who followed a low-fat, calorie-restricted diet.  Other research studies have found that dieters succeed when focusing on other nutritional measures.[7]  Scientists have theorized that diets focused on such nutrients may regulate hunger and other physiological drives to overeat in a way that moderates long-term calorie intake better than does a diet consciously focused on calorie count.[8]  The issues involve the interaction between physiological and psychological influences on behavior, and are the subject of much scientific study and debate.  The competing theories have generated controversy, but that is our point.

> **2.    Defendants Have No Evidence that Statements of Calories on Menus Will Reduce Obesity.**

Defendants argue that the new requirements for menu boards and menus are "likely" to reduce obesity by influencing consumers to choose lower-calorie selections.  S.F. Br. 4; S.C. Br. 27.  But they cannot point to any scientific studies that have shown such information to have had any impact whatsoever on long-term, or even short-term, weight control.  Indeed, San Francisco *conceded* before the Second Circuit "that there are no studies as of yet showing the actual impact of widespread mandatory nutrition disclosure in major chain restaurants."  Brief of *Amici Curiae* City and County of San Francisco *et al.* at 18, *New York State Restaurant Ass'n v. New York City Bd. of Health*, No. 08-1892-cv (2d Cir. May 14, 2008) ("S.F. *Amicus* Br.").

---

[6] Iris Shai, et al., *Weight Loss with a Low-Carbohydrate, Mediterranean, or Low-Fat Diet*, 359 NEW ENG. J. MED. 229, 232-33 (2008) (App. Ex. D).

[7] Studies have reported on the success of diets targeting "energy density," fat, "glycemic load," fiber, and other factors.  *See, e.g.*, Julia A. Ello-Martin, et al., *Dietary Energy Density in the Treatment of Obesity: A Year-Long Trial Comparing 2 Weight-Loss Diets*, 85 AM. J. CLINICAL NUTRITION 1465 (2007) (App. Ex. E); Kevin C. Maki, et al., *Effects of a Reduced-Glycemic-Load Diet on Body Weight, Body Composition, and Cardiovascular Disease Risk Markers in Overweight and Obese Adults*, 85 AM. J. CLINICAL NUTRITION 724 (2007) (App. Ex. F); GAIL WOODWARD-LOPEZ, ET AL., OBESITY: DIETARY AND DEVELOPMENTAL INFLUENCES 267-73 (CRC Press 2006) (App. Ex. G).

[8] *See generally* Robert H. Lustig, *Childhood Obesity:  Behavioral Observation or Biochemical Drive? Reinterpreting the First Law of Thermodynamics*, 2 NATURE CLINICAL PRAC. ENDOCRINOLOGY & METABOLISM 447 (2006) (App. Ex. H).

1    That concession was correct.  Defendants offer no substantive rebuttal to the analysis of the

2    scientific literature by Dr. Allison, submitted with CRA's opening briefs.  As Dr. Allison

3    summarized:

4    ▪ I surveyed the literature and asked:  Are there any observational
5    studies in the literature that demonstrate an association between
     such calorie posting, whether or not in chain restaurants, and
6    obesity?  I concluded that there are none.  None of the City
     experts have stated otherwise.

7
     ▪ I then asked:  Are there any observational studies that
8    demonstrate an association between such calorie posting, whether
     or not in chain restaurants, and any weight change in the
9    customers, or any decrease in caloric intake over an extended
     period;  I concluded that there are none.  None of the City experts
10   have stated otherwise.

11
     ▪ I then asked:  Are there any observational studies that
12   demonstrate an association between calorie posting and the
     customers' caloric intake over a period of a week or even a single
13   day?  I concluded that there are none, and none of the City experts
     have stated otherwise.
14

15   Allison Supp. Decl. ¶ 5.  Defendants have substantially adopted both the analysis and the

16   underlying studies and articles presented by New York City's witnesses; so Dr. Allison's

17   conclusions are equally applicable here.  Indeed, not a single one of defendants' witnesses has

18   challenged Dr. Allison's conclusions regarding the scientific obesity literature.  None has

19   questioned Dr. Allison's qualifications as one of the nation's preeminent obesity experts or his

20   scientific methodology.[9]

21    Other published experts agree with Dr. Allison.  For example, a recent review article

22   co-authored by Dr. Rachel K. Johnson, a Professor of Nutrition and Dean of the College of

23   Agriculture and Life Science at the University of Vermont, notes that:

24   _____

25   [9] Defendants attack Dr. Allison not on the merits of the opinions he expressed in his declaration but
     by referring to a newspaper article about their political correctness.  S.F. Br. 31 n.12; S.C. Br. 27
     n.13.  In that article, Dr. Allison described his submission of the declaration as a miscalculation "in
26   terms of Obesity Society politics," but he unambiguously reaffirmed its scientific accuracy:  "I
     stand behind the scientific statements I made, my right to make them, and the manner in which I
27   made them…."  Stephanie Saul, *Menu Fight Over Calories Leads Doctor to Reject Post*, NEW
     YORK TIMES, Mar. 4, 2008 (App. Ex. I).

28

1

> [T]here has been no research demonstrating the impact that food
> labeling will have on consumer behavior with respect to eating out.
> It has yet to be determined whether food labeling in the restaurant
> environment will lead to a change in the eating behaviors of U.S.
> patrons.  Furthermore, it is unknown whether restaurant labeling

2

3

4

> will have any impact on the incidence of obesity and overweight,
> the underlying reason behind the implementation of restaurant food
> labeling.

5

6    L.C. Savage & Rachel K. Johnson, *Labeling in Restaurants: Will It Make a Difference?*, 31

7    NUTRITION BULL. 332, 334 (2006) (App. Ex. J).  The authors called for high-quality research

8    studies to be conducted *before* enacting legislation like the ones at issue in these cases:

9

> This article also emphasizes the importance of conducting research
> to explore the impact of restaurant food labeling, prior to passing
> new legislation, as ***no studies have looked at the effect that this***
> ***may have on restaurant patron behavior***.  The importance of
> conducting research on restaurant labeling, prior to passing
> legislation, may be key to its success.

10

11

12

13    *Id.* (emphasis supplied).  Government scientists too have cautioned that a review of the literature on

14    providing nutrition information to consumers in restaurants indicates that the benefits of labeling in

15    changing consumer behavior "'may be small or uncertain at best.'"[10]

16        Undaunted, defendants point to the following supposed support for the effectiveness of

17    menu labeling in reducing obesity:  (a) experience with the federally-mandated nutritional labeling

18    of packaged food; (b) a survey conducted by the New York City Health Department of ordering at

19    fast food restaurants; (c) a few published studies of consumer reaction to nutritional information on

20    menus; and (d) a "health impact assessment" by the Los Angeles Department of Public Health and

21    an "information sheet" by the Atkins Center for Weight and Health estimating the "potential"

22    benefits of such ordinances.  None of those items provides any evidence that measures like the local

23    laws at issue here will actually reduce obesity.

24        (a)    The National Labeling and Education Act has required the "Nutrition Facts" panel

25    on packaged foods since 1994.  Defendants contend that those panels have proven effective in

26

27    _____

[10] Lando, *Helping Consumers*, 39 J. NUTRITION EDUC. & BEHAV. at 163 (quoting Jayachandran N. Variyam, *Nutrition Labeling in the Away-From-Home Sector*, Economic Research Service, U.S. Dept. of Agriculture, Economic Research Report No. 4 (April 2005)).

28

reducing obesity, and that posting calories on menus will have the same effect. Katz Decl. ¶ 40; Wootan Decl. ¶ 17. But one cannot fairly extrapolate the results of providing the comprehensive information contained in the FDA Nutrition Panel to the requirement at issue here, highlighting a single factor—calories—on menu boards, and a few others on menus. Moreover, the claim that imposition of the NLEA's labeling requirements demonstrably lowered obesity rates is mistaken. The trend toward obesity in the United States population *accelerated* over the decade after the NLEA food labeling requirements became effective in 1994. FDA, *Calories Count: Report of the Working Group on Obesity* (2004), Steely Decl. Ex. 4 at 12; *see* Katz Decl. ¶ 5; Bassett Decl. ¶ 2; Fenstersheib Decl. ¶ 7. One recent analysis by Government researchers of the impact of the NLEA's labeling requirements concluded that they had a "statistically insignificant" effect on obesity in the population as a whole.[11] A second such analysis suggested caution in considering "future nutrition labeling policies such as labeling away-from-home foods."[12]

      (b)     The New York City Health Department conducted a survey and then attempted to get it published in connection with its legal defense strategy for its own menu regulation. Katz Decl. ¶¶ 51-52; Wootan Decl. ¶ 24; Barrett Decl. ¶¶ 4-8 & Ex. 5. The survey reported an *association* between calorie information provided in Subway restaurants and lower-calorie orders in those restaurants. But as pointed out by Dr. Frederic Shaw, the Centers for Disease Control and Prevention's editor who rejected a write-up of the survey for publication in the CDC's journal (*Morbidity & Mortality Weekly Report*), the survey does not provide evidence of effectiveness:

> ***In my mind, it is not possible to conclude that looking at the caloric info is causally related to calorie purchase***. Yes, there is an association, no doubt, but the association might just be reflecting the psychology of people who both look at caloric information and eat fewer calories. To establish causality, there would have to be other probably longitudinal study methods, like looking at consumption before and after caloric info were posted.

Correspondence from Dr. Frederic Shaw to Dr. Thomas Frieden (Dec. 29, 2007) (App. Ex. M)

---

[11] Jayachandran N. Variyam & John Cawley, *Nutrition Labels and Obesity*, NBER Working Paper 11956, p.15 (2006) (App. Ex. K).

[12] Jayachandran N. Variyam, *Do Nutrition Labels Improve Dietary Outcome?*, 17 HEALTH ECON. 695, 705 (2008) (App. Ex. L).

(emphasis supplied). In addition, the survey related to calorie count information that was *not* posted on menu boards, but rather on display case stickers and other media such as in-restaurant posters and brochures. Barrett Decl. Ex. 5; Allison Decl. at 25-26; Allison Supp. Decl. ¶¶ 6-7. And it was not designed to and did not in fact evaluate obesity, weight change or caloric intake over any extended period of time—or even a single day. *See* Allison Decl. at 22-25; Allison Supp. Decl. ¶¶ 6-7.

(c)    Defendants and *amici* point to a small handful of experimental studies that have examined consumer reaction to being shown menus listing calorie, fat or other nutritional values of menu items. Katz Decl. ¶ 41; Wootan Decl. ¶ 40; NYC *Amicus* Br. 17-18. Those studies were included and discussed in Dr. Allison's comprehensive review of the scientific literature. As he explained, they are primarily small studies of subjects' one-time response to a question as to what they would *anticipate* doing if presented with a *variety* of nutritional information on media *other than menu boards*, with *no follow-up regarding weight* maintenance or obesity. Allison Decl. at 16-22. In several similar studies, the results were negative or equivocal even with respect to subjects' short-term reported intentions. *Id.* It was with specific reference to such studies and to the New York City Health Department survey that Dr. Allison found an absence of any "competent and reliable evidence" that providing restaurant patrons with calorie information on menu items will reduce individual or population levels of obesity, or that the mandated method of providing caloric information on menu boards would reduce levels of obesity more than the methods currently used by many chain restaurants to provide calorie information. *Id.* at 29. Defendants have not come forward with any evidence to dispute that conclusion.

(d)    Finally, defendants point to papers recently prepared by Los Angeles County and the Atkins Center for Weight and Health, relying on them as evidence that the local laws at issues will prevent obesity. *See* Katz Decl. ¶ 42 & Ex. B; Fenstersheib Decl. ¶ 20 & Ex. C. Those papers are not studies of whether calorie posting affects consumer behavior. Each provides only estimates of the *potential* impact that calorie posting requirements might have, given a large number of unproven assumptions. Most obviously, the estimates are based on the untested and unrealistic assumption that people who skip calories in a chain restaurant will not eat more at other times of the day. That

- 10 -

1    assumption is like assuming that skipping breakfast is a sure-fire strategy to lose weight.  It runs

2    counter to the finding in other studies that people who eat less at one meal often compensate by

3    eating more later on.  *See* Allison Decl. at 24-25.

4         Lacking evidence that their laws will directly influence consumers to choose lower-calorie

5    items, defendants "anticipate" that they will accomplish that goal indirectly, by prompting

6    restaurants subject to the ordinances to offer lower-calorie selections.  Katz Decl. ¶ 46; Fenstersheib

7    Decl. ¶ 10.  That, too, is based on speculation, not evidence.  It is supported by nothing other than a

8    handful of anecdotes reported in the popular press, and a non-systematic collection of calorie counts

9    on a smattering of menu items from various New York City restaurants, showing reduction in 18 of

10   the thousands of items.  Bassett Decl. ¶ 7.  The claim that those reductions reflect reformulations in

11   anticipation of not-yet enforced menu-labeling ordinances is pure, unsupported speculation.

**ARGUMENT**

**I.    THE ORDINANCES ARE PREEMPTED BY FEDERAL LAW.**

14        If the statement "100 calories" on a menu is a "claim" under subsection (r), then the

15   ordinances are preempted, because 21 U.S.C. § 343-1(a)(5)—the preemption statute associated with

16   subsection (r)—does not exclude state laws governing restaurants.  In contrast, if such a statement

17   appears as part of "nutritional labeling" under subsection (q), then the ordinances are not

18   preempted, because § 343-1(a)(4)—the preemption statute associated with subsection (q)—excludes

19   state laws governing restaurants.  As San Francisco puts it, the federal preemption issue "turns on"

20   whether such statements constitute "nutritional labeling within the meaning of § 343(q), or 'claims'

21   within the meaning of § 343(r)."  *See* S.F. Br. 8.  The parties agree that this question is "dispositive"

22   on the preemption issue.  *Id.*

23        The parties diverge, however, on how to answer that dispositive question.  Defendants

24   propose a multi-factor balancing test, bolstered by a series of interpretive aids such as informal

25   agency letters and publications, floor statements by legislators, the "architecture" of the statute, and

26   an *amicus* brief by the FDA in a similar case.

27        We take a different approach.  We believe that the question should be answered by reading

28   the words of the statute and the controlling regulations promulgated by the FDA after formal notice

and comment.  The statute and the regulations are unambiguous.  Below, we review the relevant

statutory and regulatory language, and then respond to the arguments of defendants.

### A.   Statements of Nutritional Amount Are "Claims" Governed by Subsection (r).

The NLEA expressly instructed the Secretary of Health and Human Services to promulgate

regulations that "shall identify claims described in section 403(r)(1)(A) of such Act" and that

"permit statements describing the amount and percentage of nutrients in food which are not

misleading and are consistent with the terms defined in section 403(r)(2)(A)(i)."  NLEA, Pub. L.

No. 101-535, § 3(b)(i) and (iv), 104 Stat. 2353, 2361 (1990) (*reprinted in* Note following 21

U.S.C.A. § 343).  Consistent with this statutory directive, and after an extensive notice-and-

comment process the FDA promulgated a regulation defining the term "claim":

> An expressed nutrient content claim is any direct statement about
> the level (or range) of a nutrient in the food, e.g., "low sodium" or
> "contains 100 calories."

21 C.F.R. § 101.13(b)(1).  Having defined "expressed" claim, the regulation also defines "implied

nutrient content claim."  *Id.* § 101.13(b)(2).  The regulation then goes on to *permit* statements of

factual information like "100 calories," so long as they do not "implicitly characterize" the food:

> [T]he label or labeling of a product may contain a statement about
> the amount or percentage of a nutrient if:
>
> * * *
>
> (3) The statement does not in any way implicitly characterize the
> level of the nutrient in the food and it is not false or misleading in
> any respect (e.g., "100 calories" or "5 grams of fat"), in which case
> no disclaimer is required.

21 C.F.R. § 101.13(i).[13]  Defendants do not and cannot deny that these regulations—duly

promulgated after notice and comment, and fully consonant with the statutory instructions quoted

above—are binding on the courts.  *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001);

*United States v. Haggar Apparel Co.*, 526 U.S. 380, 392 (1999).  "When a statute or regulation

---

[13] San Francisco inexplicably contends that this regulation provides that a statement such as 100 calories "is not a claim."  S.F. Br. 12.  The regulation says just the opposite.  The statement is *permitted* as an "expressed nutrient content claim" so long as it does not "*implicitly* characterize the level of the nutrient in the food."  21 C.F.R. § 101.13(i)(3) (emphasis supplied).  San Francisco ignores the difference between "express" claims and "implied" claims.

defines a term, that definition controls...." *Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 628

(9th Cir. 2005). As the court in *NYSRA I* concluded, "the FDA regulations treat a simple factual

statement as to a nutrient amount as within the scope of § 343(r) and subject to (although expressly

permitted by) FDA regulations." *New York State Rest. Ass'n v. New York City Bd. of Health,* 509 F.

Supp. 2d 351, 359-60 (S.D.N.Y. 2007).

> **B.**      **Statements Required by the Ordinances Do Not Fall Within the "Carve-Out."**

Faced with the unambiguous—and controlling—regulatory definition of the term "claim,"

defendants turn to the unnumbered portion of subsection (r)(1), which reads, in part:

> A statement of the type required by paragraph (q) that appears as
> part of the nutrition information required or permitted by such
> paragraph is not a claim which is subject to this paragraph....

21 U.S.C. § 343(r)(1). Defendants' reliance on this so-called "carve-out" is misplaced, because the

carve-out covers only a statement that "appears as part of" the comprehensive nutrition information

contemplated by subsection (q).

> **1.**      **The "Carve-Out" in the Statute and Regulation Covers Only Statements that "Appear as Part of" Comprehensive Nutrition Information.**

In our opening briefs, we showed that the sentence quoted above has two clauses, and that to

come within the sentence's terms, a statement must meet both clauses—that is, [1] it must be "of the

type required by paragraph (q)," and [2] it must also "appear[] as part of the nutrition information

required or permitted by such paragraph." San Francisco argues that it is sufficient for the

statement to meet the first clause, and that the statement need not meet the second clause at all. S.F.

Br. 13. We disagree. The second clause ("appears as part of") should also be given substance,

because courts "strive to avoid constructions that render words meaningless." *See United States v.

LSL Biotechnologies*, 379 F.3d 672, 679 (9th Cir. 2004).

San Francisco argues that giving independent meaning to the second clause ("appears as part

of...") would render the first clause ("of the type") superfluous. S.F. Br. 13. However, the

sentence, read in its entirety, makes perfect sense. The first clause describes the class of statements

affected, and the second clause limits that class by modifying the first clause. The House Report

confirms this. It states explicitly that Congress intended to carve out statements from the category

1   of "claims" if they are made "on the nutrition label," but not "identical" statements if they appear

2   anywhere other than on the nutrition label required by subsection (q):

3           Section 403(r)(1) also provides that a statement required by section
        403(q) is not a claim subject to section 403(r). This provision
4       removes the statements as to the amounts of nutrients required by
        section 403(q) from the disclosure and other requirements of
5       section 403(r). However, section 403(r) would apply to any
        statement that is not required by section 403(q), including a
6       statement identical to that on the nutrition label which appears on
        the front panel of the product.
7

8   H.R. Rep. No. 101-538, at 7 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3336, 3349.

9           Under defendants' reading, statements would fall within the carve-out whenever they were

10  "of the type" required by subsection (q), including statements on the front of the popular "100-

11  calorie packages," a reading that is contrary to the House Report and contrary to defendants' own

12  concession. S.F. Br. 13-14 (relying on FDA *Amicus* Br. 16); *accord* Waxman *Amicus* Br. 16.

13          The regulation implementing this portion of the statute confirms that "appears as part of ..."

14  is a necessary element of the carve-out. Section 101.13(c) thus provides that the carve-out applies

15  only to information (1) "that is required or permitted by § 101.9 … to be declared in nutrition

16  labeling"; and (2) "that appears as part of the nutrition label." The regulation further states that "[i]f

17  such information is declared elsewhere on the label or in labeling, it is a nutrient content claim and

18  is subject to the requirements for nutrient content claims." 21 C.F.R. § 101.13(c). In our opening

19  briefs, we showed in detail why statements required by the ordinances do not meet section

20  101.13(c)—they do not satisfy section 101.9; they do not "appear as part of the nutrition label"; and

21  they appear "elsewhere … in labeling." Santa Clara concedes that "the NLEA requires that

22  nutrition information appear together as a unit" to come within the carve-out. S.C. Br. 9. The

23  statute and regulations define that "unit" as the nutrition information contemplated by subsection

24  (q), that is the "nutrition label."

25          Defendants also contend that the regulation's use of the term "label" instead of "labeling"

26  should be ignored. S.F. Br. 16-17; S.C. Br. 9-10. Defendants offer no good reason to ignore the

27  actual words of the regulation, which repeat the words of the House Report describing the purpose

28  of the statutory text, and which use a term defined in the statute itself. *Compare* 21 U.S.C. § 321(k)

- 14 -

1    (defining "label") *with* 21 U.S.C. § 321(m) (defining "labeling"). But leaving aside the statutory

2    distinction between "labels" and "labeling," the outcome of this case would be the same if the

3    regulation were rewritten to read "appears as part of the nutrition *labeling*," instead of "appears as

4    part of the nutrition *label*." An isolated statement highlighting a single nutrient does not "appear as

5    part of" the nutrition labeling contemplated by subsection (q) and its implementing regulations.

6    Section 101.9 of the regulations—entitled "Nutrition labeling of food"—repeatedly uses the words

7    "nutrition labeling" to describe the uniform set of nutrients, presented in a standardized format and

8    on a per-serving basis. *See, e.g.,* 21 C.F.R. §§ 101.9(a)(1), (a)(2), (b)(2)(i)(I), (b)(8)(iv), (c)(6)(iii),

9    (c)(8)(iii), (d)(14), (f)(1), (g)(8), (h)(1), (h)(3), (j)(4), (j)(5), (j)(8)(iii), (j)(10). The statements

10    required by the ordinances do not "appear as part of" such labeling. Rather, such statements—

11    intended and designed to deliver a particularized message about the healthfulness of the food—are

12    claims about the food, and are perceived as such by consumers.

13         Defendants' reading would also undermine the policy of the NLEA. Even before Congress

14    enacted the NLEA, comprehensive nutrition labeling was required "when a nutrition claim [was]

15    made or nutrition information [was] provided on the food labeling." H.R. Rep. No. 101-538, 1990

16    U.S.C.C.A.N. at 3338. As the FDA had explained years before the NLEA, statements of calories or

17    other nutrients in isolation could be misleading: "where … a claim or information with respect to

18    nutritional properties of a food is included in labeling or advertising, *e.g.*, … the caloric or fat

19    content of a food… the full nutrition labeling established in this regulation must be utilized. Only

20    by having available the full nutrition labeling for a food … can such a claim or information be

21    evaluated and understood, and the food properly used in the diet." 38 Fed. Reg. at 2125.

22    Subsection (q) of the NLEA codified that policy by ensuring that wherever practical, "[e]very

23    covered food would have a uniform nutrition label disclosing the amount of calories, fat, salt and

24    other nutrients. In order to make this information meaningful, the bill requires the FDA to issue

25    standards providing that uniform serving size information and information concerning the number

26    of servings be furnished on the food label." H.R. Rep. No. 101-538, 1990 U.S.C.C.A.N. at 3337.

27    The NLEA and its implementing regulations thus ensured that if a food purveyor wanted to make a

28    statement about nutrient content that was not part of full "nutrition labeling" (that is, in accordance

- 15 -

1    with subsection (q)), it could do so *only* if the statement was treated as a "claim" and only if it met

2    all the requirements of the FDA's claims regime.  That is the purpose and effect of the "carve-out"

3    in the NLEA (21 U.S.C. § 343(r)(1)) and its implementing regulation (21 C.F.R. § 101.13(c)).

4              **2.      The FDA's *Amicus* Brief Is Not Entitled to Deference.**

5              Throughout their briefs, defendants substitute analysis of the statute and regulations with a

6    plea that the Court should defer to the FDA's *amicus* brief under the doctrine of *Chevron*

7    deference.[14]  However, *Chevron* deference applies where Congress has left a statutory gap.  In such

8    cases, agency regulations promulgated after notice and comment are controlling.  *See Mead Corp.*,

9    533 U.S. at 226-27; *Haggar Apparel Co.*, 526 U.S. at 392.  Thus, the FDA's *regulations*,

10   promulgated after a notice-and-comment process pursuant to the express instruction of Congress,

11   enjoy *Chevron* deference and are of "controlling weight" unless contrary to the statute,

12   unconstitutional, or arbitrary and capricious.  *See Haggar Apparel*, 526 U.S. at 392.

13             In contrast, an agency's *informal* interpretation of a statute—as in an *amicus* brief—is "not

14   one arrived at after ... a formal adjudication or notice-and-comment rulemaking [and] … do[es] not

15   warrant *Chevron*-style deference."  *Christensen v. Harris County,* 529 U.S. 576, 587 (2000); *accord*

16   *Downey v. Crabtree*, 100 F.3d 662, 666-68 (9th Cir. 1996) (rejecting informal agency interpretation

17   that contradicted unambiguous statutory language).

18             For an *amicus* brief interpreting a statute, "mere *Skidmore* deference would … be at issue."

19   *See Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1009 (2008) (declining to rely at all on the FDA's

20   views); *id.* at 1016 n.8 (Ginsburg, J., dissenting) (affording FDA *amicus* brief "little weight" after

21   considering "'the thoroughness evident in its consideration, the validity of its reasoning, its

22   consistency with earlier and later pronouncements, and all those factors which give it power to

23   persuade, if lacking power to control.'") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140

24   (1944)); *Garcia-Quintero v. Gonzalez*, 455 F.3d 1006, 1016-18 (9th Cir. 2006) (under *Skidmore*,

25   rejecting informal interpretation that contradicted statute).  Here, the FDA's *amicus* brief does not

26   even merit *Skidmore* deference because it does not attempt to—and cannot—reconcile the result it

27   _____

28   [14] Named for *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984).

1    argues for with the statutory phrase "appears as part of."

2        The FDA's *amicus* brief does not warrant *Auer* deference, either.[15]  Under *Auer*, courts may

3    defer to an agency's considered interpretation of its own ambiguous regulation.  "But *Auer*

4    deference is warranted only when the language of the regulation is ambiguous," and then only

5    where the agency's interpretation does not conflict with the regulation as written.  *Christensen*, 529

6    U.S. at 588.  The courts will not "permit the agency, under the guise of interpreting a regulation, to

7    create *de facto* a new regulation."  *Id.*; *see Carlson v. U.S. Postal Service*, 504 F.3d 1123, 1129 (9th

8    Cir. 2007) (declining to defer to an administrative interpretation of its own regulations that was

9    inconsistent with the regulations); *Crown Pac. v. Occupational Safety and Health Review Comm'n*,

10   197 F.3d 1036, 1040 (9th Cir. 1999) (declining to defer to an administrative construction precluded

11   by the "plain meaning" of the regulation).

12       *Auer* deference is inappropriate here for three reasons.  *First*, the critical clause—"appears

13   as part of"—is a statutory clause.  The FDA's *amicus* brief purports to interpret the statute.  That

14   alone makes *Auer* inapposite.  *See Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) (the "near-

15   equivalence of the statute and regulation belies [the case for] *Auer* deference").

16       *Second*, the FDA's *amicus* brief does not *interpret* significant elements of the regulation; it

17   *ignores* them.  Thus, FDA's *amicus* brief says nothing to explain how the statements compelled by

18   the laws at issue here are "required or permitted by § 101.9 ... to be declared in nutrition labeling,"

19   as § 101.13(c) requires before the statement is carved out of the "claims" category.  As we

20   explained at length in our opening briefs, section 101.9 requires nutrition labeling to provide a

21   uniform set of comprehensive information, on a per-serving basis, in specified formats.  The FDA's

22   *amicus* brief fails to mention this element of the regulation.  Similarly, the FDA's *amicus* brief fails

23   to mention the portion of § 101.13(c) stating that if the information is "declared elsewhere on the

24   label or in labeling, it is a nutrient content claim."  21 C.F.R. § 101.13(c).

25       *Third*, the FDA's *amicus* brief argues that the use of the statutorily defined word "label" in

26   the regulation should be read to mean "labeling"—another statutorily defined word.  Where a

27   ────────────────

28   [15] Named for *Auer v. Robbins*, 519 U.S. 452 (1997).

statute defines a word, "that definition controls." *Alaska Trojan P'ship*, 425 F.3d at 628.  If the Court were to accept the FDA's *amicus* brief argument, then it would be permitting "the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen*, 529 U.S. at 588.  When the FDA promulgated § 101.13, it chose the word "label" based on the common sense reading of the statutory phrase "appears as part of."  It adopted the words used in the House Report quoted above (p. 14) as well as of one of the NLEA's sponsors—*i.e.*, the word "label" "was included ... to make it clear that the information required ***on the nutrition label***, and the optional statements that are permitted as part of nutrition labeling, are not claims under section 403(r)(1) of the act…." 56 Fed. Reg. 60421, 60424 (Nov. 27, 1991) (citing 136 Cong. Rec. H5836, H5841 (July 30, 1990) (statement of Rep. Waxman)) (emphasis added).  If the FDA now wishes to amend its regulation, it must follow the procedural and substantive requirements of the Administrative Procedure Act.

In addition, if the FDA believes that, in spite of its regulations, localities should be allowed to require menu labeling laws, the FDA has the power, explicitly granted by Congress, to exempt such laws from the preemption provision.  Such exemptions, however, must be based on findings—after notice and comment—that the proposed state law "would not unduly burden interstate commerce" and "is designed to address a particular need for information which need is not met" by current FDA regulations.  21 U.S.C. § 343-1(b)(3); 21 C.F.R. § 100.1.

### C.     San Francisco's "Three-Factor Test" Does Not Comport with the NLEA or FDA Regulations.

San Francisco attempts to impose a "three-factor test" on the statute, asking whether the statement is "mandatory," "quantitative," and/or in a non-claim "location."  S.F. Br. 11.  That approach finds no support in the words of the statute or the regulations.  The statutory and regulatory scheme is straightforward:  under duly authorized regulations, "*any* direct statement" about the amount of a nutrient is a claim (§ 101.13(b)(1)), unless it "appears as part" of the comprehensive, uniform, standard-format nutrition information statement under subsection (q), in which case it is not a claim (§ 343(r)(1); § 101.13(c)).

### 1.    The "Mandatory" Factor

San Francisco says that a statement is not a "claim" if it is "mandatory."  But neither the NLEA nor the FDA's regulations limit "claims" to "voluntary" statements.  Most obviously, the regulation defining "claim" does not say a *voluntary* statement" is a claim.  It says "any statement."  In contrast, other parts of the regulations—those implementing subsection (q)—do use the term "voluntary," so some "voluntary" statements are part of "nutrition information" under subsection (q).[16]  Further, if "mandatory" statements were carved out, then "low sodium" would not be a "claim" when mandated by state law.  But even the defendants acknowledge that "low sodium" is always a claim, whether a state "mandates" it or not.  S.F. Br. 13 & n.5.

### 2.    The "Quantitative" Factor

San Francisco says that a statement is not a claim if it is "quantitative" rather than "qualitative."  But neither the NLEA nor the FDA's regulations limit "claims" to "qualitative" statements.  The regulation does not say "any *qualitative* statement" is a claim, it says "any statement," including "contains 100 calories."  21 C.F.R. § 101.13(b)(1).  Indeed, the FDA considered and rejected a "qualitative" limitation when it adopted its regulations.  We quoted the FDA's reasoning at length in our opening briefs (pp. 12-13), and defendants do not respond to that showing.  As the court in *NYSRA I* held, purely quantitative statements are "claims."  509 F. Supp. 2d at 359-60.

---

[16] *See, e.g.*, 21 C.F.R. § 101.9(c)(5) ("'Potassium' (VOLUNTARY)").  Defendants state that "subsection (q) identifies specific information that *must* appear on food labels" (S.F. Br. 15, quoting *New York State Restaurant Ass'n v. New York City Board of Health*, No. 08 Civ. 1000, 2008 WL 1752455, at *2 (S.D.N.Y. Apr. 16, 2008) ("*NYSRA II*")), but the statute and regulations also identify "voluntary" information that *may* appear on nutrition labels.  *See* 21 C.F.R. § 101.9(c) ("The declaration of nutrition information on the label and in labeling of a food shall contain information about the level of the following nutrients, except for those nutrients whose inclusion, and the declaration of amounts, is **_voluntary_** as set forth in this paragraph.") (emphasis supplied).

*Amici* quote a law journal article to support the assertion that, in the NLEA, a mandatory statement is not a "claim."  Waxman *Amicus* Br. 20-21 (quoting Steve Keane, *The Case of Food Labeling*, 16 Transnat'l L. & Contemp. Probs. 291, 295 (2006)).  However, the comment in the article is not about the NLEA.  It addressed whether proposals in Europe for labeling genetically modified organisms could survive review by the World Trade Organization.

- 19 -

### 3.    The "Location" Factor

San Francisco says that the "location" of a statement "should also be considered in determining whether the statement is a claim." S.F. Br. 16. By this, San Francisco appears to mean that "placement on menus" renders the statement "nutrition labeling" and not a "claim" on the theory that such placement "is consistent with FDA regulations regarding the placement of nutrition labeling information for foods without labels." S.F. Br. 16 (quotation omitted). But it is meaningless to distinguish "nutrition labeling" from "claims" on the basis of "consistency" with FDA regulations on the subject of placement. That is because placement on menus is consistent with FDA regulations for the placement of both "claims" and "nutrition labeling." Nutrition labeling for food without labels need only be *somewhere* "at the point of purchase." *See* 21 C.F.R. § 101.9(a)(2).[17] Similarly, all "claims" are covered by the "claims" regime *wherever* they are made "in the label or labeling of the food." 21 U.S.C. § 343(r)(1)(A); *accord* 21 C.F.R. § 101.13(b).

Moreover, the regulations provide that a "nutrient content claim used on food that is served in restaurants ... shall comply with the requirements of this section[]"—*i.e.*, the section that governs "claims." 21 C.F.R. § 101.13(q)(5). If any statement appropriately placed in a restaurant were excluded from the "claims" regime, this regulation would be superfluous.

* * * *

In contrast to San Francisco's "three-factor test," the statute and regulations provide a set of requirements that govern *all* nutrition labeling for unpackaged foods. These include comprehensive inclusion of nutrients, particular formats, and per-serving computation of the amounts of the nutrients. Unless a statement "appears as part of" nutrition information in compliance with all these requirements, it is not "nutrition labeling" as that term is used in subsection (q) and its implementing regulations.

---

[17] "When food is not in package form, the required nutrition labeling information shall be displayed clearly at the point of purchase (e.g., on a counter card, sign, tag affixed to the product, or some other appropriate device). Alternatively, the required information may be placed in a booklet, looseleaf binder, or other appropriate format that is available at the point of purchase." 21 C.F.R. § 101.9(a)(2).

- 20 -

1

**D.    Santa Clara's "Promotional Statements" Theory Does Not Comport with the NLEA or FDA Regulations.**

2

3        Santa Clara does not adopt San Francisco's three-factor test.  It does not adopt any of the

4    theories put forward in *NYSRA I* or *NYSRA II*, either.  Rather, it offers a new theory:  According to

5    Santa Clara, a statement of nutrient content, such as calories on a menu, is a claim only if it is

6    promotional—*i.e.*, if it "promote[s] (or discourage[s]) the consumption of any particular food

7    product."  S.C. Br. 8.  Whether or not a statement promotes or discourages depends on the context

8    in which it is made.  Here the ordinance requires a statement of calories on all the menu items.  In

9    that "context," says Santa Clara, the statements are not promotional.

10        There are at least four things wrong with Santa Clara's theory.

11        1.        The definition of "claims" in the FDA's regulations says nothing about

12    "promotional" statements.  The definition says a claim is "any direct statement" about the level of a

13    nutrient in food.  21 C.F.R. § 101.13(b)(1).

14        2.        Simply as a matter of fact, Santa Clara is not correct to say that the statements it

15    mandates do not "discourage" the consumption of particular food products.  To the contrary, Santa

16    Clara defends the efficacy of its ordinance by asserting that customers will order lower-calorie

17    foods in the target restaurants.  The statements are designed to discourage the consumption of high-

18    calorie foods in chain restaurants.

19        3.        Santa Clara says context matters, and we agree.  However, the NLEA itself and the

20    FDA's implementing regulations define the relevant context for distinguishing between "claims"

21    and "nutrition labeling."  That context is not whether a particular statement appears together with

22    similar statements for other food items.  The relevant inquiry about context is whether the statement

23    "appears as part of the nutrition information required or permitted by [subsection] (q)."  The House

24    Report explains that "[subsection (r)] would apply to any statement that is not required by

25    [subsection (q)], including a statement identical to that on the nutrition label...."  H.R. Rep. 101-

26    538, 1990 U.S.C.C.A.N. at 3349.  The FDA's implementing regulation provides that "[i]nformation

27    that is required or permitted by § 101.9 … to be declared in the nutrition labeling, and that appears

28    as part of the nutrition label, is not a nutrient content claim," but "[i]f such information is declared

- 21 -

1   elsewhere on the label or in labeling, it is a nutrient content claim and is subject to the requirements

2   for nutrient content claims." 21 C.F.R. § 101.13(c). Santa Clara's argument cannot be reconciled

3   with these provisions.

4          4.    In support of its theory, Santa Clara contends that the requirements of 21 C.F.R. §

5   101.9 do not apply to food served in restaurants. S.C. Br. 9. But the requirements of section 101.09

6   specifically apply to food served in restaurants if that food bears "[c]laims or other nutrition

7   information." 21 C.F.R. § 101.9(j)(2). Santa Clara also says that "claims" are limited to statements

8   that "inherently characterize" the nutrition information. S.C. Br. 8 ("the selection of certain [menu]

9   items inherently characterizes them" thus making the statements "claims"). The statute is not

10  limited to claims that "inherently" characterize the nutrition information. Rather, the statute covers

11  any claim that "*expressly **or** by implication* characterizes the level of any nutrient." 21 U.S.C. §

12  343(r)(1)(A) (emphasis supplied).

13         **E.    The "Presumption Against Preemption"**

14         The "presumption against preemption" has been used as a canon of construction to interpret

15  ambiguous preemption statutes. *See*, *e.g.*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Here,

16  however, the outcome of the case does not turn on the meaning of the NLEA's preemption

17  provision, but rather on the *substance* of the NLEA and regulations (S.F. Br. 8). If "100 calories"

18  on a menu is a "claim" within the meaning of subsection (r), the ordinances are preempted because

19  section 343-1(a)(5) unambiguously preempts state requirements for claims "not identical to" those

20  required by federal law. On the other hand, if "100 calories" on a menu is not a "claim," then the

21  statement is not covered by 343-1(a)(5), and the ordinances are not preempted under section 343-

22  1(a)(4) because that section exempts state laws concerning restaurants. None of the words of the

23  preemption statute require construction. Defendants concede that "the statutory text is entirely

24  unambiguous. " S.F. Br. 9; *see* S.C. Br. 11. Therefore, the "presumption" used to interpret

25  preemption statutes is irrelevant. Defendants cite no case—and we have found none—holding that

26  a *substantive* provision of a federal statute should be interpreted in any particular way (either

27  narrowly or broadly) in order to avoid the preemptive effect of an unambiguous preemption statute.

28

### F.    CRA's Theory of the Case Harmonizes the Statute.

As noted above, both sides agree that states are not preempted from requiring restaurants to provide comprehensive nutrition information comporting with subsection (q) and regulations thereunder. 21 U.S.C. § 343-1(a)(4). Both sides also agree that states *are* preempted from regulating "claims" in restaurants in any way that is not "identical to" the FDA's regulations promulgated under subsection (r). 21 U.S.C. § 343-1(a)(5). This does not result in any way in a "regulatory vacuum," or an "information blackout," as defendants contend. *See* S.F. Br. 18; S.C. Br. 4. By operation of § 343-1(a)(4)'s restaurant exemption and the "carve-out" in the statute and regulations, the State of California can require full nutrition labeling in restaurants in accordance with section 343(q) and the FDA's regulations. The NLEA does not preempt such state laws.

Viewed in this light, defendants' reference to legislative history (*e.g.*, S.F. Br. 9-10, S.C. Br. 11-12) confirms that states may require comprehensive nutrition labeling consistent with the requirements of subsection (q) and the FDA's regulations, and they may not do so with regard to "claims." To take one prominent example, defendants quote Senator Metzenbaum's explanation of how the NLEA affects state nutrition labeling requirements for restaurants:

> Because food sold in restaurants is exempt from the nutrition labeling requirements of section 403(q)(1)-(4), the bill does not preempt any State nutrition labeling requirements for restaurants.

136 Cong. Rec. S16607-02, S16608 (Oct. 24, 1990); S.F. Br. 9; S.C. Br. 12. But defendants leave out the rest of the story. In the very next sentence of Senator Mezenbaum's description of the preemption statute, he said:

> If States do require such labeling in restaurants, it is important that they make every effort to make those requirements **consistent** with the requirements of this bill. To the extent that **a consistent format and content** is used, consumers will be able to make greatest use of the nutrition information.

*Id.* (emphasis supplied). The ordinances at issue here are not "consistent" with subsection (q) of the NLEA in several ways—they remove the restaurants' flexibility in choosing the location of the nutrition information, and they do not have subsection (q)'s comprehensive set of information, presented on a per serving basis with standardized formats.

Notably, as well, Senator Metzenbaum was *not* saying that states had free reign to regulate

*claims* in restaurants.[18]  Here, San Francisco and Santa Clara County have eschewed comprehensive nutrition labeling consistent with the requirements of subsection (q).  Contrary to the approach taken in the NLEA, defendants have chosen instead to require consumers to focus on isolated statements.  That is not an attempt to fill a regulatory gap.  It is an attempt to regulate in an area where Congress has forbidden it.

## II.    THE ORDINANCES ARE PREEMPTED BY STATE LAW.

In 2006, California's Legislature enacted the California Retail Food Code ("Food Code"). The Food Code is intended "to occupy the whole field of health and sanitation standards for retail food facilities."  Cal. Health & Safety Code § 113705.  As one court has observed, the Food Code's preemption clause uses "the type of language accepted as expressly preempting all local power over a given topic."  *Viacom Outdoor, Inc. v. City of Arcata*, 140 Cal. App. 4th 230, 240 & n.7 (2006).

Defendants respond that labeling of food served in restaurants is not within the field occupied by the Food Code, contending that preemption provision reaches only the "purity, safety, and adulteration of food."  S.F. Br. 20; S.C. Br. 14 (aimed at "preventing transmission of communicable diseases").  That is not correct.  The occupied field is not stated to be "food safety," or "communicable diseases," as defendants contend, but "*health* and sanitation standards for retail food facilities [*i.e.,* restaurants]."  Cal. Health & Safety Code § 113705 (emphasis supplied).  As defendants themselves admit, one of the express purposes of the Food Code is to "safeguard public health" by making sure that food in restaurants is "honestly presented."  S.F. Br. 19-20 (quoting Cal. Health & Safety Code § 113703); S.C. Br. 14 (same).  The local ordinances at issue here also seek to promote public health by regulating how food in restaurants may be honestly presented. Indeed, in defending the ordinances, defendants have expressly invoked their "power to protect public health."  S.F. Br. 7; S.C. Br. 14 ("protecting and advancing public health").  Thus, they have even contended—albeit incorrectly—that menus are "deceptive" (*i.e.*, dishonest) without calories.

---

[18] Other legislative and administrative materials relied on by defendants (S.F. Br. 9-10) and their *amici* are consistent with these views.  For example, the FDA's Informal "Q&A" Guide for Restaurants repeats that states can require "the nutrition labeling of [restaurant] foods," but only for foods that "do not bear a claim."  FDA, *Food Labeling: Questions and Answers*, attached as Ex. 3, p. 10, to Marquez Decl.

1   S.C. Br. 22-25; S.F. Br. 25.  Thus, the purposes (public health) and means (labeling to ensure honest

2   presentation) of the ordinances overlap with those of the Food Code.

3       Santa Clara mistakenly states that the Food Code "does not include a single reference to

4   food labeling or consumer information."  S.C. Br. 15.  The Food Code contains an Article entitled

5   "Consumer Information."  The "Consumer Information" Article includes sections entitled

6   "labeling" (§§ 114089, 114089.1), as well as "other forms of information" (§ 114090), "consumer

7   advisory" (concerning undercooked foods in restaurants) (§ 114093) and "notice to consumer"

8   (concerning restaurant confectionaries made with alcohol) (§ 114093.1).  Contrary to defendants'

9   argument, this Article evidences a pattern of regulation in furtherance of one of the purposes of the

10  Food Code—to "safeguard public health" by making sure that food in restaurants is "honestly

11  presented" with appropriate "consumer information," including "labeling."

12      Most specifically, the "Consumer Information" Article of the Food Code contains a

13  provision incorporating the comprehensive labeling and information regulations promulgated under

14  the NLEA when it comes to prepackaged foods in restaurants, though not to other foods sold in

15  restaurants.  Cal. Health & Safety Code § 114089(a).  San Francisco contends that the Food Code

16  contains only a "solitary reference" to food labeling in restaurants.  That "solitary reference,"

17  however, is an express incorporation by reference of 21 C.F.R. Part 101, *in its entirety*.  The statute

18  incorporates more than 200 single-spaced pages of regulations.  Those regulations are of the same

19  force and effect as if they had been written out in the text of the statute itself.

20      San Francisco's reliance on two repealed state statutes—the California Uniform Retail Food

21  Facilities Law and the California Restaurant Act—is misplaced.  San Francisco argues that nutrition

22  labeling of food served in restaurants was not a feature of these earlier provisions, so it is not

23  properly within the field *now* regulated by the Food Code.  However, Article 8 of the Food Code

24  was not derived from predecessor California laws.[19]  The Food Code made "substantive changes" to

25

---

26  [19] In large part, the Food Code was based on a model statute published by the FDA itself.  *See*
    Senate Health Committee Report on SB 144, p. 8 (April 27, 2005) (App. Ex. N).  The labeling
27  provisions discussed above are based on this model.  *Compare* § 114089 *with* FDA, 2005 Model
    Food Code § 3-602.11 (App. Ex. O).

28

1    prior law.  *See* Assembly Health Committee Report on SB 144 (July 5, 2005) (App. Ex. P).  The

2    *expansion* of the field covered by the Food Code (a "substantive change" from prior law) supports

3    the conclusion that the Food Code now covers the field of "Consumer Information" in restaurants,

4    as regulated by Chapter 4, Article 8 of the new law.[20]

5    **III.    THE ORDINANCES VIOLATE THE FIRST AMENDMENT.**

6         The major premise of defendants' First Amendment argument is that the ordinances are

7    "disclosure" laws and that such laws can be justified by showing nothing more than a reasonable

8    relationship between the law and some legitimate state interest.  Although the ordinances would

9    violate the First Amendment even if they could fairly be characterized as disclosure laws, they are

10   not disclosure laws.  By San Francisco's reckoning, its ordinance exempts approximately 92% of

11   the restaurants in that City from its reach.  S.F. Br. 30.[21]  Santa Clara's ordinance applies to a grand

12   total of nine restaurants.  Nor do the ordinances reach food service facilities in places like schools,

13   hospitals, or other government-run facilities.  All those restaurants and cafeterias must "disclose"

14   nothing.  And most of the restaurants that *are* subject to the regulation already "disclose" the level

15   of calories in their foods in accordance with regulations promulgated by the FDA.  They also

16   "disclose" the level of other nutrients in their foods—fat, saturated fat, cholesterol, sodium, total

17   carbohydrates, sugars, dietary fiber, and total protein.

18        These ordinances are thus quite different from an ordinary disclosure law.  They require the

19   targeted restaurants to shout the number of calories at their customers.  By design and effect, the

20   laws discourage customers from buying the food of the targeted restaurants and drown out the other

21   health messages that some restaurants had been conveying.  *See supra* pp. 5-6.

22

23   ―――――――――――――――
     [20] Finally, defendants rely on *Bravo Vending v. City of Rancho Mirage*, 16 Cal. App. 4th 383
24   (1993).  The court actually found that the state and local laws overlapped.  *Id.* at 403, 408.
     However, the court applied a special preemption rule applicable only "when the state has preempted
25   the regulatory field regarding the criminal aspects of a particular activity," and then only when the
     local ordinance "(1) is intended to discourage the activity proscribed by state law and (2) does not
26   attempt to either expand or reduce the degree to which the particular activity regulated by state law
     is criminally proscribed."  *Id.* at 410.  That rule has nothing to do with this case.

27   [21] We accept the representation that San Francisco's law applies to 372 of that city's 4,500
     restaurants.  This is 8% of the city's restaurants, not 12% as San Francisco claims.  S.F. Br. 30.
28

CASE NOS. CV-08-3247 (CW) and CV-08-3685 (CW); PLAINTIFF'S REPLY MEMORANDUM IN FURTHER
SUPPORT OF ITS MOTIONS FOR DECLARATORY RELIEF AND A PRELIMINARY INJUNCTION

**A.     The Ordinances Cannot Pass Muster Under *Central Hudson*.**

    **1.     The Ordinances Are More Extensive than Necessary to Achieve the Government's Asserted Interest in Curbing Obesity.**

Under the Supreme Court's leading commercial-speech case, *Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557 (1980), when the government regulates commercial speech, it must employ a means "narrowly tailored to achieve the desired objective." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) (internal quotations omitted).  Thus, if the government can accomplish its stated purpose with alternatives "less intrusive" to the restaurants' First Amendment rights, then the regulation is "more extensive than necessary" and must be struck down. *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 491 (1995).

Here, defendants have rejected less burdensome alternatives such as brochures, counter-mats, posters, tray-liners, table tents, stanchions, and flip charts.  They dismiss these less intrusive alternatives without offering any reason why providing nutrition information in other possible formats could not achieve their stated purpose.  Defendants argue that "nutrition information is most valuable ... when it is provided at the point of purchase."  S.F. Br. 32; S.C. Br. 28 ("at the point of decision making").  The rejected alternatives are all at the point of purchase.  *See* 21 C.F.R. §§ 101.10, 101.45.  Thus, defendants arbitrarily rejected "less intrusive" alternatives, and instead restricted speech more than necessary.

    **2.     Defendants Cannot Demonstrate that the Ordinances Directly Advance Their Asserted Interest in Curbing Obesity.**

*Central Hudson* also requires defendants to prove that the ordinances advance the government's asserted interest in combating obesity in a "direct and material way." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993).  The courts rigorously apply this standard, consistently striking down regulations on speech—even those based on substantial government interests—unless the government has proven, with evidence, that the law regulating speech in fact directly advances the stated government interest. *See, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996) ("We can agree that common sense supports the conclusion that a prohibition against price advertising ... will tend to mitigate competition and maintain prices at a higher level than would

- 27 -

1    prevail in a completely free market....  However, without any findings of fact, or indeed any

2    evidentiary support whatsoever, we cannot agree with the assertion that the price advertising ban

3    will significantly advance the State's interest in promoting temperance.") (footnote omitted); *Rubin*,

4    514 U.S. at 489-90; *Ibanez v. Florida Dept. of Bus. & Prof. Reg., Bd. of Accountancy*, 512 U.S. 136,

5    144 (1994) ("To survive constitutional review, the Board must build its case on specific

6    evidence...."); *Edenfield*, 507 U.S. at 771 (state "present[ed] no studies that suggest personal

7    solicitation of prospective business clients by CPA's creates the dangers of fraud, overreaching, or

8    compromised independence that the Board claims to fear.").[22]

9        Here the government interest asserted is the public health—more specifically, the interest in

10   reducing obesity.[23]  In our opening briefs, we demonstrated that there is an absence of scientific

11   evidence of any kind supporting the conclusion that requiring restaurants to display certain

12   nutritional criteria will reduce obesity rates in San Francisco and Santa Clara, or even that it will

13   decrease caloric intake.  As discussed above (*supra* pp. 6-11), defendants' "evidence" consists of

14   speculation and conjecture.  This "evidence" was all known to San Francisco when it conceded—

15   correctly—that "there are no studies as of yet showing the actual impact" of the proposed law-

16   change.  S.F. *Amicus* Br. 18.

---

[22] Santa Clara relies on *Association of Nat'l Advertisers v. Lungren*, 44 F.3d 726, 733-34 (9th Cir. 1994).  There, the court held that "the record contains abundant support for the proposition that green marketing boosts consumer demand for the allegedly recycled or biodegradable product."  *Id.* at 733.  Here, as discussed above (*see supra* pp. 6-11), the record is devoid of evidence linking mandatory calorie listings on menus to any reduction in obesity.

[23] Santa Clara asserts an additional and separate interest in "educating the public" by spreading "information."  S.C. Br. 26.  Santa Clara County is, of course, free to spend its own funds and devote its own resources to "educating the public."  That is not what it is doing.  It is requiring restaurants to provide information.  Forcing private citizens to provide information for information's sake is not a legitimate government interest.  Thus, in *International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 73-74 (2d Cir. 1996), the Court observed, "[w]e are aware of no case in which consumer interest alone was sufficient to justify requiring a product's manufacturers to publish the functional equivalent of a warning about a production method that has no discernable impact on a final product....  Were consumer interest alone sufficient, there is no end to the information that states could require manufacturers to disclose....  Absent, however, some indication that this information bears on a reasonable concern for human health or safety or some other sufficiently substantial governmental concern, the manufacturers cannot be compelled to disclose it."

In this regard, San Francisco's selective quotation from the Keystone Center's Final Report, (previously attached as Exhibit F to Plaintiff's Appendix) is misguided.  The Keystone Report states that there are "pros" and "cons" to providing information on menus.  According to the Keystone Report, there is no consensus whatsoever on what format is best for providing nutrition information in restaurants (Keystone Report 81), and available scientific information is "limited" (Keystone Report 69), with "a clear need for more research" (Keystone Report 83).  While the scientists responsible for compiling the Keystone Report express a *policy preference* for taking *some action*, that preference cannot be translated into scientific evidence meeting the *legal standard* imposed on the government when it regulates speech.

**B.**    **Compelled Speech Is Subject to the Same Level of Scrutiny as Government Suppression of Speech.**

Government-compelled statements trigger the same level of scrutiny under the First Amendment as government-compelled silence.  In *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001), the Court stated that "commercial speech [is] entitled to lesser protection" than other forms of speech.  Nonetheless, the Court struck down a statute that compelled a commercial actor to subsidize speech that it did not want to subsidize, applying traditional "compelled speech" cases to protect the speaker's First Amendment rights.  *Id.* (citing and following *Wooley v. Maynard,* 430 U.S. 705 (1977), and *West Virginia State Bd. of Ed. v. Barnette,* 319 U.S. 624 (1943)).  "[C]ompelling cognizable [commercial] speech officially is just as suspect as suppressing it, and is typically subject to the same level of scrutiny."  *Glickman v. Wileman Bros.*, 521 U.S. 457, 481 (1997) (Souter, J., dissenting).[24]

This is not to say that the government can *never* compel statements by commercial actors— only that compelled statements are subject to the *same* level of scrutiny as government suppression of speech.  Here, that is the intermediate scrutiny required by *Central Hudson*:  just as government *suppression* of commercial speech is scrutinized under the *Central Hudson* standard, so is its *compulsion* of commercial speech (unless such speech is misleading).

---

[24] The *Glickman* majority did not disagree on this point.

1    Defendants attempt to distinguish *United Foods* by pointing out that it involved a compelled

2    subsidy, while this case involves compelled speech. But the *United Foods* Court observed that

3    forcing a person to "utter the speech itself" is a *greater* infringement on First Amendment freedoms

4    than "simply" requiring the person to subsidize the speech. 533 U.S. at 413; *accord Johanns v.*

5    *Livestock Mktg. Ass'n*, 544 U.S. 550, 568-69 (2005) (Thomas, J., concurring) ("The payment of

6    taxes to the government for purposes of supporting government speech is not nearly as intrusive as

7    being forced to 'utter what is not in [one's] mind,' or to carry an unwanted message on one's

8    property.") (quoting *Barnette*, 319 U.S. at 634).

9    Defendants also argue that *United Foods* is not instructive because the ordinances "do[] not

10    force restaurants to voice a message or to take a position in any ongoing debate," but only require

11    restaurants to state "factual and uncontroversial information" with which they agree. S.F. Br. 27

12    (quotations and citations omitted); *see* S.C. Br. 16-17, 21. As we have demonstrated above (*see*

13    *supra* pp. 2-6), there is no question that defendants have chosen sides in an ongoing debate about

14    weight loss, and that they are compelling restaurants to deliver a shorthand "health message" with

15    which the restaurants disagree—namely that calories are the most significant health information

16    about food and that customers must look at calorie counts before ordering. The impracticality of

17    listing comprehensive nutritional information on menus and menu boards effectively makes the

18    mandate to list calories into a mandate to emphasize calorie content as the most important

19    nutritional factor to consider and as a shorthand health message.

20    Moreover, in "disclosure" cases, the "message" triggering First Amendment scrutiny may be

21    the *significance* of particular facts. Thus, in *International Dairy Foods Ass'n v. Amestoy*, 92 F.3d

22    67 (2d Cir. 1996), the Second Circuit struck down a law that required labeling to disclose the use of

23    rBST growth hormone in milk cows, accepting plaintiff's argument that the law "compel[led] them

24    'to convey a message regarding the ***significance*** of rBST use that is expressly contrary to their

25    views.'" 92 F.3d at 71-72 (emphasis supplied; internal quotations omitted). To state the obvious,

26    the plaintiffs in *International Dairy Foods* did not dispute that they administered rBST to their milk

27    cows, just as the restaurants do not dispute that their food contains specific amounts of calories.

28    There, as here, the very disclosure of this "factual information" injected the plaintiff into a health

- 30 -

1    debate and required them to espouse viewpoints about the *significance* of the facts—viewpoints that

2    they did not support.  Similarly, in *United Foods*, the promotional material at issue conveyed no

3    "message" in the narrow sense that the defendants use that term.  Instead, it listed recipes and

4    conveyed basic information.  *United Foods*, 533 U.S. at 431 (appendix).  The Court had no

5    difficulty concluding that this information was a "message" with which the plaintiff disagreed.  *Id.*

6    at 411.

7            Defendants also state that restaurants can "publicize their [own] views" and add "clarifying"

8    information to the compelled statements.  S.C. Br. 22; S.F. Br. 27; Rudd *Amicus* Br. 5.  This

9    argument further demonstrates that the ordinances require restaurants to convey a point of view

10   with which they disagree.  Permitting restaurants to disavow the message that defendants are

11   forcing them to convey does not solve the First Amendment harm.  "The danger that [a citizen] will

12   be required to alter its own message as a consequence of the government's coercive action is a

13   proper object of First Amendment solicitude."  *Pacific Gas & Elec. Co. v. Public Utilities Comm'n*

14   *of California,* 475 U.S. 1, 16 (1986); *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 99 (1980)

15   (Powell, J., concurring) (the fact that a speaker "is free to dissociate himself from the views

16   expressed on his property cannot restore his 'right to refrain from speaking at all.'" (citation

17   omitted)).

18           Finally, defendants attempt to draw a distinction between compelled "disclosures of purely

19   factual information" and "a message or a viewpoint."  S.F. Br. 28.  As we have already shown, the

20   ordinances do compel restaurants to convey a message and a viewpoint.  But the distinction is a

21   false one in any event.  The First Amendment's protection of those who wish not to speak "applies

22   not only to expressions of value, opinion, or endorsement, but equally to statements of fact the

23   speaker would rather avoid."  *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,

24   515 U.S. 557, 573-74 (1995) (citations omitted).  In *Riley v. National Federation of the Blind of*

25   *N.C., Inc.*, 487 U.S. 781 (1988), the Court specifically rejected the argument defendants make here,

26   refusing to distinguish earlier compelled-speech cases "simply because [the earlier cases] involved

27   compelled statements of opinion while here we deal with compelled statements of 'fact':  either

28   form of compulsion burdens protected speech."  487 U.S. at 797-98.  Again, this is not to say that

- 31 -

1  the government may *never* compel a commercial speaker to state facts—only that such compulsion

2  is subject to the same level of scrutiny as compelled statements of opinion and the same level of

3  scrutiny as suppression of speech.

4  **C.    "Reasonableness" Review Is the Wrong Standard.**

5  The ordinances are designed to intrude directly on speech by forcing a targeted group of

6  vendors to make statements to their customers that are intended to discourage the customers from

7  buying the targeted vendors' products.  It is not too much to ask that the government defend its

8  decision to force speech in this way by satisfying the burden of proof required to survive scrutiny

9  under traditional commercial speech doctrine.  The *Central Hudson* standard protects First

10  Amendment principles and comports with the holding of the Supreme Court in *United Foods*

11  expressly limiting "reasonableness" review to cases of misleading speech.

12  **1.    First Amendment Doctrine Robustly Protects Commercial Speech.**

13  Commercial speech is of vital importance to First Amendment values.  As the Supreme

14  Court explained in *United Foods*, "[t]he subject matter of the speech may be of interest to but a

15  small segment of the population; yet those whose business and livelihood depend in some way upon

16  the product involved no doubt deem First Amendment protection to be just as important for them as

17  it is for other discrete, little noticed groups in a society which values the freedom resulting from

18  speech in all its diverse parts."  533 U.S. at 410.

19  Defendants rely on *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of*

20  *Ohio*, 471 U.S. 626 (1985).  But *Zauderer* began its analysis by reiterating the *Central Hudson*

21  standard, not departing from it.  471 U.S. at 638 (citing *Central Hudson*).  Defendants suggest that

22  *all* "disclosure requirements" are entitled to only minimal First Amendment protections, no matter

23  the reason for the state's regulation.  The *Zauderer* Court held no such thing:  "We do not suggest

24  that disclosure requirements do not implicate the advertiser's First Amendment rights at all."  *Id.* at

25  651.  Rather, "we hold that an advertiser's rights are adequately protected as long as disclosure

26  requirements are reasonably related to the State's interest in preventing ***deception of consumers***."

27  *Id.* (emphasis supplied; footnote omitted).

28  This aspect of *Zauderer* derives directly from the *absence* of First Amendment protection

- 32 -

1   for misleading and deceptive commercial speech—just as obscenity, fighting words, and statements

2   necessary to commit crimes do not merit constitutional protection.  *See R.A.V. v. City of St. Paul*,

3   505 U.S. 377, 389 (1992).  In both *Central Hudson* and *Zauderer*, the Court explained that "false,

4   deceptive, or misleading" commercial speech is entitled to no First Amendment protection.

5   *Zauderer*, 471 U.S. at 638; *Central Hudson*, 447 U.S. at 563.

6           In the years since *Zauderer*, the Court has continued to recognize the robust protection

7   afforded to commercial speech.[25]  *United Foods* is the most recent such case in that line.  *See* 521

8   U.S. at 409 ("The commercial marketplace, like other spheres of our social and cultural life,

9   provides a forum where ideas and information flourish.") (quotation omitted).

10                   **2.    *United Foods* Expressly Rejects the "Reasonableness" Standard.**

11          In *United Foods*, the Court specifically limited *Zauderer* to laws "preventing deception of

12  consumers" by misleading speech.  533 U.S. at 416 (quotations omitted).  San Francisco contends

13  that *United Foods* was simply distinguishing the *Zauderer* case on its facts, rather than applying the

14  robust commercial speech doctrine developed in earlier cases and articulated in the *Glickman*

15  dissent discussed below.  S.F. Br. 24-25.  That seems unlikely, as the government (the petitioner in

16  *United Foods*) did not even cite *Zauderer* or otherwise argue its applicability.[26]  The *United Foods*

17  Court raised and discussed *Zauderer* in order to explain why its holding was "not inconsistent with

18

19  [25] *See Edenfield*, 507 U.S. at 767 ("[T]he general rule is that the speaker and the audience, not the government, assess the value of the information presented.  Thus, even a communication that does

20  no more than propose a commercial transaction is entitled to the coverage of the First Amendment."); *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 481, 490 (1997) (Souter,

21  J., dissenting) ("[C]ompelling cognizable [commercial] speech officially is just as suspect as suppressing it, and is typically subject to the same level of scrutiny. * * * [We disagree with the]

22  assumption that regulation of commercial speech is justified solely or largely on preservation of public access to truthful information....  Truth is indeed a justifiable objective of commercial speech

23  protection, but so is nonmisleading persuasion directed to the advertiser's own choice of what to promote." (citation omitted)); *44 Liquormart*, 517 U.S. at 522 (Thomas, J., concurring) ("I do not

24  see a philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech."); *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 636 (1995) (Kennedy,

25  J., dissenting) ("[E]ven so-called commercial speech has become an essential part of the public discourse the First Amendment secures."); *Rubin*, 514 U.S. at 494 (Stevens, J., concurring)

26  ("[E]conomic motivation or impact alone cannot make speech less deserving of constitutional protection....  Neither can the value of speech be diminished solely because of its placement on the

27  label of a product.").

28  [26] Brief for the United States in *United Foods*, No. 00-276.

1   the Court's decision in *Zauderer*," and in order to do so, it rejected the reasonable relationship test

2   because *United Foods* was not a case about a speaker misleading consumers.  *See United Foods*,

3   533 U.S. at 416.

4          The Court's opinion in *United Foods* comports with the reasoning of a dissent in an earlier

5   case, *Glickman v. Wileman Bros.*, 521 U.S. 457, 490-91 (1997) (Souter, J., dissenting).  That

6   dissent, joined by four members of the Court, explained specifically that "*Zauderer* carries no

7   authority for a mandate unrelated to the interest in avoiding misleading or incomplete commercial

8   messages."  *Glickman,* 521 U.S. at 491.  The majority in *Glickman* did not disagree with this

9   limitation of *Zauderer*.  And in *United Foods*, six members of the Court agreed with this limitation

10  of *Zauderer*.  As one commentator explaining *United Foods* put it, "[w]hile the *Zauderer* test could

11  have potentially raised some interesting questions regarding the application of *Central Hudson*, the

12  Court has limited the *Zauderer* test to cases involving misleading advertising."[27]  To say, as

13  defendants and their *amici* do, that the compelled speech doctrine does not apply to commercial

14  speech is to ignore the reasoning of *United Foods*.[28]

15         Defendants rely heavily on the Second Circuit's decision in *National Electric Manufacturers*

16  *Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001).  That case purported to expand *Zauderer's* reasonable

17  relationship test to all commercial "disclosure" laws.  But the parties in *Sorrell* did not bring *United*

18  *Foods* to the court's attention, and the *Sorrell* court simply did not address whether *United Foods*

19  limited *Zauderer*.[29]

---

[27] Emily Buchanan Buckles, *Food Fights in the Courts: The Odd Combination of Agriculture and First Amendment Rights*, 43 Hous. L. Rev. 415, 435 (2006) (footnote omitted).

[28] One of defendants' *amici* contends, in an article, that *United Foods* is a "seriously misguided" case, "a mistake of the first magnitude" and "in serious tension with *Zauderer*."  Robert C. Post, *Transparent & Efficient Markets: Compelled Commercial Speech & Coerced Commercial Associations in* United Foods*, Zauderer, and* Abood, 40 Val. U. L. Rev. 555, 557, 575-77 (2006).  Contrary to *amici*, however, the Supreme Court has not withdrawn from *United Foods* or from the way it limited *Zauderer* in *United Foods*.  It remains the law of the land.

[29] In addition to *Sorrell*, defendants seek support from two Ninth Circuit cases, but neither one supports expansion of *Zauderer*.  The first case did not even involve commercial speech. *Environmental Defense Center, Inc. v. EPA*, 344 F.3d 832, 849-50 (9th Cir. 2003).  In addition, that case distinguished *United Foods* on the ground that the regulation at issue in *United Foods* "was not part of a broader regulatory apparatus already constraining the plaintiff's autonomy in the relevant arena."  *Id*. at 851 n.26.  What was true in *United Foods* is true here—the ordinances are not part of a broad regulatory apparatus "already constraining the plaintiff's autonomy."  The other Ninth

---

1        **D.    The Ordinances Cannot Be Saved with Accusations of Deception.**

2        Defendants argue that their ordinances aim to prevent "consumer confusion and even

3  deception regarding the calorie content of chain restaurant meals." S.F. Br. 25; S.C. Br. 22-25.

4  Menus without calories listed are not misleading speech. A menu saying "Garden Salad, $1.99" or

5  "Taco, 99¢" or "Cheeseburger and fries, $3.99" is not misleading or deceptive in any way. Such

6  transactions have been commonplace since the beginning of commercial food establishments

7  without any suggestion that the purchasers of the food were being deceived because they did not

8  know the specific number of calories in the food.

9        Moreover, as we noted in our opening briefs, where the government's regulation has

10  substantial gaps, the government must put forth a convincing reason for "pegging" its restriction "to

11  the identity of the owners or operators" affected. *See, e.g., Greater New Orleans Broad. Ass'n v.*

12  *United States*, 527 U.S. 173, 191 (1999); *Valley Broad. Co. v. United States*, 107 F.3d 1328, 1334-

13  35 (9th Cir. 1997). Here, as in *Greater New Orleans*, "the Government presents no sound reason

14  why such lines bear any meaningful relationship to the particular interest asserted." 527 U.S. at

15  193. Defendants do not explain why they have exempted all but a few restaurants. In San

16  Francisco, 8% of restaurants are affected. Santa Clara devotes substantial effort to arguing that

17  menus without calories are "deceptive and misleading," and that consumer confusion is "rampant."

18  S.C. Br. 23. Yet its ordinance applies to nine restaurants in a county with a population of 1.7

19  million. Defendants point to obesity among children, but their ordinances do not even reach school

20  cafeterias, where children eat every day. If menus without calories were actually deceptive,

21  defendants' ordinances would be a gross mismatch between the disease and the cure.

22        **E.    This Case Does Not Threaten Consumer Protection Laws.**

23        Defendants and their *amici* contend that "countless" federal and state disclosure statutes and

24

25  ─────────────────
   Circuit case, *United States v. Schiff,* 379 F.3d 621 (9th Cir. 2004), concerns a government regulation
   "to prevent the deception of consumers." *Schiff,* 379 F.3d at 631. Finally, defendants rely on
26  *Pharmaceutical Care Management Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005), but that too was a
   case about disclosure requirements for the purpose of "protecting covered entities from questionable
27  [] business practices" and therefore served the state's interest in "preventing deception." *Id.* at 316.
   The case does not expand *Zauderer* in the way defendants suggest.

28

─────────────────────────────────────────
- 35 -

1  regulations will be jeopardized if this Court applies the law of the land embodied in *Central Hudson*

2  and other Supreme Court precedents.  But defendants suggest no reason why the analytical

3  framework required by *Central Hudson* and its progeny is inadequate to balance the governmental

4  interests at stake in such statutes against the free-speech interests of private citizens.  Indeed, when

5  the FDA promulgated its recent regulation requiring disclosure of trans-fatty acids in nutrition

6  labeling, it concluded that the regulation would survive First Amendment scrutiny under any

7  applicable standard of review, including *Central Hudson*.  68 Fed. Reg. 41434, 41439-40 (July 11,

8  2003).

9      Defendants and their *amici* cite laws that (a) are directed toward preventing deceptive

10  speech in commercial transactions,[30] (b) do not concern commercial speech at all,[31] or (c) could

11  easily be subject to review under *Central Hudson* without any grave threat to the fabric of our

12  society.[32]  There is no reason to suspect that continuing to apply *Central Hudson* as the law of the

13  land would be a death knell for state and federal laws requiring warnings about products that the

14  government has properly determined to be inherently dangerous, such as cigarettes, pesticides,

15  carcinogens, and alcoholic beverages.  Such laws have proven robust in the three decades that

16  *Central Hudson* has been on the books.

17  **IV.    THE ORDINANCES VIOLATE THE CALIFORNIA CONSTITUTION.**

18      In our opening briefs, we showed that the California Supreme Court and the California court

19  of appeals have adopted the *Central Hudson* test as the standard for evaluating compelled

20  commercial subsidies and compelled commercial speech.  *Gerawan Farming, Inc. v. Kawamura*, 33

21

---

22  [30] *See, e.g.*, 15 U.S.C. § 78*l* (registration requirements for securities, including anti-fraud
    disclosures); 21 C.F.R. § 202.1 (regulating drug advertisements to protect consumers from

23  confusing or misleading advertisements); 15 U.S.C. §§ 68-68*j* (requiring labeling of wool products'
    actual content, to "protect consumers against the concealment of substitutes for wool in products

24  claimed to be made wholly or partially of wool" (*Marcus v. FTC*, 354 F.2d 85, 87 (2d Cir. 1965));
    15 U.S.C. §§ 1667-1667f (protecting consumers against inadequate and misleading leasing

25  information); Cal. Civ. Code § 1916.5(a)(6) (same, for consumer loans).

26  [31] *See, e.g.*, Cal. Corp. Code § 12310(b) (corporate purpose in articles of incorporation).

27  [32] 15 U.S.C. § 1333 (cigarette labeling) (*cf. Lorillard*, 533 U.S. 525); Cal. Health & Safety Code
    § 25249.6 (warnings to persons who will be intentionally exposed to carcinogens); 21 U.S.C. § 343
    (nutrition fact panel); Cal. Pub. Res. Code § 15013(b) (toxic materials in batteries).

28

1   Cal. 4th 1, 15 (2004) ("*Gerawan II*"); *ARP Pharmacy Servs., Inc. v. Gallagher Bassett Servs., Inc.*,

2   138 Cal. App. 4th 1307, 1316 (2006).

3        Defendants respond by contending that "California courts apply the *Zauderer* reasonable

4   relationship test to factual commercial disclosure requirements." S.F. Br. 33 (citing *People v.*

5   *Anderson*, 235 Cal. App. 3d 586 (1991)); *see* Rudd *Amicus* Br. 21 (citing *Perlman v. People*, 99

6   Cal. App. 3d 568 (1979)). That is not a fair description of the cited cases. Both cases involved the

7   state's interest in preventing consumer deception. In *Perlman*, the court concluded that "[t]he

8   disclosure requirements are reasonably related to the purpose of the regulation—namely, to detect

9   and *protect the public from fraudulent solicitations*…." 99 Cal. App. 3d at 579 (emphasis

10  supplied). And in *Anderson*, the court held: "where commercial speech is affected, the state need

11  only show a reasonable relationship between the statute and the state's interest in *preventing*

12  *deception of consumers*." 235 Cal. App. 3d at 591 (emphasis supplied). Neither case can be fairly

13  read to expand *Zauderer* beyond cases of deception and fraud.

14       Defendants also contend that California courts afford "respectful consideration" to decisions

15  by the United States Supreme Court on constitutional matters. S.F. Br. 33; S.C. Br. 29. That is

16  true. And it counsels for *following*—rather than ignoring—*United Foods*. Of course, this Court

17  need not guess at the standard that would be applied by the California Supreme Court, for that Court

18  has specifically held that a compelled subsidy cannot "pass muster [under the California

19  Constitution] simply because it is rationally based." *Gerawan II*, 33 Cal. 4th at 22. Defendants

20  attempt to distinguish this holding as inapplicable to compelled speech itself. S.F. Br. 34-35. But a

21  law that forces a speaker not merely to *pay for* speech but actually to *utter the speech* is subject to

22  greater scrutiny, not less, because compelled speech is more onerous than compelled funding. *See*

23  *United Foods*, 533 U.S. at 413; *Johanns*, 544 U.S. at 568-69.

24       Finally, defendants rely on a superior court case regarding Proposition 65's "safe harbor"

25  provision. S.F. Br. 33-34 (citing *Environmental Law Foundation v. Laidlaw Transit Servs.*, No.

26  451832, 2008 WL 2157672 (Cal. Super. Jan. 8, 2008)); S.C. Br. 29 (same). The court's decision in

27  that case is unpersuasive, as the court failed to cite either *Gerawan II* or *ARP Pharmacy Services,*

28  *Inc.* In *ARP Pharmacy Services*, concerning a compelled speech law, the court stated: "[t]he

- 37 -

constitutional validity of the regulation of commercial speech is tested under an intermediate standard, articulated by the United States Supreme Court in *Central Hudson* ... and adopted by the California Supreme Court." 138 Cal. App. 4th at 1316. Where, as here, an intermediate appellate court has articulated a rule of state law, that interpretation should not "be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. American Telephone & Telegraph Co.*, 311 U.S. 223, 236-37 (1940).

## CONCLUSION

The Court should grant the motions for a preliminary injunction and a declaratory judgment that the ordinances are preempted.


Dated:  August 22, 2008                ARNOLD & PORTER LLP



By: _____/s/_____
                      Trenton H. Norris
                   Attorneys for Plaintiff
              CALIFORNIA RESTAURANT
                      ASSOCIATION